## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| COMPLETE LOGISTICAL SERVICES, LLC, | * | Civil Action No.: 18-3799 |
| Plaintiff | * | |
| | * | Judge: Eldon E. Fallon |
| versus | * | |
| | * | Magistrate Judge: Michael North |
| DONALD RULH, JR., ARNOLD BAKER, | * | |
| MORRIS KAHN, MICHELLE ELWELL, and | * | |
| SHAWANA HARRIS, | * | |
| Defendants. | * | |

## STATEMENT OF UNCONTESTED FACTS

Defendant/counterclaimant Donald Rulh, Jr. respectfully submits this *Statement of Uncontested Facts* in further support of his *Motion for Partial Summary Judgment* and avers as follows:

1. Mr. Rulh is a second-generation maritime professional and has literally grown up in the maritime industry, owning and operating different maritime businesses with his family. Second Declaration of Donald Rulh, Jr. (hereafter, "Rulh 2nd Dec.") ¶ 3, Exhibit "A", hereto.

2. As a young child, Mr. Rulh would accompany his father and uncle going onto foreign flagged vessels along the United States Gulf Coast. Rulh 2nd Dec., ¶ 4.

3. In high school, Mr. Rulh worked in dispatching and commercial transportation, servicing clients in the oil and gas and international shipping industries. *Id.*

4. After college, in 1996, Mr. Rulh opened Ocean Air Services, Inc. with his father and uncle, providing freight forwarding services for shipping companies doing business along the United States Gulf Coast and the Mississippi River. *Id.*

5. Mr. Rulh has also worked as a domestic and international shipping agent/manager for

the offshore and inshore international shipping industry. *Id.*

6. As part of this job, Mr. Rulh provided coordination services for domestic and international ship owners and cargo charters in the United States and abroad. *Id.*

7. Throughout his career, Mr. Rulh has built countless contacts in the maritime industry. Rulh 2nd Dec., ¶ 5.

8. In June of 2010, Mr. Rulh brought together Spencer Sens, a long-term employee of one of his family's customers, and Dr. Natchez Morrice, III, a family friend with no maritime background, to form CLS. Rulh 2nd Dec., ¶ 6.

9. CLS is a Louisiana company that has or has had offices in Gretna, Harvey, New Orleans East, Chalmette, and Broussard, Louisiana. Rulh 2nd Dec., ¶ 7.

10. CLS's Operating Agreement was executed in August of 2011. Rulh 2nd Dec., ¶ 8.

11. CLS started out as a project management and logistics company and almost immediately obtained work on the NASA forensic investigation of the BP Oil Spill Macondo Oil Well Blowout Preventer. Rulh 2nd Dec., ¶ 9.

12. At the time of CLS's formation, Mr. Sens was working for Agility Logistics (one of Mr. Rulh's family's clients), and Dr. Morice did not have any maritime experience, so Mr. Rulh ran CLS almost singlehandedly. Rulh 2nd Dec., ¶ 10.

13. During Mr. Rulh's work on the Macondo project, he began doing middleman staffing work on behalf of CLS, which would end up being the primary focus of its business. Rulh 2nd Dec., ¶ 11.

14. The staffing business relies heavily on relationships, which Mr. Rulh had cultivated throughout his life and career. Rulh 2nd Dec., ¶ 12.

2

15. During late fall of 2017, Mr. Rulh started to sense that the business partners he brought together were conspiring to freeze him out of his business.  Rulh 2nd Dec., ¶ 14.

16. In mid-December of 2017, before Mr. Rulh was made an assignee of the company, all members of CLS had discussed retaining Postlethwaite & Netterville to evaluate <u>all</u> membership interests in CLS, Fourchon Launch Services, LLC ("FLS"), and Trash Doctors, LLC ("TD"), but only for the specific purpose of a possible reorganization of the owners of CLS, FLS, and TD.  Corporate Deposition of CLS, (hereafter "CLS Depo."), Exhibit "B", hereto, p. 97, ln. 9-17.

17. In early 2018, Mr. Rulh was notified that his suspicions were correct, and that his business partners had taken steps toward freezing him out of CLS.  Rulh 2nd Dec., ¶ 15.

18. On January 12, 2018, CLS overtly indicated its intent to commence freezing Mr. Rulh out of CLS, based on a cryptic provision of the CLS Operating Agreement[1] by calling a members' meeting for January 22, 2018 to discuss trumped up charges that Mr. Rulh had somehow damaged CLS (hereinafter the "First Meeting") and to thus make him an "assignee" of the company.  *Verified Amended Complaint* (Rec. Doc. No. 98), ¶ 63.

19. The conduct complained of was so *de minimis* that it should not be read as anything but a pretext to diminish Mr. Rulh's control of the company and also the value of his interest in the company.  For example, CLS complained of Mr. Rulh taking his back owed salary from the company accounts, but this was after Mr. Rulh discovered and brought to light multiple financial irregularities in CLS's books, as well as routine forging of company documents.  Rulh 2nd Dec., ¶ 16.

20. Mr. Rulh's actions also occurred after CLS refused to pay him his back salary and while

---

[1] Exhibit "A", Exh. "1", thereto.

3

CLS was bonusing other employees and throwing lavish parties.  Hypocritically, CLS never took any action when another member, Trey Morice, took $200,000.00 for no reason and has never paid those monies back to CLS.  CLS Depo, pp. 216-220.

21. Another, incident of alleged harmful conduct was Mr. Rulh allegedly being drunk at a Christmas party in 2013, some four (4) years prior to the decision to expel, as well as an alleged incident completely based on hearsay of a non-employee.   All of these complaints were first voiced after Mr. Rulh brought to light the aforementioned financial irregularities. Rulh 2nd Dec., ¶ 16.

22. On that same day Mr. Rulh was made an "assignee", CLS issued a notice to its members, setting a meeting for February 26, 2018 for CLS to authorize Postlewaithe & Netterville to provide CLS a financial evaluation of Mr. Rulh's interest in CLS (hereinafter the "Second Meeting"). *Verified Amended Complaint* (Rec. Doc. No. 98), ¶ 65, 67.

23. On June 5, 2008, Postlethwaite & Netterville, through Jason MacMorran, issued its valuation opinion that the expulsion price for Mr. Rulh's ownership interest as of February 28, 2018 was ($172,664); thus, meaning, absurdly, that Mr. Rulh was better off giving his interest away for free. *Verified Amended Complaint* (Rec. Doc. No. 98), ¶ 68.

24. Mr. MacMorran invoked Section 10.3 of the Operating Agreement for:  (1) the right to expel Mr. Rulh; (2) pay him the expulsion price; and (3) pay that amount over 120 equal installments.  The report/opinion employed a fair market value methodology provided for by Section 11.3 of the Operating Agreement, a completely irrelevant provision that pertains to redeeming the interest of an assignee, who has not been made

4

a member, not a member being treated as an assignee.  Report of Postlethwaite & Netterville (hereafter "P&N/MacMorran Report"), Exhibit "C", hereto.

25. The P&N/MacMorran Report drafted for purposes of Mr. Rulh's expulsion was submitted *verbatim* in this litigation as CLS's expert report in support of its request for declaratory judgment.  Exhibit "D", hereto, Email from Arthur Kraatz to J. Geoffrey Ormsby.

26. On June 8, 2018, CLS issued a notice setting a members' meeting for July 23, 2018 to finalize the expulsion of Mr. Rulh from CLS and to determine the amount CLS would pay Mr. Rulh for his membership interest (hereinafter "the Third Meeting").  *Verified Amended Complaint* (Rec. Doc. No. 98), ¶ 68.

27. On July 6, 2018, consistent with the Operating Agreement, Mr. Rulh provided a financial evaluation for his interest in CLS for consideration at the July 23, 2018 meeting. Rulh 2nd Dec, ¶ 27, Exhibit "2", thereto.

28. On July 23, 2018, Mr. Rulh was formally expelled from CLS, and the expulsion price was set, without any appreciable or proper forensic support, at a mere $3,300.00. *Verified Amended Complaint* (Rec. Doc. No. 98), ¶ 69.

29. On July 24, 2018, corporate counsel for CLS, Mark Fullmer of Phelps Dunbar LLP, reiterated that the members, "**acting in accordance with Section 10.3 of the Operating Agreement**" transmitted the company's offer of a mere $3,300.00 for Mr. Rulh's interest, even though Postlethwaite & Netterville had valued the company at over $10,000,000.00.  July 24, 2018 Correspondence of Mark A. Fulmer, Exhibit "E" hereto.

30. Section 10.3 of CLS's Operating Agreement, titled "Expulsion," governs the valuation of an expelled member's interest. CLS Operating Agreement, Section 10.3. Rulh 2nd Dec., ¶ 8, Exhibit "1", thereto.

31. The Operating Agreement expressly differentiates "expulsion" from "withdrawal", with "withdrawal" being addressed in Section 10.2 of the Operating Agreement. Rulh 2nd Dec., ¶ 29, Exhibit "1", thereto.

32. Section 10.3 states that, "if the actions of the member are egregious enough to warrant full expulsion, then the members may convene no earlier than 30 days from the date of the vote to have a financial evaluation of the offending member's interest." Rulh 2nd Dec., ¶ 30, Exhibit "1", thereto.

33. Section 10.3 goes on to state that, "[i]f the offending member wishes to introduce his own evaluation price at the meeting, then he must request that his independent evaluation should be considered." Rulh 2nd Dec., ¶ 31, Exhibit "1" thereto.

34. The members agreed to include specific language in the Operating Agreement requiring that the expulsion "price shall take into account all losses caused by the offending member whether actual or speculative." Rulh 2nd Dec., ¶ 32, Exhibit "1", thereto.

35. Section 10.3 does not require that the valuation price take into account any discounts whatsoever. Rulh 2nd Dec., ¶ 33, Exhibit "1", thereto.

36. Section 10.3 does not even contain the word "discount." Rulh 2nd Dec., ¶ Exhibit "1", thereto.

37. Mr. MacMorran prefaced its valuation, as follows:

> [We] have prepared and enclosed [our] independent estimate of value of Donald Rulh, Jr.'s ownership interest in Complete Logistical Services, LLC as of February 28, 2018, including an analysis to consider losses caused by Mr. Rulh to arrive at an expulsion price in accordance with Section 10.3 of

Complete Logistical Services, LLC's Operating Agreement.

P&N/MacMorran Report, p. 1.

38. Consistent with Section 10.3, Postlethwaite & Netterville opined as to purported damages allegedly caused by Mr. Rulh and unjustifiably deducted more than $2,000,000.00 right off the top of his overall $10,127,737.00 valuation of CLS. P&N/MacMorran Report, p. 12.

39. Despite acknowledging that its valuation was in accordance with Section 10.3, Postlethwaite & Netterville's valuation improperly included a thirty-five percent (35%) discount for lack of marketability, which, as established, is not provided for in Section 10.3.  P&N/MacMorran Report, pp. 15-18.

40. Mr. MacMorran relied on no other colorable factual or legal basis for employing these discounts in the face of the explicit expulsion provision in the Operating Agreement.

41. Section 11.2 of the Operating Agreement, entitled "Right of Redemption of Assignee's Interest," states:

> If an assignee is not admitted as a member, the company has the option, but not the obligation, to redeem the assignee's economic rights and the assignor's membership interest.  The decision to exercise the company's option to redeem shall be made by a majority of the remaining members.  The redemption price shall be the redemption price calculated and paid as provided in Section 11.3.

Rulh 2nd Dec., ¶ 34, Exhibit "1", thereto

42.  Section 11.3 goes on to discuss how the redemption price is calculated, stating:

> The "redemption price" shall be the fair market value of the membership interest based on a "going concern" valuation and taking into consideration valuation discounts for lack of control, minority interest, and lack of marketability.  If the fair market value of the membership interest cannot be agreed upon by the company and the assignee, the fair market value shall be determined by appraisal.  The company and the assignee shall appoint an independent qualified appraiser to determine the fair market value.  If they

7

are unable to agree upon a single appraiser, each shall appoint a qualified independent appraiser.  Each appraiser shall independently determine the fair market value of the membership interest.  The redemption price shall be the fair market value determined by the single appraiser or, if unable to agree on a single appraiser, the average of the values determined by the three appraisers.

Rulh 2nd Dec., ¶ 35, Exhibit "1", thereto

43. It is telling that a majority of CLS's members never voted to exercise CLS's option to redeem Mr. Rulh's membership interest while he was an assignee.  Rulh 2nd Dec., ¶ 36.

44. There was no effort by CLS to agree upon the fair market value of Mr. Rulh's membership interest with Mr. Rulh.  Rulh 2nd Dec., ¶ 37.

45. There was no agreement between CLS and Mr. Rulh upon a single appraiser after Mr. Rulh was made an assignee. Rulh 2nd Dec., ¶ 38.

Respectfully submitted,

*/s/ J. Geoffrey Ormsby*
**RANDALL A. SMITH (#2117)**
**J. GEOFFREY ORMSBY, T.A.  (#24183)**
   **-OF-**
**SMITH & FAWER, L.L.C.**
201 St. Charles Avenue, Suite 3702
New Orleans, Louisiana 70170
Telephone: (504) 525-2200
Telecopy: (504) 525-2205

***Counsel for Donald Rulh, Jr.***


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 16th day of April 2019, the foregoing has been electronically filed with the Clerk of Court by using the CM/ECF filing system, which will send notice of electronic filing to all counsel of record.

*/s/ J. Geoffrey Ormsby*