## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **COMPLETE LOGISTICAL SERVICES, LLC,** | * | **Civil Action No.: 18-3799** |
|     Plaintiff | * | |
| | * | **Judge: Eldon E. Fallon** |
| **versus** | * | |
| | * | **Magistrate Judge: Michael North** |
| **DONALD RULH, JR., ARNOLD BAKER,** | * | |
| **MORRIS KAHN, MICHELLE ELWELL, and** | * | |
| **SHAWANA HARRIS,** | * | |
|     Defendants. | * | |

---

### SECOND DECLARATION OF DONALD RULH, JR.

I, DONALD RULH, JR., submit this Declaration pursuant to 28 U.S.C. § 1746, and do hereby declare, under the penalty of perjury, the following:

1. My name is Donald Rulh, Jr., and I am a defendant in the above matter.

2. I am over the age of 21 and am competent to make this Declaration. I reside in New Orleans, Louisiana. I have personal knowledge of the facts set forth in this Declaration.

3. I am a second-generation maritime professional and have literally grown up in the maritime industry, owning and operating different maritime businesses with his family.

4. As a young child, I would accompany his father and uncle going onto foreign flagged vessels along the United States Gulf Coast. In high school, I worked in dispatching and commercial transportation, servicing clients in the oil and gas and international shipping industries. After college, in 1996, I opened Ocean Air Services, Inc. with his father and uncle, providing freight forwarding services for shipping companies doing business along the United States Gulf Coast and the Mississippi River. I also



worked as a domestic and international shipping agent/manager for the offshore and inshore international shipping industry. As part of this job, I provided coordination services for domestic and international ship owners and cargo charterers in the United States and abroad. *Id.*

5. Throughout my career, I built countless contacts in the maritime industry.

6. In June of 2010, I brought together Spencer Sens, a long-term employee of one of his family's customers, and Dr. Natchez Morrice, III, a family friend with no maritime background, to form CLS.

7. CLS is a Louisiana company that has or has had offices in Gretna, Harvey, New Orleans East, Chalmette, and Broussard, Louisiana.

8. CLS's Operating Agreement was executed in August of 2011. Exhibit "1" "hereto".

9. CLS started out as a project management and logistics company, and almost immediately obtained work on the NASA forensic investigation of the B.P. Oil Spill Macondo Oil Well Blowout Preventer.

10. At the time of CLS's formation, Mr. Sens was working for Agility Logistics (one of Mr. Ruhl's family's clients), and Dr. Morice did not have any maritime experience, so I ran CLS almost singlehandedly.

11. During my work on the Macondo project, I began doing middleman staffing work on behalf of CLS, which would end up being the primary focus of its business.

12. The staffing business relies heavily on relationships, which I had cultivated throughout his life and career in the maritime industry.

13. CLS enjoyed great success for the initial five or six years.

14. During late Fall of 2017, after noting financial irregularities with CLS, I started to

sense that the business partners I had brought together were conspiring to freeze me out of the business. Specifically, I was concerned that Mr. Sens had been using CLS accounts to pay for personal travel, independent education and associations, and lumber purchased for his home and fishing camp.

15.    In early 2018, I was notified that my suspicions were correct, and that my business partners had indeed taken steps toward freezing me out of CLS. Their first move was on January 22, 2018, when they made me an assignee of CLS, thus stripping me of any management authority.   On that date, Mr. Sens and Mr. Morice indicated that they would be moving to expel me as a member of CLS.

16.    In support of their pretextual objective to reduce my involvement and authority, and to later expel me, CLS complained among other things that I took back owed salary from the company accounts. Another, incident of alleged harmful conduct was that I was allegedly drunk at a Christmas party in 2013, some four (4) years prior to the decision to make me an assignee and eventually expel me.  Another alleged incident was based on hearsay from a non-employee.  These complaints only started after I had discovered and brought to light the multiple financial irregularities in CLS's books, as well as the routine forging of company documents.

17.    About a week after I was made an assignee and realizing that I was going to be expelled from my own company, I spoke with Michelle Elwell about starting a competing business to CLS that would be a disadvantaged business enterprise (DBE). Never before January 2018, I had ever considered competing against CLS.

18.    In late January and through February, CLS continued the process of expelling me from CLS.

19. Knowing I was being frozen out, in early March of 2018, I went into my office, which I had not been barred from doing, and asked my assistant, Janet Pipitone, to print and scan to me a copy of CLS's current client list and its profit and loss statements.

20. It was typical for me to ask Ms. Pipitone to complete such tasks, and at the time, I did not believe, and had not been informed, that I was prohibited from accessing such information. Namely, CLS never advised me that I could not access CLS's files, and I was not otherwise prohibited from accessing CLS files. I also was not aware that a crawfish boil was transpiring on that date, as I had not been invited to the crawfish boil.

21. I am not aware that the documents that were printed and scanned to me had any security over them, such as a restricted server, password protection, or encryption. I did not sign any confidentiality agreement or any other agreement prohibiting me from viewing the documents and/or sending them to myself.

22. I did not need to obtain a list of the customers that I had worked with for nearly seven years with CLS, as I can recall CLS's customers from memory and worked with some CLS clients for decades through my family's businesses

23. CLS's customers are readily known to anyone working in the marine staffing industry.

24. On March 9, 2018, I sent these documents to Morris Kahn, Michelle Elwell, and Arnold Baker with confidentiality agreement. They were not sent to Shawana Harris because it was still unclear if she would be joining the new venture.

25. Until this litigation was filed, I never discussed customer list and/or profit and loss statements with my potential business partners after they were transmitted on March 8, 2018.

26. I have not used the customer lists or profit and loss statements that I obtained, so as to compete with CLS, nor do I intend to.

27. On July 6, 2018 consistent with the Operating Agreement, my attorney provided a financial evaluation for my 33% interest in CLS for consideration at the July 23, 2018 expulsion meeting. Exhibit "2" hereto.

28. Section 10.3 of CLS's Operating Agreement, titled "Expulsion," governs the valuation of an expelled member's interest. Exhibit "1" hereto.

29. The Operating Agreement expressly differentiates "expulsion" from "withdrawal", with "withdrawal" being addressed in Section 10.2 of the Operating Agreement. Exhibit "1" hereto.

30. Section 10.3 states that, "if the actions of the member are egregious enough to warrant full expulsion, then the members may convene no earlier than 30 days from the date of the vote to have a financial evaluation of the offending member's interest." Exhibit "1" hereto.

31. Section 10.3 goes on to state that, "[i]f the offending member wishes to introduce his own evaluation price at the meeting, then he must request that his independent evaluation should be considered." Exhibit "1" hereto.

32. Section 10.3 of the Operating Agreement requires that the expulsion "price shall take into account all losses caused by the offending member whether actual or speculative." Exhibit "1" hereto.

33. Section 10.3 of the Operating Agreement does not require that the valuation price take into account any discounts; Section 10.3 does not even contain the word "discount." Exhibit "1" hereto.

34. Section 11.2 of the Operating Agreement, entitled "Right of Redemption of Assignee's Interest," states:

> If an assignee is not admitted as a member, the company has the option, but not the obligation, to redeem the assignee's economic rights and the assignor's membership interest. The decision to exercise the company's option to redeem shall be made by a majority of the remaining members. The redemption price shall be the redemption price calculated and paid as provided in Section 11.3.

Exhibit "1", hereto.

35. Section 11.3 goes on to discuss how the redemption price is calculated, stating:

> The "redemption price" shall be the fair market value of the membership interest based on a "going concern" valuation and taking into consideration valuation discounts for lack of control, minority interest, and lack of marketability. If the fair market value of the membership interest cannot be agreed upon by the company and the assignee, the fair market value shall be determined by appraisal. The company and the assignee shall appoint an independent qualified appraiser to determine the fair market value. If they are unable to agree upon a single appraiser, each shall appoint a qualified independent appraiser. Each appraiser shall independently determine the fair market value of the membership interest. The redemption price shall be the fair market value determined by the single appraiser or, if unable to agree on a single appraiser, the average of the values determined by the three appraisers.

Exhibit "1" hereto.

36. A majority of CLS's members never voted to exercise CLS's option to redeem my membership interest while I was an assignee.

37. There was no effort by CLS to agree upon the fair market value of my membership interest.

38. There was no agreement between CLS and me upon a single appraiser after I was

made an assignee.

I do declare, under penalty of perjury, that the foregoing is true and correct.

New Orleans, Louisiana, this 15th day of April 2019.

*/s/ Donald Rulh, Jr.*

## OPERATING AGREEMENT OF COMPLETE LOGISTICAL SERVICES, LLC.

This operating agreement dated as of August   , 2011 is made by and among the members.

### ARTICLE 1

### DEFINITIONS

Unless the context requires otherwise, the following terms shall have the meanings described below. Other definitions may appear elsewhere in this operating agreement.

(a). "Affiliate" means, with respect to a person, (i) a person directly or indirectly controlling, controlled by or under common control with the person, (ii) a person owning or controlling ten percent or more of the outstanding voting interests of the person, (iii) an officer, director or general partner of the person, or (iv) any person who is an officer, director, general partner, trustee or holder of ten percent or more of the voting interests of a person described in clauses (i) through (iii) of this sentence. For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise.

(b). "Articles of Organization" shall mean the articles of organization of the company, as amended, supplemented and restated from time to time.

(c). "Assignee" means a person to whom all or a portion of a membership interest has been transferred (whether or not in compliance with the restrictions in this operating agreement) but who has not been admitted as a member.

(d). "Capital Account" means the account established on the books of the company for each member under Article 5.

(e). "Capital Contributions" means, with respect to a member, the money, services and other property contributed to the company by the member.

(f). "Company" means Complete Logistical Services, LLC.

(g). "Distribution" means a disbursement of cash or other property from the company to or on behalf of a member arising from the member's interest in the company, other than a payment to a member for property or services or as repayment of a loan.

(h). "Economic Rights" means a member's rights to receive distributions and tax allocations.

(i). "Encumber" means to grant or suffer a mortgage, pledge, security interest or other encumbrance, whether voluntarily, involuntarily or by operation of law.

(j). "IRC" means the Internal Revenue Code of 1986, found in 26 USCA §§1 to 9722, as amended, or any successor thereto.

(k). "Majority of Members" means a majority of members who hold sharing ratios who are entitled to vote on the matter subject to the vote.

EXHIBIT

1 to Exh "A"

tabbies

(l). "Management Rights" means all rights of a member other than economic rights, including without limitation a member's rights to notice, vote, inspect the books and records, attend meetings of the members and otherwise participate in the management of the company.

(m). "Members" means the persons admitted to the company as members. The initial members are Natchez Morice, III, Donald Rulh, Jr. and Spencer Sens.

(n). "Membership Interest" means a member's total interest in the company, including without limitation the member's economic rights and management rights, and is expressed as a sharing ratio.

(o). "Operating Agreement" means this operating agreement of the company, as amended, supplemented and restated in writing from time to time.

(p). "Organizer" means the person who executed the articles of organization at the direction of and on behalf of the members.

(q). "Person" means a natural person, corporation, partnership, limited partnership, limited liability company, joint venture, trust, estate, or other entity or association.

(r). "Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the company's taxable income or loss for the year or period, determined in accordance with 26 U.S.C.A. §703(a) (for the purpose, all items of income, gain, loss, deduction or credit required to be stated separately under 26 U.S.C.A. §703(a)(1) shall be included in taxable income or loss).

(s). "Sharing Ratios" means the ratios, expressed as a percentage, for each member as described below in Section 2.6.

(t). "Treasury Regulations" includes the proposed, temporary and final income tax regulations promulgated under the IRC, as issued and amended from time to time, and found in 26 CFR §§1.0-1 et seq.

(u). "Transfer" means a sale, assignment, transfer, exchange, donation, disposition, or other alienation, whether voluntary, involuntary, by operation of law, gratuitous or onerous.

## ARTICLE 2

## FORMATION

### 2.1 Formation

The company was or will be formed as a limited liability company under the Louisiana Limited Liability Company Law, La Rev Stat Ann §§12:1301 et seq. The company was or will be formed by the organizer at the direction of and on behalf of the members. In executing this operating agreement the members: (a) approve the formation of the company by the organizer; and (b) release and hold harmless the organizer from any liability arising out of the formation of the company. The organizer intervenes in this operating agreement for the purpose of acknowledging that the organizer formed the company at the direction of and on behalf of the members.

### 2.2 Filings

The organizer shall cause the articles of organization and the initial report of the company to be filed in the office of the Louisiana Secretary of State as required by law. The members shall

execute and cause to be filed appropriate documents and certificates and shall take any and all other actions that may be reasonably necessary to perfect and maintain the status of the company as a limited liability company under the laws of the State of Louisiana and any other states or jurisdictions in which the company engages in business.

### 2.3 Term

The term of the company shall begin on the date of organization and shall be perpetual unless dissolved sooner under the provisions of Section 12.1.

### 2.4 Business and Purpose

The purpose of the company is to engage in any lawful activity for which limited liability companies may be formed under the Louisiana Limited Liability Company.  In order to carry out its purpose, the company shall have and may exercise all powers now and hereafter conferred on limited liability companies under Louisiana law and shall have the authority to do all things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of its purpose and for the protection and benefit of the company.

### 2.5 Members

The names and municipal addresses of the initial members are as follows:

Spencer Sens

Natchez Morice III

Donald Rulh, Jr.

### 2.6 Sharing Ratios

The initial sharing ratios of the members are as follows:

| Members | Sharing Ratios |
|---------|----------------|
| Spencer Sens | 33.3% |
| Natchez Morice, III | 33.3 % |
| Donald Rulh, Jr. | 33.3% |
| Total | 100% |

The sharing ratios can be changed only by an amendment to this operating agreement and shall not change as a result of changes in the members' capital accounts or for any other reason.

### 2.7 Tax Classification; No State Law Partnership

To the extent permitted by the treasury regulations and applicable state law, the members elect to be classified as a partnership for federal and state tax purposes. The company is a limited liability company under state law. It is not a partnership other than for purposes of federal and state tax classification.

### 2.8 Liability to Third Parties

Except as otherwise expressly agreed in writing, no member shall be liable for the debts, obligations or liabilities of the company.

**2.9 Registered Agent and Registered Office**

The registered agent for service of process on the company in Louisiana is Natchez Morice, III. The registered office of the company in Louisiana is located at 1216 Victor II Blvd, Morgan City, Louisiana, 70380. The registered agent and registered office may be changed by at least a majority of the members without an amendment to this operating agreement.

## ARTICLE 3

## MANAGEMENT

**3.1 Management by Members**

Subject to the terms of this operating agreement, the company shall be managed by the members.

**3.2 Membership Voting, Actions and Decisions**

Except as specifically otherwise provided in this operating agreement, whenever by the terms of this operating agreement or by law the vote, consent, approval, election, or other action of the members is required or permitted, the affirmative vote, consent, approval, election, or other action of at least a majority of the members shall be the required vote, consent, approval, election, or other action of the members. Without limiting the generality of the foregoing, the vote of at least a majority of the members shall be sufficient to approve any of the matters described in La Rev Stat Ann §12:1318(B).

**3.3 Meetings**

A meeting may be called by members holding in the aggregate at least 20% of the total sharing ratios. The date of the meeting shall be no more than 30 days and no less than ten days after the date of the notice of the meeting. The meeting shall be held at 119 Enterprise Drive, Gretna, Louisiana, 70056 or at another location agreed upon by at least a majority of the members. A notice of the meeting shall be sent to all members by certified mail. Participation in the meeting waives all notice requirements stated herein. The notice shall state the time, place and purpose of the meeting. Each member shall bear his own costs and expenses for transportation to and attendance at the meeting. A member may attend the meeting in person or by written proxy. A member may give a proxy only to another member. A quorum for the purpose of holding a meeting shall consist of a majority of the members attending in person or by proxy. The members may participate in and hold a meeting by means of conference telephone or similar communication equipment provided that all persons participating in the meeting can hear and communicate with each other. Participation in such a meeting shall constitute attendance at the meeting. Notwithstanding the foregoing, nothing herein shall require a meeting. Any matter that may be decided by the members at a meeting may also be decided by a consent in writing signed by at least a majority of the members after the appropriate notice has been given.

**3.4 Administrators**

A majority of the members may appoint one or more administrators to manage the day to day business and affairs of the company. The administrator or administrators may be but need not be

members of the company. The first administrators shall be Natchez Morice III, Donand Rulh, Jr. and Spencer Sens.

### 3.5 Member's Duties

The members duties are listed in the attached Exhibit A. It is understood that these duties are essential to the operation of the company and that any ownership interest is in consideration of the member fulfilling those duties competently, consistently, efficiently and to the best of his abilities.

## ARTICLE 4

## OTHER BUSINESSES AND VENTURES

La. R.S. 23:921, sets forth the law for limitation of competition of the members of this company. If the law shall change, the members of this company all agree that the substance of this agreement is that no person or persons will engage in competition with the company for a period of two years from their departure (whether voluntary or involuntary) from this company as described below.

### 4.1 Agreement not to compete

The members of this company agree not to solicit, nor engage in any similar business within a period of two years from their departure as a member of this company. Although the departure of the member may be voluntary or involuntary, the terms of this agreement not to compete shall not change. The members agree not to solicit or compete in any similar business in the following Louisiana Parishes: Cameron, Lafayette, Vermillion, Iberia, St. Mary, Terrebonne, Lafourche, Jefferson, Plaquemines, St. Bernard, St. Charles, St. John the Baptist, East Baton Rouge, West Baton Rouge Plaquemine, Ascension, St. Tammany and/or Orleans. The parties also agree not to solicit nor compete in the Gulf Coast Counties of Texas, Mississippi, Alabama and Florida.

### 4.2 Other Businesses of the Members

The members may engage independently or with others in other business ventures of every nature and description except equipment rental services targeted at the maritime. The members shall devote to the company only the time that may be necessary for the proper performance of the members' duties, but the members shall not be required to devote full time to the performance of these duties.

### 4.3 Opportunities

The members shall be obligated to present any particular investment or business opportunity to the company if the opportunity is of a character, if presented to the company that could be taken by the company as related to the equipment rental services or any ancillary business.

### 4.4 Proceeds From Other Ventures

The pursuit of other ventures by the members shall not be competitive with the business of the company as described in Section 4.2 above. The company shall have the right to other ventures or activities of the members or to the income or proceeds derived therefrom if in violation of this operating agreement.

### 4.5 Affiliates

The company may contract or otherwise deal with the members or their affiliates for the sale of goods or services if: (a) compensation paid or promised for the goods or services is reasonable and is paid only for goods or services actually furnished to the company; (b) the goods or services to be furnished shall be reasonable for; and necessary to, the company, (c) the terms for the furnishing of the goods or services shall be at least as favorable to the company as would be obtainable in an arms-length transaction; and (d) transportation of any goods owned, leased, rented or controlled by the company, shall be given to Blue Marine Transportation, Inc for first right of refusal to transport the items from/to place of rest (storage) to/from the job site.

## ARTICLE 5

## CAPITAL CONTRIBUTIONS/CAPITAL ACCOUNTS

### 5.1 Initial Capital Contributions

The initial capital contributions are as follows:

| Members | Initial Capital Contributions |
|---|---|
| Spencer Sens | $1,000 and duties as described in Exhibit "A" |
| Natchez Morice III | $1,000 and duties as described in Exhibit "A" |
| Donald Ruth, Jr. | $1,000 and duties as described in Exhibit "A" |

The initial capital contributions shall be contributed no later than five days after the date of this operating agreement.

### 5.2 Additional Capital Contributions

A member shall not be obligated to make an additional capital contribution to the company without it first being approved by a majority of the members. If a majority of the members vote to make an additional capital contribution, then all members will be required to contribute a proportionate share of total contribution approved that is equal to their sharing ratio in the Company. If a member fails to deposit the contribution in the Company bank account within 14 days of the properly called vote, then that member's interest shall be reduced by 1% of his sharing ratio for each thousand dollars that the members fails to contribute to Complete Logistical Services, LLC in the time allotted. The percentage of sharing ratios forfeited by the member shall be divided among the member(s) who contribute the non-paying member's proportionate funds to Complete Logistical Services, LLC. Each member will be given 7 days to deposit the non-paying member's funds in the Company bank account and all participants will share equally in the redistribution of the non-paying member's sharing ratios that are forfeited.

The making of any additional capital contribution shall not result in a change to the sharing ratios of the members, except in accordance with Section 2.6 and this section. All votes shall be made in accordance with Section 3.3.

### 5.3 Loans

If a member makes a loan to the company, the amount of the loan shall not be treated as a capital contribution. It shall be a debt due from the company to the member. The loan shall be on the terms and shall bear interest at the rate determined by the lending member and the company. The interest rate shall not exceed the maximum rate permitted by law. A member shall not be obligated to make a loan to the company.

### 5.4 Miscellaneous Capital Provisions

Each capital contribution shall be credited to the capital account of the contributing member. No interest shall be paid on capital contributions. A member may not withdraw any of the member's capital contribution. A member receiving a return of all or any portion of the member's capital contribution shall have no right to receive a particular type of property or a particular asset.

### 5.5 Capital Accounts

The company shall maintain or cause to be maintained an individual capital account for each member. Each member's capital account shall be increased by the following items:

(a). the amount of money and services contributed by the member to the company;

(b). the fair market value of property contributed by the member to the company (net of liabilities secured by encumbrances on the contributed property that the company is considered to assume or take subject to under 26 U.S.C.A. §752); and

(c). allocations to the member of the company's income and gain (or items thereof), including income and gain exempt from tax and income and gain described in 26 C.F.R. §1.704-1(b)(2)(iv)(g) but excluding income and gain described in 26 C.F.R. §1.704-1(b)(4)(i);

(d). allocations to the member of income described in 26 U.S.C.A. §705(a)(1)(B).

Each member's capital account shall be decreased by the following items:

(e). the amount of money distributed to the member by the company;

(f). the fair market value of property distributed to the member by the company (net of liabilities securing the distributed property that the member is considered to assume or take subject to under 26 U.S.C.A. §752);

(g). allocations to the member of expenditures of the company described in 26 U.S.C.A. §705(a)(2)(B); and

(h). allocations to the member of company loss and deduction (or items thereof), including loss and deduction described in 26 C.F.R. §1.704-1(b)(2)(iv)(g) but excluding items described in subparagraph (g) immediately above and excluding loss or deduction described in 26 C.F.R. §1.704-1(b)(4)(i) or (iii);

The capital account shall be otherwise adjusted in accordance with the additional rules on the maintenance of capital accounts described in 26 C.F.R. §1.704-1(b)(2)(iv).

### 5.6 Single Capital Account

A member that has more than one interest in the company shall have a single capital account that reflects all interests, regardless of the type of interests and regardless of when or how the interests were acquired.

### 5.7 Conformity with Treasury Regulations

The provisions of Sections 5.5 and 5.6 are intended to satisfy the capital account maintenance requirements of 26 U.S.C.A. §704(b) and the Treasury Regulations promulgated thereunder.

including 26 C.F.R. §1.704-1(b)(2)(iv). These provisions shall be deemed modified to the extent required by that section or any successor thereto.

## ARTICLE 6

## DISTRIBUTIONS

### 6.1 Sharing of Distributions

Except as otherwise provided in Article 12 with respect to liquidating distributions, all distributions, when and if made, shall be distributed to the members in accordance with their sharing ratios.

### 6.2 Amount and Timing of Distributions

Except as otherwise provided in Article 12 with respect to liquidating distributions, the amount and timing of all distributions shall be determined by at least a majority of the members or as described in section 13.7. The members shall cause a distribution to be made for all local, state and/or federal taxes, tariffs and/or surcharges when due.

### 6.3 Amounts Withheld

All amounts withheld pursuant to the IRC or any provision of any state or local tax law with respect to any payment, distribution or allocation to a member shall be treated as amounts distributed to the member pursuant to this Article 6 for all purposes. The company is authorized to withhold from distributions to the members and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the IRC or any provision of any other federal, state or local law and shall allocate any such amounts to the members with respect to which such amount was withheld.

## ARTICLE 7

## TAX ALLOCATIONS

### 7.1 Sharing Ratios

Profits and losses for a fiscal year shall be allocated to the members in accordance with their respective sharing ratios.

## ARTICLE 8

## RECORDS, ACCOUNTS, AND REPORTS

### 8.1 Books

The company shall keep or cause to be kept at the company's principal office and place of business adequate books and records with respect to the company's business. The company shall keep at its registered office in Louisiana the records required to be maintained by law, including those required by La Rev Stat Ann §12:1319(A).

### 8.2 Access to Information

Each member and the member's agent shall have the right, at any reasonable time, to inspect, review and copy at the expense of the inspecting member any and all books and records of the company at the office of the company.

### 8.3 Tax Information

The company shall deliver to the members information concerning the company necessary for the preparation of the members' federal and state income tax returns. To the extent feasible, the company shall attempt to deliver this information to the members within 90 days after the end of each fiscal year.

### 8.4 Bank Accounts and Funds

Company funds shall be deposited in an account or accounts in the name of the company and shall not be commingled with the funds of any member or any other person. All checks, orders, or withdrawals shall be signed by any one or more persons authorized by a majority of the members.

### 8.5 Method of Accounting; Fiscal Year

The method of accounting and fiscal year of the company for tax and other purposes shall be determined by at least a majority of the members.

### 8.6 Tax Matters Partner

Spencer Sens shall be the "Tax Matters Partner" as defined in 26 U.S.C.A. §6231(a)(7).

## ARTICLE 9

## TRANSFER OF INTERESTS

### 9.1 General Rule

A member shall not transfer or encumber all or a portion of a membership interest without first complying with the requirements in this Article 9. A transfer or encumbrance that does not comply with the requirements of this Article 9 shall be null and void and of no legal effect.

### 9.2 Transfer Restrictions

A member shall not transfer a membership interest unless the member complies with the following transfer restrictions:

(a). The transferor shall provide to the company an opinion of counsel acceptable to the company that the proposed transfer: (i) will not cause the termination of the company's treatment as a partnership for federal income tax purposes; and (ii) is not in violation of federal or state securities laws.

(b). The transferor shall pay to or reimburse the company for all reasonable legal fees and other costs and expenses incurred by the company in connection with the proposed transfer.

(c). The other members shall have a **right of first refusal to acquire the membership interest in connection with any transfer.** The transferor shall first give written notice to the other members of the member's intention to transfer all or a portion of the member's membership interest (the "subject interest"). The transfer notice shall include the name and address of the

proposed transferee, a description of the subject interest, a full, accurate and complete description of the price and terms upon which the transfer is to be made and a copy of all contracts relating to the transaction. This notice shall constitute an offer to transfer the subject interest to the other members at the price and on the terms and conditions specified in a bona fide written offer or agreement between the transferor and a third party. Within 30 days after the notice is given by the transferor, the other members may elect to acquire the subject interest from the transferor at the price and on the terms and conditions stated in the transferor's offer. If none of the other members elect to acquire the subject interest within the 30-day period, the transferor may, subject to the other provisions of this Article 9, transfer the subject interest within three months after the end of the 30-day period to the proposed transferee for the price and on the terms and conditions specified in the offer. If one or more of the other members elect to acquire the subject interest, the subscribing member or members shall acquire the subject interest within 60 days after their election at a time and on a date specified by the subscribing member(s). Each subscribing member shall acquire a fraction of the subject interest of which the numerator is the sharing ratio of the subscribing member and the denominator is the sum of the sharing ratios of all subscribing members or in such other proportions as the subscribing members shall agree.

**9.3 Permitted Transfers**

The right of first refusal of Section 9.2(c) shall not apply to the following transfers (the "permitted transfers"):

(a). a transfer upon the death of an individual member from the former member to the former member's executor, administrator, estate, or other legal representative;

(b). a transfer in connection with the adjudication by a court of competent jurisdiction that an individual member is incompetent to manage the member's person or property from the member to the member's guardian, conservator, or other legal representative;

(c). a transfer in connection with the dissolution of a corporation, partnership or other entity to the entity's shareholders, partners, or other owners; and

(d). a transfer to any one or more of the following: (1) an existing member; (2) an ascendant, descendant, sibling or spouse of the transferor; (3) a trust for any of the foregoing; or (4) in the case of a member that is a trust, from the trustee to a successor trustee or to the principal beneficiaries of the trust.

**9.4 Admission as a Member**

An assignee, including an assignee pursuant to a permitted transfer described above in Section 9.3, shall not be admitted as a member unless all of the following requirements are satisfied:

(a). the transfer must be made in compliance with the terms of this operating agreement, including but not limited to the transfer restrictions in Section 9.2 (unless otherwise exempted by the terms of Section 9.3);

(b). the admission is approved in writing by at least a majority of the members; a member's approval may be granted in the member's sole discretion or may be withheld for any reason or no reason; provided further that the admission of an assignee who assigned its interest pursuant to a permitted transfer shall not require the approval of the other members;

(c). the assignee accepts and agrees to be bound by the provisions of this operating agreement; the assignee shall execute any and all documents, instruments, and agreements required by the company to evidence this acceptance and the admission of the assignee as a member; and

(d). the assignee pays or reimburses the company for all reasonable legal fees, costs, and expenses incurred by the company in connection with the admission of the assignee as a member.

## 9.5 Encumbrance

A member shall not encumber all or a portion of the member's membership interest without the prior written consent of at least a majority of the members. A purported encumbrance without the required consent shall be null and void and of no legal effect. Furthermore, a membership interest cannot be transferred to satisfy the debt for which it was given as security without complying with the other provisions of this Article 9.

## 9.6 Distributions and Allocations in Respect to Transferred Interests

If there is a transfer of all or a portion of a membership interest, the profits, losses, each item thereof and all other items attributable to the transferred interest for the fiscal year during which the transfer occurred shall be divided and allocated between the transferor and the transferee by taking into account their varying sharing ratios during the fiscal year in accordance with 26 U.S.C.A. §706(d), using any convention permitted by law and selected by the members. All distributions on or before the date of the transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making the allocations and distributions, the company shall recognize the transfer not later than the end of the calendar month during which it is given notice of the transfer. If the company is given notice of a transfer at least ten days before the transfer, the company shall recognize the transfer as of the date of the transfer. If the company does not receive a notice stating the date the interest was transferred and such other information as may reasonably be required within 30 days after the end of the fiscal year during which the transfer occurs, then all items shall be allocated, and all distributions shall be made, to the person who, according to the books and records of the company, was the owner of the membership interest on the last day of the fiscal year. The members shall incur no liability for making allocations and distributions in accordance with the provisions of this Section 9.6, whether or not any member has knowledge of a transfer of all or a portion of a membership interest.

## 9.7 Divorce and Non-Member Spouse Ownership

In the case that any member shall be divorced and a court of competent jurisdiction decrees that the member's former spouse has any ownership interest in this company, then ownership interest of the member's former spouse shall be only be given economic rights and treated as an Assignee under article 11 for all purposes. The company shall have no obligation to admit the assignee as a member and the company can exercise the right of redemption at any time it is de-sired, without giving any notice to the assignee.

## ARTICLE 10

## DISSOCIATION OF A MEMBER

### 10.1 Death, Interdiction and Dissolution

If a member who is an individual dies or a court of competent jurisdiction adjudges the member to be incompetent to manage the member's person or property, the member's executor, administrator, guardian, conservator, or other legal representative shall be an assignee of the member's membership interest. If a member is an entity and the entity is dissolved or terminated, the member's legal representative or successor shall be an assignee of the member's membership interest.

## 10.2 Withdrawal

A member shall not withdraw or resign from the company. If under applicable law a member has the power to withdraw in violation of this operating agreement, then the member who withdraws shall become an assignee.

## 10.3 Expulsion

A member who may have his interest assigned or be expelled through this process will be called the "offending member" for purposes of discussion in 10.3. A member can have his interest assigned or be expelled from the company for conduct causing the direct harm to the company. The process of full expulsion takes three meetings and the timelines are to be strictly construed. Complete Logistical Services, LLC is currently made up of three members so therefore a majority of members means a minimum of two votes will still be needed even after a member is voted to be an assignee. Without the needed votes on these issues, the expulsion procedure cannot move forward and at least 30 days shall pass before the same issue is brought to a vote again through these procedures.

First, a properly noticed certified mail letter shall be sent to each member's home address stating the place, date and time of the meeting to discuss expulsion and the reasons alleged that support the expulsion action. This meeting shall take place no earlier than seven days after the mailing of the certified notice. This first meeting involves a two-part process where two or more members must agree by a vote that the offending member has caused direct harm to Complete Logistical Services, LLC and thereafter two or more members must agree by a vote that the offending member shall immediately be treated as an assignee of Complete Logistical Services, LLC for all purposes. These votes shall take place at the same meeting.

Second, if the actions of the member are egregious enough to warrant a full expulsion, a properly noticed certified letter shall be sent to each member's home address stating the place, date and time of the meeting and the agenda to discuss ordering a financial evaluation of the offending member's interest. This meeting shall take place no earlier than 30 days from the date of the mailing of the certified notice. Nothing shall prohibit the mailing of the certified notice of the second meeting on the same day a vote is taken on the first meeting. At this second meeting, two or more members must agree by a vote to have a financial evaluation of the offending member's interest in order to progression the expulsion of the offending member. During the 14-30 days before the second meeting is to take place, the offending member may make a specific re

quest to Complete Logistical Services, LLC to receive computer generated financial reports so that he may have an independent evaluation at his own cost if he so chooses. The request shall name each specific report sought and shall be sent via certified mail addressed to every member's home address. This timeline will be strictly construed.

Third, if the actions of the member are egregious enough to warrant full expulsion, then the members may convene no earlier than 30 days from the date of the vote to have a financial evaluation of the offending member's interest. A properly noticed certified mail letter shall be sent to each member's home address stating the place, date and time of the meeting and the agenda to discuss final expulsion of the offending member along with the payment amount for his interest in Complete Logistical Services, LLC at least 30 days before the meeting. Nothing shall prohibit the mailing of the certified notice on the same day a vote is taken at the second meeting. The evaluation price shall be shall be sent out with the certified notice of the meeting.

If the offending member wishes to introduce his own evaluation price at the meeting, then he must request that his independent evaluation should be considered. The offending member's request shall be made during the 14-30 days before the third meeting is to take place. The offending member's request shall be in writing, including all supporting documentation and information used by the offending member and shall mailed certified to each member's home address. This timeline will be strictly construed. At this third meeting two or more members must agree by a vote to expel the offending member and agree on a price to pay the expelled member for his interest. This price shall take into account all losses caused by the offending member whether actual or speculative.

The price paid to the expelled member shall be paid in equal monthly installments, with interest, but in no case to exceed 120 monthly installments. The price can be prepaid at the election of two or more members without premium or penalty. Notwithstanding the foregoing, if the company is dissolved after the event giving rise to the payment, the expelled shall receive instead of the agreed upon price, liquidating distributions at the times and in the amounts provided by article 12. The price should be evidenced by a promissory note, secured by the redeemed membership interest and should earn interest at the Louisiana Judicial Interest Rate pursuant to the authority granted by LA.R.S. 13:42(B) (1), as amended by acts 2001, No. 841, and set by the Louisiana Commissioner of Financial Institutions.

**10.4 Bankruptcy**

Upon the bankruptcy of a member, the member shall cease to be a member of the company and shall become an assignee.

**10.5 No Automatic Redemption**

A dissociation of a member as a result of death, interdiction, dissolution, withdrawal, bankruptcy, or any other reason shall cause the former member or the former member's

representative or successor to become an assignee. Neither the former member nor the former member's representative or successor shall be entitled to a return of the former member's capital contributions or to a redemption payment for the membership interest. The former member or the former member's representative or successor shall be an assignee and shall have only the rights of an assignee described below in Article 11.

## ARTICLE 11

## ASSIGNEES

### 11.1 Rights of Assignee

An assignee shall have no management rights. The assignee shall receive only the economic rights to which the assignee otherwise would be entitled if the assignee were a member. The member from whom the assignee acquired its interest shall continue to have all voting rights of a member until the assignee is admitted as a member. However, if the transfer to the assignee was made in violation of the terms of this Operating Agreement, then neither the assignee nor the member from whom the assignee acquired its interest shall have any voting rights.

### 11.2 Right of Redemption of Assignee's Interest

If an assignee is not admitted as a member, the company has the option, but not the obligation, to redeem the assignee's economic rights and the assignor's membership interest. The decision to exercise the company's option to redeem shall be made by a majority of the remaining members. The redemption price shall be the redemption price calculated and paid as provided in Section 11.3.

### 11.3 Redemption Price

The "redemption price" shall be the fair market value of the membership interest based on a "going concern" valuation and taking into consideration valuation discounts for lack of control, minority interest, and lack of marketability. If the fair market value of the membership interest cannot be agreed upon by the company and the assignee, the fair market value shall be determined by appraisal. The company and the assignee shall appoint an independent qualified appraiser to determine the fair market value. If they are unable to agree upon a single appraiser, each shall appoint a qualified independent appraiser and the two selected appraisers shall designate a third qualified independent appraiser. Each appraiser shall independently determine the fair market value of the membership interest. The redemption price shall be the fair market value determined by the single appraiser or, if unable to agree on a single appraiser, the average of the values determined by the three appraisers. The company and the assignee shall split the cost of the single appraiser, or, if unable to agree on a single appraiser, each shall bear the costs of the appraiser appointed by it and the cost of the third appraiser shall be split between them. The redemption price shall be paid to the assignee in equal monthly installments, without interest and determined by a majority of the members, but in no case to exceed 120 monthly installments. The redemption price can be prepaid at the election of the company without premium or penalty. Notwithstanding the foregoing, if the company is dissolved within 120 days after the event giving rise to the redemption payment, the assignee shall receive, instead of the redemption price, liquidating distributions at the times and in the amounts provided by Article 12.  The redemption price should be evidenced by a promissory note, secured by the redeemed membership interest and should earn interest at the Louisiana Judicial Interest Rage pursuant to authority granted by La. R.S. 13:4202(B)(1), as amended by Acts 2001, No. 841, and set by the Louisiana Commissioner of Financial Institutions.

## ARTICLE 12

## DISSOLUTION AND LIQUIDATION

### 12.1 Events of Dissolution

The company shall be dissolved upon the occurrence of any one of the following events:

(a). expiration of the company's term;

(b). entry of an order for relief with respect to the company under Chapter 7 of the Bankruptcy Code;

(c). entry of a judgment of dissolution of the company pursuant to La Rev Stat Ann §12:1335 and

(d). consent to dissolve the company by at least a majority of the members.

### 12.2 Liquidation

The members, or as many members willing to serve, shall be the liquidators. Upon the dissolution of the company, the liquidators shall liquidate the company's assets and terminate its business in accordance with this Section 12.2. The liquidators shall promptly prepare or cause to be prepared, at the expense of the company, a statement setting forth the assets and liabilities of the company as of the date of dissolution and shall furnish that statement to all members. The liquidators shall proceed to liquidate the company's assets and to terminate its business as promptly as possible but shall be allowed a reasonable time for orderly liquidation of company assets and the discharge of liabilities to creditors (including members who are creditors) in order to minimize losses normally incident to a liquidation. The liquidators shall have full power and authority to operate company properties in the ordinary course of business for the account of the company. The proceeds of the liquidation, as and when available, shall be applied and distributed in the following order and priority:

(a). first, to the payment of all debts and liabilities of the company;

(b). second, to the setting up of reserves that the liquidators deem reasonably necessary for contingent, unmatured or unforeseen liabilities or obligations of the company; and

(c). third, the balance to the members in accordance with their positive capital account balances as of the date of the distribution after giving effect to all contributions, distributions and allocations for all periods.

The liquidators shall file all certificates and notices of the dissolution of the company required by law, including the notice of authorization of the dissolution and the articles of dissolution required by Louisiana Revised Statutes Annotated §12:1336. Promptly after the complete liquidation and distribution of the company's assets, the liquidators shall furnish to each member a statement showing the manner in which the company's assets were liquidated and distributed.

### 12.3 Deficit Capital Accounts

If any member has a deficit balance in the member's capital account (after giving effect to all contributions, distributions and allocations for all fiscal years, including the fiscal year in which the liquidation occurs), then that member shall have no obligation to make a contribution to the

capital of the company with respect to the deficit and the deficit shall not be considered a debt owed to the company or to any other person for any purpose whatsoever.

**ARTICLE 13**

**MISCELLANEOUS PROVISIONS**

**13.1 Investment Representations**

Each member represents to the company and the other members that the member is acquiring the membership interest for the member's own account, for investment and not with a view to resale or redistribution.

**13.2 Notices**

Unless otherwise expressly provided elsewhere in this operating agreement, an election, notice or other communication required or permitted to be given under this operating agreement shall be in writing and shall be deemed to have been duly given if and when delivered personally or when mailed, by first class mail return receipt requested, with proper postage prepaid, or when sent by a national commercial courier service for next day delivery, or when telecopied, telegraphed or telexed. Notices and other communications shall be sent to the company at its registered office and to a member at the member's address reflected in the records of the company.

**13.3 Amendments**

This operating agreement, including Exhibit A, may be amended by an instrument in writing executed by at least a majority of the members.

**13.4 Successors**

This operating agreement shall be binding upon and inure to the benefit of the members and their respective heirs, executors, successors, and assigns. This provision shall not be deemed to permit an assignment by a member of the member's rights or obligations under this operating agreement except as expressly provided herein.

**13.5 No Third Party Beneficiaries**

None of the provisions of this operating agreement shall be for the benefit of or enforceable by a third party, including without limitation creditors of the company or of a member.

**13.6 Expansion of Ongoing Business**

In order for the company to expand to another port or to another area of business, it is agreed that at least a majority of members must agree on the expansion. If the decision is not unanimous, then the members choosing to expand shall give a detailed business plan and accounting to the non-agreeing member at his home address through certified mail with a return receipt. The non-agreeing member shall have 90 days to respond in writing that he wishes to be a part of the expansion under the terms and ownership interest provided herein, or the other members may begin their expansion without the non-agreeing member having any ownership interest or any property rights therein. Any such expansion approved by less than all of the members as provided in this Section 13.6 shall not constitute a violation of or default under Article 4 of this Agreement.

**13.7 Pay Down of Note and Member Distributions**

It is agreed by the members that paying off any loans needed to startup the company is of utmost importance.  It is agreed that once the Company is operational with income over expenses, than 50% of collections over the costs will go to a "reserve" account for the stability of the company.  The remaining 50% of collections over costs will go to pay off any approved loans made for startup costs for the company.  After the "reserve" account acquires a net balance of $100,000.00, then 100% of the collections over costs will go towards paying off the startup loans.

Distributions to the members after $100,00.00 is in the "reserve" account and the initial start up loans are paid off in full shall be made by a vote of at least a majority of the members.

**13.8 Further Actions**

Each member agrees to execute and deliver further instruments and do further acts and things that may be required or useful to carry out or further evidence the intent and purpose of this operating agreement.

**13.9 Entire Agreement**

The articles of organization and this operating agreement contain the entire agreement of the members with respect to the company. This operating agreement supersedes all prior and contemporaneous agreements and understandings, oral or otherwise, among the members with respect to the matters contained in this operating agreement and may not be modified or amended except as provided in this operating agreement.

**13.10 Severability**

Every provision of this operating agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason, the illegality or invalidity shall not affect the validity of the remainder of the terms or provisions of this operating agreement.

**13.11 Waivers**

The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this operating agreement shall not prevent a subsequent act, that would have originally constituted a violation, from having the effect of an original violation.

**13.12 Counterparts**

This operating agreement may be executed in one or more counterparts. Each counterpart shall be an original. All the counterparts together shall constitute but one and the same instrument, binding upon all members, notwithstanding that all the members may not have executed the same counterpart.

**13.13 Applicable Law**

This operating agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of Louisiana, excluding any conflict of laws rule or principle that might refer the governance or the construction of this operating agreement to the law of another jurisdiction. If there is a direct conflict between the provisions of this operating agreement and: (a) any provision of the articles of organization; or (b) any mandatory provision of the Louisiana Limited Liability Company Law, the provisions of the articles of organization and the mandatory

provisions of the Louisiana Limited Liability Company Law, as applicable, shall apply. The terms of this operating agreement shall prevail over any nonmandatory or default provision of the Louisiana Limited Liability Company Law.

IN WITNESS WHEREOF, the members execute this operating agreement effective as of the date first stated above.

WITNESSES:                                    MEMBERS:

# EXHIBIT 2

## (TO BE FILED UNDER SEAL)