### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **COMPLETE LOGISTICAL SERVICES, LLC,** | * | **Civil Action No.: 18-3799** |
|     **Plaintiff** | * | |
| | * | **Judge: Eldon E. Fallon** |
| **versus** | * | |
| | * | **Magistrate Judge: Michael North** |
| **DONALD RULH, JR., ARNOLD BAKER,** | * | |
| **MORRIS KAHN, MICHELLE ELWELL, and** | * | |
| **SHAWANA HARRIS,** | * | |
|     **Defendants.** | * | |

---

### THIRD DECLARATION OF DONALD RULH, JR.

I, DONALD RULH, JR., submit this Declaration pursuant to 28 U.S.C. § 1746, and do hereby declare, under the penalty of perjury, the following:

1. My name is Donald Rulh, Jr., and I am a defendant/counterclaimant in the above matter.

2. I am over the age of 21 and am competent to make this Declaration. I reside in New Orleans, Louisiana. I have personal knowledge of the facts set forth in this Declaration.

3. I have Bachelor of Science in Marketing from Our Lady of Holy Cross College.

4. I was previously asked to lead a series of classes at Our Lady of Holy Cross College pertaining to maritime logistics and international trade.

5. I currently own and operate several businesses and, therefore, I am intimately familiar with general and specific business economics, including, among other things, understanding business revenue, costs of goods sold, and profit and the computation thereto, especially in the maritime logistics industry.



EXHIBIT
F

6. In contending that the CLS customer list with corresponding revenues is somehow a trade secret, Mr. Sens erroneously claims that revenues alone indicate profits.

7. Revenue and profits are not synonymous, and a business must consider, among other things, cost of goods and operating expenses, as well as revenues, in determining profits. Simply knowing revenues does not provide one with profits.

8. Knowing particular client revenues does not equate to or define margins showing profitability or overall strength of those customers, as some customers may bring in larger revenues but could still have a lower profit margin.

9. The information Mr. Sens admitted to providing Kelly Brouillette is more valuable to a competitor than the information at issue in this case.

10. By providing profit margins, costs of goods sold and charge-out rates, Mr. Sens is providing CLS's price points and actual client-specific profit to an outside party, thus giving that third-party a road map of which clients generate the most profit and thus, under his position, which clients to target.

11. At the July 23, 2018 expulsion meeting, my independent valuation of $7.4 million was presented and discussed extensively. In particular, long discussions were had on the fact that it was based on unaudited financial records (as was the P&N/MacMorran Report) and that I had never been provided a exact valuation date

12. At the July 23, 2018 expulsion meeting, my counsel offered a settlement price less than the $7.4 million valuation.

13. At the July 23, 2018 expulsion meeting, corporate counsel for CLS, Mark Fullmer, persistently and improperly attempted to compel me to withdraw my valuation. He also attempted to confuse me not to commit to a valuation.

14. I retained Athen Sweet to provide a valuation of my interest in CLS.

15. I have reviewed those unprotected aspects of Mr. Sweet's valuation report (attached hereto as Exhibit "1", the entirety of which was submitted as my expert report in the litigation.

I do declare, under penalty of perjury, that the foregoing is true and correct.

New Orleans, Louisiana, this 30th day of April 2019.

*/s/ Donald Rulh, Jr.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| COMPLETE LOGISTICAL SERVICES, LLC<br>Plaintiff, | §<br>§<br>§ | Civil Action No.: 18-3799 |
| | § | Judge: Eldon E. Fallon |
| versus | §<br>§ | Magistrate Judge: Michael North |
| DONALD RULH, JR., *et al.*<br>Defendant | §<br>§ | |

### EXPERT REPORT BY ATHEN M. SWEET ON BEHALF OF DONALD RULH, JR.

_____
Athen M. Sweet

_____04/03/2019_____
Date

**CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER**



**TABLE OF EXHIBITS**

| Exhibit AMS-1 | American Staffing Association 2018 Staffing Industry Playbook |
|---|---|
| Exhibit AMS-2 | Industry Growth & CLS Growth |
| Exhibit AMS-3 | Unpaid Defendant Salary Analysis |
| Exhibit AMS-4 | Discounted Cash Flow Analysis |
| Exhibit AMS-5 | Guideline Transactions Analysis |
| Exhibit AMS-6 | Guideline Public Company Analysis |
| Exhibit AMS-7 | Scope Limitation |
| Exhibit AMS-8 | CLS Salary Analytic |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## NATURE OF INVOLVEMENT

1.   DONALD RULH, JR., referred to as the "Defendant", engaged me as an expert via my firm, Innovatus IQ, LLC.  Per our engagement agreement, I am to render an opinion for the Court's consideration in the form of a written report regarding the value of a thirty-three and one-third percent (33.33%) membership interest (the "Interest") of COMPLETE LOGISTICAL SOLUTIONS, LLC, referred to as the "Plaintiff" , "CLS", or the "Company", as of February 28, 2018 (the "Valuation Date").

## CREDENTIALS AND COMPENSATION

2.   I am the sole founder and member of Innovatus IQ, LLC (IIQ), a merger and acquisition advisory firm. Prior to founding IIQ, I spent eight and a half years in public accounting. I spent seven of those years as a Certified Public Accountant licensed by the State of Louisiana[1], and four and a half of those years as an equity partner in a 45-employee CPA firm. I rose from the entry level position of Staff Accountant to the position of Equity Partner in four years. As an Equity Partner, I was responsible for operations, final review of work product, and personnel in both the tax department and the for-profit business consulting department. During my time as a partner, I regularly conducted business valuations for clients of the firm and was a member of the deal team responsible for executing every business sale, business acquisition, and merger pursued by clients of the firm.

3.   My current professional practice offers services such as: business valuations, transaction advisory for business sales, mergers and acquisitions, recapitalizations, and other capital sourcing needs, strategic advisory services, and a wide array of general business consulting. My extensive expertise includes my experience prior to founding IIQ, including tax planning and compliance, client representation before Federal and various State taxing authorities, financial audits and reviews, forensic accounting, corporate turnarounds, general accounting, and the same services offered currently through IIQ.

4.   A copy of my professional resume is attached to this report as Appendix A. I have served as an expert in two prior cases, as included in my resume[2]. Within the past five years I have not served as an expert in any other litigation or administrative proceedings. IIQ is being compensated on an hourly basis at a rate of $300 per hour of my time and $150 per hour of IIQ staff time, to the extent they assist in the process. For testimony at deposition or trial, IIQ will be paid at the rate of $400 per hour. Additionally, IIQ will be

---

[1] Innovatus IQ, LLC is not a CPA firm and Athen Sweet has elected to transfer his CPA license to Inactive status.
[2] Appendix A

reimbursed for the direct expense, plus a 5% handling charge, of travel & lodging costs, engaging other consultants, advisors, or subject matter experts with experience or knowledge deemed valuable by IIQ. This compensation is not dependent in any way upon the outcome of this litigation or upon reaching any specific opinion or conclusion. My professional expertise, education, logic, and experience form the foundation upon which this report and the opinions included herein are based.

### INFORMATION REVIEWED

5.    A list of the information considered, relied upon, or used as support in forming the opinion(s) presented herein is attached as Appendix B.  Additional information may be reviewed should it become available. Should it please the Court, I would ask to maintain the right to amend or supplement this report considering any additional or future information made available to me.

### SCOPE LIMITATION

6.    Despite requesting much of the same data that was clearly made available to Postlethwaite & Netterville ("P&N"), expert for the Plaintiff, certain of my key requests were reported to be nonexistent or were only partially produced. One critical example of this is my request for management's most recent forecasts/projections which was met with the response "CLS is not in possession of any documents responsive to this request."[3] As discussed later in my report, the most widely accepted method used to value a business such as CLS is a discounted cash flow analysis ("DCF"). A DCF is critically dependent on forecasts of future cash flow – forecasts such as those provided to the Plaintiff's expert[4], but claimed to be nonexistent when requested by me.

7.    Due to the limitations listed in Exhibit AMS-7, I have relied, in part, on certain underlying data presented in the P&N report[5] to craft this report. While relying on data presented by the Plaintiff's expert is far from ideal and undeniably favors the Plaintiff, the P&N report is the only source to which I have access that includes certain data the Plaintiff has refused to produce, neglected to produce, or only partially produced.

---

[3] CLS Responses to Defendant's Third Set of Requests for Production of Documents, Production No. 36
[4] CLS000307, second to last paragraph, "consistent with a management prepared forecast…"
[5] CLS000295-CLS000383

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## CASE BACKGROUND

8.  *Donald Rulh, Jr.* – The Defendant co-founded the Company in 2010. Leveraging his maritime experience and connections the Defendant contributed to the development of a company that, in 2017, generated roughly $14M in revenue. As of the Valuation Date, the Defendant held a 33.33% membership interest in Complete Logistical Solutions, LLC. On July 23, 2018 Defendant was the subject of a forced cash out, expelled from the Company, and offered three thousand three hundred thirty ($3,330) dollars to be payable in 120 equal monthly installments.

9.  *Complete Logistical Services, LLC.* – Plaintiff is a Louisiana Limited Liability Company, formed on June 15, 2010. Plaintiff operates in the staffing industry, with a specific focus on temporary staffing of various maritime-related positions such as captains, welders, engineers and divers. Candidate vetting, testing and training are included in its service packages. Plaintiff's annual revenue grew to $5M in 2015 and then to nearly $14M in 2017.

10. *Defendant's Unpaid Salary.* – According to the Defendant, for most of 2016 and all of 2017, Plaintiff prioritized the payment of expenses such as employee bonuses, holiday parties and software development over the payment of Defendant's salary[6]. Despite recurring promises from Defendant's partners to pay him his due salary, such payments were never made. As a result, by December of 2017, Defendant's unpaid salary totaled an estimated $235,617[7][8]. On December 6, 2017, Defendant, an authorized signer on the Company accounts, withdrew $222,000 to reduce the amount owed to him to approximately $13,617. Defendant's accounts were subsequently frozen, resulting in CLS seizing roughly $25,000 from Defendant. Accounting for this seizure along with Defendant's additional accrued and unpaid salary From January 1, 2018 through February 28, 2018 (an additional $21,670) brings the unpaid balance as of 02/28/2018 to approximately $60,287[9].

11. *Plaintiff Initiates Expulsion.* – On January 6, 2018, Plaintiff called meeting of the Members of the Company to be held on January 22, 2018. At this meeting the expulsion process began. A second meeting was scheduled for February 26, 2018 to discuss the engagement of Postlethwaite & Netterville ("P&N"), who would ultimately become the Plaintiff's expert, to perform a business valuation of the Defendant's 33.33% ownership

---

[6] CLS000348, P&N Report illustrating the cutoff in 2016 salary and absence of 2017 salary.

[7] I requested all payroll, bonus, and distribution records for all Members of CLS and received payroll records for Spencer Sens only. The lack of payroll records for the Defendant aligns with his assertion that he was not paid any salary to which he was due in 2017.

[8] Exhibit AMS-3

[9] Exhibit AMS-3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

interest in CLS, thereby arriving at an expulsion price. On July 23, 2018, Plaintiff called a third and final meeting to vote on the Defendant's expulsion and determine the amount CLS would pay the Defendant for his Interest (the "Expulsion Price"). The amount so determined was three thousand three hundred thirty ($3,330) dollars to be payable in 120 equal monthly installments.

12.  <u>Governing Documents.</u> – The Plaintiff elected to invoke the expulsion clause, Article 10.3, of the Company operating agreement. Article 10.3 provides exhaustive detail as to the timeline and sequence of events necessary to affect an expulsion. However, regarding the standard of value, premise of value, and the valuation method or methods, Article 10.3 references only a broad "financial evaluation" of the member's interest in the Company. Article 11.3 of the same agreement establishes a "redemption price" and defines the standard of value as "fair market value" and the premise of value as that of a "going concern", but the context of the operating agreement indicates 11.3 does not apply to an expulsion as defined in Article 10.3.

13.  In outlining the parameters for the expulsion price, Article 10.3 makes no reference to Article 11.3, which it would if 11.3 were meant to control the expulsion price.

14.  Article 10.3 provides that the expulsion price is determined by the Company ordering a "financial evaluation" of the member's interest and continues to provide that the member may "have an independent evaluation at his own cost". This is in stark contrast to the language in Article 11.3 that provides in part "each [the Company and the Redeemed Member] shall appoint a qualified independent appraiser and the two selected appraisers shall designate a third qualified independent appraiser" (bracketed clarification mine).

15.  Article 10.3 provides for the expulsion price to be paid to the expelled member "in equal monthly installments, **with interest**, but in no case to exceed 120 monthly installments" (emphasis mine). This is again at odds with the language in Article 11.3 which provides for the redemption price to be paid to the redeemed member "in equal monthly installments, **without interest**…, but in no case to exceed 120 monthly installments" (emphasis mine).

16.  Articles 10.3 and 11.3 are clearly intended to govern different transactions. 11.3 (redemption) clearly defines the standard of value and the premise of value while 10.3 (expulsion) does not. This makes sense in the contexts of minority member/shareholder protection and general fairness. If a member is forced out, he should not have the value of his interest reduced arbitrarily through the use of the fair market value standard which includes reductions in value for "lack of marketability" and "lack of control" that often seem punitive in their magnitude.

## STANDARD AND PREMISE OF VALUE

17.     Based on my review of the case background and governing documents, the appropriate standard of value, and the standard utilized in my report, is that of Fair Value. *"The meaning of "fair value" is not clear and free from ambiguity and is often incorrectly conflated with the term "fair market value." Because the shares of a minority shareholder lack value-enhancing attributes such as control and liquidity, "fair market value" captures the absence of those features by reducing, or "discounting," the purchase price of those shares. However, Louisiana law explicitly rejects the applicability of discounts in the context of the purchase of a withdrawing shareholder's interest. The shares of a minority shareholder are not valued in and of themselves, but rather as part of the overall value of the corporation with no discounting for the shares' lack of valuable attributes. Thus, the term "fair value" in this context means the withdrawing shareholder's proportionate interest in the corporation valued as an ongoing concern. To determine this, the trial court must first determine the value of the corporation in its entirety and then allocate the withdrawing shareholder his proportionate interest of that value."*[10]

18.     The Fair Market Value standard is clearly inappropriate based on its very definition in *The International Glossary of Business Valuation Terms*, which defines Fair Market Value as *"The price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open an unrestricted market, **when neither is under compulsion to buy or sell** and when both have reasonable knowledge of the relevant facts."* (emphasis mine). An expulsion is undeniably a compulsion to sell, making the Fair Market Value standard inappropriate by definition.

19.     My estimate of value is based on the premise of going concern which assumes the enterprise will continue to operate normally, using all of its assets to generate income.

## STAFFING INDUSTRY OVERVIEW

20.     In general, the staffing industry includes two broad service categories, Search and Placement Services ("SPS"), and Temporary and Contract Services ("TCS"). CLS operates in the latter category, TCS, which generates between 83% and 90% of the industry's total revenue annually.

---

[10] Kowle v. Civil and Structural Engineers, Third Circuit, No. CA 18-398 (2/21/19)

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER                    Page **7** of **19**

21.     The industry as a whole returned to pre-recession levels in 2011 when it generated an estimated $114 billion[11]. By 2017 industry wide revenue reached an estimated $161 billion[12], achieving a compounded average growth rate ("CAGR") of 5.9% over the same 6-year period.

22.     Since the great recession, TCS, the section of the industry in which CLS operates, has grown nearly two times faster than the economy with GDP growth at 2.2% and TCS growth at 3.8%[13].

**VALUATION APPROACHES AND METHODS**

23.     Generally, a valuation is the process of determining the value of a business, business ownership interest, security, or intangible asset. Valuations are most often executed using one or more of three broad approach groups: 1) the income approach; 2) the asset approach; and 3) the market approach.

24.     Income Approach – a general way of determining a value indication of a business, business ownership interest, security, or intangible asset using one or more methods that convert anticipated economic benefits into a present single amount.[14] The income approach is based on this concept of present value. Present value in this context refers to the dollar amount that a rational, well-informed investor would be willing to pay today for the stream of expected economic income (future cash flow) that is being evaluated. This concept is applied using one of two methods, the Capitalization of Cash Flow Method OR the Discounted Cash Flow Method.

25.     Capitalization of Cash Flow Method – generally used when the subject company's growth and performance margins are expected to remain stable. In this method a single benefit stream is used to determine the present value of all future company cash flow.

26.     Discounted Cash Flow Method – providing far more flexibility than its capitalization counterpart, the Discounted Cash Flow Method (DCF) may be the most-often deployed and widely accepted valuation method. Multiple future periods are projected, and each resulting benefit stream is discounted to a present value using a required rate of return (discount rate) that appropriately accounts for the risk of investing in the subject company. By projecting multiple future years, appraisers can adjust growth rates, performance margins, fluctuations in working capital, and other variables for subject companies without static performance. In the final year of the projection, a terminal

---

[11] Exhibit AMS-1, page 28
[12] Exhibit AMS-1, page 28
[13] Exhibit AMS-1, page 34
[14] *AICPA Statement on Standards for Valuation Services No 1*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

value or residual value is calculated to capture the value of cash flows set to occur after the final projection year.

27.   Asset Approach – a general way of determining a value indication of a business, business ownership interest, or security using one or more methods based on the value of the assets net of liabilities.[15] The two basic methods of applying the asset approach are the adjusted net asset value method and the liquidation value method.

28.   The Adjusted Net Asset Value Method – the net asset value of a company is the total market value of all the assets it holds minus the total market value of any liabilities.[16] The fair value of an asset (or a liability) is defined in accordance with the Financial Accounting Standard Board as: The price that would be received to sell an asset, or paid to transfer a liability, in an orderly transaction between market participants at a measurement date.[17] All assets are valued and restated on the balance sheet, with intangible assets being determined either collectively or discretely. Similarly, restating all liabilities to market value and subtracting this amount from the total assets value yields the equity value of the company. In some situations, the net asset value can be the value of the firm, especially in asset-intensive business.[18]

29.   The Liquidation Value Method – using this method, the value indication is based upon the net amount that can be realized if the business was terminated and the assets are sold. The liquidation value method is generally only utilized when substantial concern exists regarding the ability of the business to operate as a going concern.

30.   Market Approach – a general way of determining a value indication of a business, business ownership interest, security, or intangible asset by using one or more methods that compare the subject to similar businesses, business ownership interests, securities, or intangible assets that have been sold.[19] The market approach is based on the principle of substitution. The appraiser looks to the market to determine how similar businesses or business interests are valued, such as the most relevant pricing multiple, and then applies the same, in whole or in part, to the subject company. The various market approach methods are as follows.

---

[15] *AICPA Statement on Standards for Valuation Services No 1*
[16] Fishman, J. E., Pratt, S. P., Griffith, J. C., & Wilson, D. K. (2002). *Guide to Business Valuations*. Practitioners Publishing Company, Inc.

[17] FASB ASC 820
[18] Fishman, J. E., Pratt, S. P., Griffith, J. C., & Wilson, D. K. (2002). *Guide to Business Valuations*. Practitioners Publishing Company, Inc.

[19] *AICPA Statement on Standards for Valuation Services No 1*

31.     Prior Transactions/Deal Price Method – in some cases, the best value indication of a subject company is an arm's length transaction which occurred in the subject company itself. Appraisers can use past transactions in the current subject company as an indication of its value.  According to Revenue Ruling 59-60 (1959), in determining the value of a stock of a closely held company, actual arm's length sales of such stock in the normal course of business within reasonable time before or after the valuation date are the best criteria of market value.[20]

32.     Guideline Public Company Method – in this method, the appraiser searches publicly traded companies to find guideline companies similar to the subject company. Often, this involves companies from the same Standard Industrial Classification (SIC) or the North American Industrial Classification system (NAICS) code.

33.     Guideline Transactions Method – the basic principle of the guideline transactions method is comparing how privately held companies similar to the subject company are valued. While traditionally more difficult to utilize due to the limited scope of available private data, finding private business transactions involving private companies which are significantly similar to the subject company is becoming easier as database platforms specializing in this arena evolve. In this method, the transaction prices and earnings fundamentals of the merged or acquired companies are used to calculate pricing multiples. The multiples used in the analysis are selected based on a comparative analysis of the merged or acquired companies relative to the subject company. The selected multiples are applied to the appropriate earnings fundamentals of the subject company to estimate its value.

34.     The Rule of Thumb Method – the Business Valuation Standards set by the American Society of Appraisers state that the "value indications derived from the use of rules of thumb should not be given substantial weight unless supported by other valuation methods and it can be established that knowledgeable buyers and sellers place substantial reliance on them."[21] An example of a rule of thumb method is accounting firms are bought and sold at a 1.25 multiple of revenue. Such a method, with little to no empirical backing, excludes consideration of many factors and should be used only as a sanity check.

**ASSESSMENT OF THE SUBJECT COMPANY**

35.     A review of the Company's recent revenue trends compared to industry-wide and TCS revenue trends illustrates the Company's impressive growth. CLS generated $5.01M in

---

[20] Revenue Ruling 59-60, C.B.237-IRC Sec. 2031(1 1959)
[21] American Society of Appraisers. (n.d.). Definitions. ASA Business Valuation Standards

revenue in 2014, growing to $13.91M in revenue in 2017[22]. This equates to total revenue growth of 178% and a CAGR of 40.6%. This growth rate is in stark contrast to the TCS total growth of 9.9% and CAGR of 3.2%. CLS's compounded annual growth rate outperformed its TCS industry counterpart by a multiple of 12.6, or 1260%.

36.   Management's forecasts for the discrete period beginning in 2018 and ending in 2021[23] include annual growth of 18% in core operations and 3% in the diving division. Considering the Company's annual growth rates of 37.1% in 2015, 17.8% in 2016, and 71.9% in 2017[24], these forecasted growth rates are comparatively conservative and seem reasonable.

37.   In an article dated August 15, 2018, *The Advocate* identified CLS as a member of *Inc. Magazine*'s list of the 5,000 fastest-growing US-based companies. This recognition made CLS one of only 17 New Orleans-based companies that made the list of 5,000.

38.   My review of CLS indicates that the value of the enterprise, in terms of assets, is driven by the ability of those assets to generate a benefit stream rather than the intrinsic value of the underlying assets themselves. As such, while I considered the Asset Approach, I did not use it to estimate the value of CLS.

39.   As previously mentioned, a DCF analysis is the most widely used and accepted method for valuing a company such as CLS. As such, a DCF analysis has been included in my estimate of value.

40.   The mature industry in which CLS operates bodes well for utilizing the Guideline Transactions Method. As high-integrity private company transaction data is more difficult to obtain than public company data, a mature industry generally ensures a more robust list of comparable industry transactions than one would find when valuing a company in a younger industry. As such, a Guideline Transactions analysis has been included in my estimate of value.

41.   CLS has enjoyed strong growth in revenue and profitability and operates in a mature industry. These attributes generally bode well for utilizing the Guideline Public Company Method as the number of comparable companies is generally greater than one would find when valuing a company lacking these attributes. As such, a Guideline Public Company analysis has been included in my estimate of value.

---

[22] Exhibit AMS-2
[23] CLS000357
[24] Exhibit AMS-2

42.  To summarize, based upon the specific facts and circumstances surrounding the subject
     company and this case, I based my valuation of the company on 1) a discounted cash
     flow analysis, 2) a guideline transactions analysis, and 3) a guideline public company
     analysis.

**INDICATIONS OF VALUE BY METHOD**

43.  <u>Discounted Cash Flow Analysis</u>. As mentioned previously, the foundation of a DCF is the
     financial forecast of the subject company. Using the forecast[25] and free cash flow
     calculations[26] presented in P&N's report[27] as my baseline, I adjusted the tax and working
     capital components of the free cash flow calculations to arrive at free cash flows to
     invested capital. The tax rate was adjusted to a flat, fixed 40% combined rate. Target
     working capital levels were determined by reviewing RMA Industry Standard Ratios[28] for
     the temporary help services industry and averaging the five most recent years of the
     Sales / Working Capital Ratio. The resulting average of 20.9 indicates that, of the over
     100 companies RMA tracks in CLS's industry, the average company's sales were 20.9
     times higher than their working capital. I applied this ratio to the Company's forecasted
     annual sales[29] to derive a target working capital balance by year and consequently
     derive the annual amount by which working capital would increase, and thereby
     decrease cash flow to invested capital.

44.  To calculate the cost of capital, also called a discount rate or required rate of return, I
     used the Weighted Average Cost of Capital ("WACC"). The WACC recognizes that most
     companies have both equity and debt as components of their capital structure and,
     more importantly, that these two components of the capital structure have very
     different costs or required rates of return. I sourced cost of equity data using the Duff &
     Phelps Cost of Capital Navigator and, using the Capital Asset Pricing Model ("CAPM"),
     determined the cost of equity to be 15.72%[30]. I sourced cost of debt data from the
     Federal Reserve, assuming a Baa corporate bond, and determined the pre-tax cost of
     debt to be 4.55% and the post-tax cost of debt to be 2.73%. I summarized the amount of
     debt included in the CLS capital structure allowing me to perform iterative calculations
     and determine that the CLS capital structure is 5.60% debt and 94.40% equity[31]. Finally,
     the cost of equity multiplied by its portion of the capital structure is added to the post-

---

[25] CLS000357
[26] CLS000358
[27] Forecasts/projections prepared by CLS management were not produced by the Plaintiff upon request
necessitating the use of the only forecasts available, those presented in the P&N report.
[28] Exhibit AMS-4.1
[29] Exhibit AMS-4.2
[30] Exhibit AMS-4.3
[31] Exhibit AMS-4.4

tax cost of debt multiplied by its portion of the capital structure to arrive at a WACC of 14.99%[32].

45.    Excluded from my WACC calculation is any adjustment for a company-specific risk premium ("CSRP"). Proponents of the CSRP allege that the companies they value are so unique that they face challenges other companies in their industry do not face and, thus, they must price in additional risk specific to the Company they are assessing. Oddly enough, I have never seen an exceptional company, such as CLS, benefit from a reduction in overall risk because it is outperforming in measures of growth, profitability and execution and is thereby inherently less risky than its industry peers. One judge stated "To judges, the company-specific risk premium often seems like the device experts employ to bring their final results in line with their client's objectives, when other valuation inputs fail to do the trick."[33] It is well-known and often discussed in corporate finance and investment communities that the risk the CSRP purports to address is: A) risk that should have already been considered and addressed through the company's forecasts; and B) risk that is easily diversified away.

46.    The enterprise value of the subject company is comprised of two elements, the present value of the discrete period cash flows and the present value of the terminal period cash flows. The discrete period captures value created during the projection period of the DCF analysis, in this case through 12/31/2021, while the terminal period is meant to capture all value created after the discrete period ends. The WACC as calculated above is applied to the annual free cash flows for each year in the discrete period. Free cash flows from the terminal period are divided by the capitalization rate then discounted back to present value and added to the total derived from the annual cash flows. The resulting total is $17,999,078 which represents the enterprise value of the subject company. After adjusting for cash, non-operating assets and interest-bearing debt, my estimate of the equity value of 100% of the subject company is **$17,535,666**.

47.    <u>Guideline Transactions Analysis</u>. As previously mentioned, the foundation of a Guideline Transaction Analysis is a sample of acquisition or merger transactions involving companies similar to the subject company. I utilized the DoneDeals database and searched for transactions from 01/01/2013 – the valuation date in SIC codes 7361 and 7363, that included staffing in the description and were profitable (EBITDA greater than zero)[34]. I then reviewed the list of 11 transactions and excluded two transactions that included significant contingent compensation to the seller as this would lead to unnecessary uncertainty in the actual deal price and resulting multiples. I performed a

---

[32] Exhibit AMS-4.5
[33] *Del. Open MRI Radiology Assoc. v. Kessler*, 898 A.2d 290 (Del Ch. 2006)
[34] Exhibit AMS-5

statistical analysis on the full data set and then repeated that analysis on the data excluding the transaction that yielded the highest EBITDA multiple and the transaction that yielded the lowest EBITDA multiple. The standard deviation and the coefficient of variation, both indications of variability within a data set, dropped significantly in the trimmed data set, indicating more uniform results in the EBITDA multiple results, despite the significant variation in company size.

48.     I selected the median EBITDA multiple from the trimmed data set which is 12.33[35]. I applied this multiple to the Company's 2018 projected EBITDA and arrived at an enterprise value of $20,299,716. After adjusting for cash, non-operating assets and interest-bearing debt, my estimate of the equity value of 100% of the subject company is **$19,821,767**.

49.     <u>Guideline Public Company Analysis</u>. As previously mentioned, the foundation of a Guideline Public Company Analysis is a sample of publicly traded companies similar to the subject company. I used KeyValueData to search for companies operating in SIC Codes 7361 and 7363 with staffing in the company description. My search resulted in four companies varying widely in size from $33M to $2.5B in revenue. I calculated two pricing multiples for each company, Market Value of Invested Capital ("MVIC") /EBIT and MVIC/EBITDA. I performed a statistical analysis on the full data set and then repeated that analysis on the data excluding two companies with data only as recent as 2014 and 2015. the transaction that yielded the highest EBITDA multiple and the transaction that yielded the lowest EBITDA multiple. The standard deviation and the coefficient of variation, both indications of variability within a data set, dropped significantly in the trimmed data set, indicating more uniform results in the EBIT and EBITDA multiple results, however, this reduced my data set to two and actually increased the average EBIT and EBITDA multiples. Erring in favor of a larger data set and more conservative multiples, I selected the average multiples from the full data set and applied them to the appropriate projected 2018 financial measures. Weighting the EBIT and EBITDA multiples evenly, my estimate of the equity value of 100% of the subject company is **$21,576,585**.

**VALUATION SUMMARY**

50.     Of the three methods I used in estimating the fair value of CLS, I place a 40% weight on the Discounted Cash Flow indication of value, a 40% weight on the Guideline Transactions indication of value, and a 20% weight on the Guideline Public Company indication of value. The result is as follows:

---

[35] Exhibit AMS-5

| Complete Logistical Services, LLC Summary of Value Indications | As of February 28, 2018 | | |
|---|---|---|---|
| | Value by Method | Weights Applied | Weighted Results |
| Discounted Cash Flow | $    17,535,666 | 40% | $    7,014,266 |
| Guideline Transactions | $    19,821,767 | 40% | $    7,928,707 |
| Guideline Public Company | $    21,576,585 | 20% | $    4,315,317 |
| | | 100% | $    19,258,290 |

|  |  |
|---|---|
| Fair Value of 100% of the Equity of CLS as of February 28, 2018 | $    19,258,290 |
| Subject Interest Percentage | 33.33% |
| **Fair Value of 33.33% Equity Interest in CLS (rounded)** | **$    6,419,000** |

**VALUATION ADJUSTMENTS**

51.   As discussed in paragraphs 12 – 18 above, the standard of value appropriate in this instance is the standard of Fair Value. Fair Value excludes consideration of discounts for lack of control or lack of marketability.

**EXPULSION PRICE**

52.   Article 10.3 of the Company operating agreement, provides that the expulsion price "shall take into account all losses caused by the offending member whether actual or speculative."

53.   In his deposition, Spencer Sens, President and CEO of the Company, was asked several questions regarding what losses were caused by the Defendant when he withdrew a portion of his back salary, the $222,000. His responses indicate little if any affect other than being short on cash flow for a couple of days[36]. Mr. Sens alleges that the withdrawal caused them to lose a key employee and consequently a client or two because part of the withdrawal was earmarked for employee bonuses[37]. However,

---

[36] Sens Depo. page 161, line 4
[37] Sens Depo. Page 164, line 11

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

information to the contrary suggests the cause and effect alleged by Mr. Sens is a stretch.

54. In the same deposition, Mr. Sens stated that the bank funded the payroll shortfall the very next day[38], the Company's factoring company chipped in another roughly $40,000[39], and they received a customer payment they weren't expecting[40]. Additionally, a brief review of the "office" or "indirect" salaries paid by CLS by month tells a much different story[41].

55. The $222,000 salary withdrawal occurred on December 6, 2017. By the end of that same December, CLS had generated over $1.4M in revenue, its fourth highest month in the 21-month period analyzed in AMS-8. Then, in March of 2018, CLS paid out a record total in salaries and or bonuses. $282,245 was paid out, making it the highest month in this analysis. In fact, the March total is 2.4 times higher than the next highest month, July of 2017 in which only $120,199 was paid out. The average salary for every month other than March of 2018 is $83,573. March exceeded this average by 3.4 times, or $198,672.

56. Reviewing the fact pattern in the two paragraphs above should not lead any rational person to believe CLS lost an employee due to its inability to pay a bonus. I have found nothing else indicating any losses, whether actual or speculative, caused by the Defendant. Consequently, I have made no adjustments to the fair value of a 33.33% equity interest stated above.

**CONCLUSION**

57. Based on the analysis presented in this report, my estimate of the expulsion price for Mr. Donald Rulh, Jr.'s 33.33% membership interest in CLS as of February 28, 2018 is **$6,419,000**.

---

[38] Sens Depo. Page 160, line 22
[39] Sens Depo. Page 162, line 1
[40] Sens Depo. Page 161, line 2
[41] Exhibit AMS-8

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

ATHEN M. SWEET

INNOVATUS IQ, LLC

**APPENDIX A**

6406 Muir St | Baton Rouge, LA  70817 | (225) 306-3116 x700 | athen.s@innovatusiq.com

EDUCATION

Master of Business Administration                                                         2008
Bachelor of Science, Accounting                                                            2007
*Southeastern Louisiana University*
- Completed undergraduate and graduate degrees in 3 years, 9 months total

Professional Licenses & Certifications
- Certified Public Accountant from 2009 – 2016, licensed in the state of Louisiana

EXPERIENCE

Founder & CEO                                                                               2016
*Innovatus IQ, LLC.*
- Launched in December of 2016, IIQ is full-service Merger & Acquisition Advisory firm. In addition to M&A Advisory, we offer Business Valuation services, advisory services focused on raising capital at various stages of the company life cycle, Innovation Development, Strategic Advisory, Staff and Business Culture Development, Executive Coaching, Financial Consulting, Management Consulting, and various other advisory services deemed valuable by our clients.
- I currently develop and lead every initiative at IIQ, review all final work product, develop all business, train all employees, and most importantly, define and drive company culture.

Equity Partner, Tax and For-Profit Consulting Divisions                                     2012
Director of Healthcare Consulting Services                                                  2010
Staff Accountant                                                                            2008
*Faulk & Winkler, LLC*
- Initiated, grew and led the Outsourced CFO service line, focused on for-profit clients. Managed the provision of service for all accounting and financial aspects, from AP/AR Clerks, to Controllers to the CFO position, for multiple companies simultaneously, some as large as $75M in annual revenue. As CFO, my responsibilities included leading acquisition deal teams, valuations, leading recapitalization efforts, ultimate responsibility for the integrity of corporate financial statements and internal controls, and providing clear strategic direction and financial advice to the Owner(s)/CEO.
- Responsible for final review of all Firm valuation work, M&A strategies, and complex or uncertain tax strategies.
- Excelled as the head of recruitment and retention.

ASSOCIATIONS AND MEMBERSHIPS

Member, Baton Rouge Rotary Club
Finance Chair, YMCA Board of Directors
Professional Chairman, Southeastern Louisiana University Accounting Advisory Committee
- Chair of the professional arm of the committee consisting of three arms – Professional, Faculty, and Student
- Tasked to contribute to curriculum development, soft-skill enhancement, and general preparation for success

**APPENDIX A**

PRESENTATIONS
- Conducted one graduate-level class each semester as Southeastern Louisiana University during 2016 and 2017. Topics alternated between the M&A Process and the Importance of Soft Skills and Communication. Generally delivered to the Capstone class of the MBA program.
- Frequently requested speaker at Medical Group Management Association (MGMA) events. Topics include, valuations for Partner entry/exit, medical practice mergers, financial metrics, trending, internal controls, and fraud detection.
- CYA 360 Presentation on the challenges and benefits of Captive Insurance Companies for pooled self-insurance and wealth preservation purposes.

PRIOR EXPERT TESTIMONY

-Darrin Stanton, and HNL, LLC v. Organic Energy Corporation, and George K. Gitschel. C.A. No. 10945-VCL. I was engaged by the Defendants to issue a rebuttal report in response to a report issued by an expert for the Plaintiffs. The key issues addressed included those of solvency, business valuation, and the valuation of certain intellectual property. On January 24, 2018, this case was dismissed with prejudice. My rebuttal report was submitted to the Court in advance of this dismissal which occurred before I was deposed or required to testify.

-William Richard Kruse, *et. al.* v. Synapse Wireless, Inc. I was engaged by the petitioners. Over the course of the engagement I issued an initial report, issued a rebuttal report, was deposed, and testified at trial. The case is ongoing as of 04/03/2019.

**APPENDIX B**

| Beginning Bates Number | Ending Bates Number | Document Description |
|---|---|---|
| | | CLS Operating Agreement dated August 2011 |
| CLS000295 | CLS000384 | P&N Valuation |
| CLS002663 | CLS002746 | CLS Monthly Financial Statements |
| | | 2019-03-13 CLS Responses to Rulh's 3rd RFPs |
| | | Sens Deposition p158-165 & p178-185 |
| | | Rulh Position Paper dated 01-28-2019 |
| | | Kowle v Civil and Structural Engineers Third Circuit No CA 18-398 |
| | | ASA 2018 Staffing Industry Playbook |
| | | *Cost of Capital in Litigation: Applications and Examples* Shannon P. Pratt and Roger J. Grabowski (2011) John Wiley & Sons, Inc. |
| | | FASB ASC 820 |
| | | Fishman, J. E., Pratt, S. P., Griffith, J. C., & Wilson, D. K. (2002). *Guide to Business Valuations.* Practitioners Publishing Company, Inc. |
| | | Revenue Ruling 59-60,C.B.237-IRCSec.2031(1 1959) |
| | | American Society of Appraisers. (n.d.). Definitions. ASA Business Valuation Standards |
| | | Other documents as citied throughout my report |