In the Matter of:

## Complete Logistical Services, LLC

**Versus**

## Donald Rulh, Jr., et al

## COMPLETE LOGISTICAL SERVICES, LLC THROUGH SPENCER SENS

*January 10, 2019*



EXHIBIT
C

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF LOUISIANA

 3

 4

 5  COMPLETE LOGISTICAL SERVICES, *  CIVIL ACTION
    LLC                           *  NO.:  18-3799
 6                                *
    VERSUS                        *  JUDGE:  ELDON E.
 7                                *  FALLON
                                  *
 8  DONALD RULH, JR., ET AL       *  MAGISTRATE JUDGE:
                                  *  MICHAEL NORTH
 9  *  *  *  *  *  *  *  *  *  *  *

10

11          Deposition of COMPLETE LOGISTICAL SERVICES,

12  LLC, THROUGH ITS REPRESENTATIVE, SPENCER SENS,

13  taken at the offices of Phelps Dunbar, LLP, located

14  at 365 Canal Street, Suite 2000, New Orleans,

15  Louisiana  70130, on Thursday, the 10th day of

16  January, 2019 at 9:53 a.m.

17

18

19

20

21  REPORTED BY:

22          QUINCEE B. ROCCAFORTE, CCR, RPR
            CERTIFIED COURT REPORTER
23

24

25
```

2

```
 1  APPEARANCES:

 2          PHELPS DUNBAR, LLC
            (BY:  DAVID PATRÓN, ESQUIRE)
 3          (BY:  ARTHUR R. KRAATZ, ESQUIRE)
            365 Canal Street
 4          Suite 2000
            New Orleans, Louisiana  70130
 5          504-566-1311
            david.patron@phelps.com
 6          arthur.kraatz@phelps.com
            (Counsel for the Plaintiff,
 7          Complete Logistical Services, LLC)

 8          FISHMAN HAYGOOD
            (BY:  LORI G. MINCE, ESQUIRE)
 9          201 St. Charles Avenue
            Suite 4600
10          New Orleans, Louisiana  70170
            504-586-5252
11          lmince@fishmanhaygood.com
            (Counsel for Spencer Sens)
12
            SMITH & FAWER, LLC
13          (BY:  J. GEOFFREY ORMSBY, ESQUIRE)
            201 St. Charles Avenue
14          Suite 3702
            New Orleans, Louisiana  70170
15          504-525-2200
            gormsby@smithfawer.com
16          (Counsel for the Defendant,
            Donald Rulh, Jr.)
17
            THE MORICE LAW FIRM
18          (BY:  MARK E. MORICE, ESQUIRE)
            1132 Derbigny Street
19          Gretna, Louisiana  70053
            504-366-1641
20          markmorice@moricelawfirm.com
            (Counsel for the Defendants,
21          Michele Elwell, Shawana Harris, Arnold Baker
            and Morris Kahn)
22
     ALSO PRESENT:
23          MICHELE ELWELL
            SHAWANA HARRIS
24          DONALD RULH, JR.

25
```

COMPLETE LOGISTICAL SERVICES, LLC THROUGH SPENCER SENS on 01/10/2019

3

```
 1                        INDEX

 2  EXAMINATION BY:
    MR. ORMSBY.....................................  5
 3  MR. MORICE.................................... 194
    MR. PATRÓN.................................... 305
 4  RE-EXAMINATION BY:
    EXAMINATION BY:
 5  MR. ORMSBY.............................. 293, 309
    MR. MORICE.................................... 318
 6
                      *   *   *   *   *
 7                       EXHIBITS
    Exhibit No. 1..................................  7
 8       (Notice of Deposition)
    Exhibit No. 2................................. 13
 9       (Secretary of State corporation documents)
    Exhibit No. 3................................. 22
10       (Operating agreement of CLS)
    Exhibit No. 4................................. 23
11       (4/23/2014 meeting minutes)
    Exhibit No. 5................................. 42
12       (11/28/2017 e-mail from M. Carbo to S. Sens)
    Exhibit No. 6................................. 53
13       (Notice of meeting)
    Exhibit No. 7................................. 54
14       (12/6/2017 e-mail from D. Rulh to S. Sens)
    Exhibit No. 8................................. 55
15       (12/7/2016 e-mail from D. Rulh to S. Sens)
    Exhibit No. 9................................. 67
16       (12/6/2017 e-mail from M. Carbo to M.
         Fullmer)
17  Exhibit No. 10................................ 71
         (12/22/2017 e-mail from M. Fullmer to
18       L. Rose)
    Exhibit No. 11................................ 83
19       (Consent of members)
    Exhibit No. 12................................ 86
20       (1/3/2018 e-mail from M. Villarrubia o/b/o
         M. Fullmer to D. Rulh)
21  Exhibit No. 13................................ 89
         (1/5/2018 e-mail from M. Villarrubia o/b/o
22       M. Fullmer to D. Rulh)
    Exhibit No. 14................................ 90
23       (1/23/2018 letter from M. Fullmer to D. Rulh)
    Exhibit No. 15................................ 92
24       (Meeting minutes)
    Exhibit No. 16................................ 92
25       (Consent of members)
```

 1   EXHIBITS CONTINUED:
     Exhibit No. 17................................ 109
 2        (Verified amended complaint)
     Exhibit No. 18................................ 114
 3        (4/11/2018 letter from M. Fullmer to D. Rulh
          and M. Carbo)
 4   Exhibit No. 19................................ 135
          (Vistage slideshow)
 5   Exhibit No. 20................................ 136
          (Vistage Group 4080 quarterly trend analysis)
 6   Exhibit No. 21................................ 140
          (4/6/2017 e-mail from S. Sens to K.
 7        Brouillette)
     Exhibit No. 22................................ 145
 8        (Quarterly sales spreadsheet)
     Exhibit No. 23................................ 159
 9        (Postlethwaite & Netterville business
          valuation and expulsion price analysis)
10   Exhibit No. 24................................ 168
          (3/9/2018 nondisclosure agreement)
11   Exhibit No. 25................................ 297
          (1/22/2018 notes taken by D. Rulh)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    S T I P U L A T I O N

3

4        It is stipulated and agreed by and between

5    counsel for the parties hereto that the deposition

6    of the aforementioned witness is hereby being taken

7    under the Federal Code of Civil Procedure, for all

8    purposes, in accordance with law;

9        That the formalities of reading and signing

10   are specifically waived;

11       That the formalities of sealing,

12   certification, and filing are specifically waived;

13       That all objections, save those as to the

14   form of the question and the responsiveness of the

15   answer, are hereby reserved until such time as this

16   deposition, or any part thereof, may be used or

17   sought to be used in evidence.

18

19       QUINCEE B. ROCCAFORTE, Certified Court

20   Reporter in and for the State of Louisiana,

21   officiated in administering the oath to the

22   witness.

23

24

25

```
 1              Sure.                                        11:20

 2         (A discussion was held off the record.)

 3    BY MR. ORMSBY:

 4         Q.    I presume this is Donald writing; is

 5    that correct?

 6         A.    Yes.

 7         Q.    Okay.  And on the next page, CLS, the

 8    last two digits, 65, Donald -- at the top, before

 9    the two lines, the second to last paragraph, "We

10    pay 30,000 a year for Vistage."

11              Who is Vistage?

12         A.    Okay.  So Vistage is a CEO roundtable

13    group, and then there's a key group.

14         Q.    And Donald was aware that --

15         MR. MORICE:

16              In Kenner, you said?

17         THE WITNESS:

18              A key group.  So you have a CEO group

19    and then you have, like, a key employee group.

20    BY MR. ORMSBY:

21         Q.    And Donald was aware that you had

22    people were members of -- or that CLS was members

23    of Vistage?

24         A.    Yeah.  Yes.

25         Q.    Okay.  Now, you would agree with me
```

1  that in conjunction with CLS being affiliated with      11:23

2  Vistage, you provided them with CLS financial

3  information, correct?

4          A.    Very basic financial.

5          Q.    Okay.  And was Donald aware that you

6  were providing that financial information to

7  Vistage?

8          A.    I'm assuming, yes.

9          Q.    Okay.  You're assuming; you don't know

10  for certain?

11          A.    (Shakes head.)

12          Q.    Okay.  Because at the next -- at the

13  next paragraph, he says, "At Vistage, she is likely

14  showing our books when I don't trust none of those

15  cut-throat guys."

16              Do you see that?

17          A.    Uh-huh.

18          THE COURT REPORTER:

19              "Yes"?

20          THE WITNESS:

21              Yes.  I'm sorry.

22          THE COURT REPORTER:

23              Thank you.

24          THE WITNESS:

25              I'm sorry.

1        Q.    Well, what's the basis of your lawsuit,        01:13

2   of CLS's lawsuit?

3        A.    The basis of the lawsuit is that he

4   took the financial information and he distributed

5   it to other people to start a competing company.

6        Q.    Okay.  What date did he take the

7   financial information?

8        A.    I discovered it on, I think March 10th.

9        Q.    Okay.

10       A.    Of 2018.  March 9th, March 10th,

11  something like that.

12       Q.    Okay.  So up until March 10th, 2019 --

13  I mean, 2018, you would need to see the notices or

14  the minutes from any meeting to determine if he was

15  authorized or not authorized?

16       A.    Well, I can -- I can tell you that on

17  advice of legal counsel, I removed his access from

18  the company software, his passwords.

19       Q.    Did you tell him that?

20       A.    No.

21       Q.    Okay.  Did you ever tell him that he

22  was unauthorized to access the financial

23  documentation?

24       A.    I had no contact personally with

25  Mr. Rulh after November of 2017.

1  was an assignee and did not have the right to

2  access that financial information, correct?

3        A.    Yes.

4        Q.    Okay.  And now you contend that that

5  financial information is a trade secret, right,

6  proprietary information --

7        A.    The information that he took, yes, that

8  I --

9        Q.    The financial records, the incomes and

10  financials?

11        A.    Customer list, yes.

12        Q.    Okay.  Let's talk about the customer

13  list.

14              Do you agree with me that Donald,

15  working at that company, knew who your customers

16  were?

17        A.    I believe he probably knew most of

18  them, yes.

19        Q.    Okay.  Most or all?

20        A.    I'd say most.

21        Q.    So those were committed to his memory.

22  He didn't need a sheet of paper to know who those

23  were, did he?

24        A.    No.

25        Q.    Okay.  So how would the customer list

01:22

1  assist Donald in competing against you if it's          01:23

2  already in his head?

3      A.    So the customer list with revenue is a

4  competitive advantage.

5      Q.    How?

6      A.    Because I can tell you most of my

7  competitors have a general knowledge of who our

8  competitors are, just like I have a general

9  knowledge of theirs.

10      Q.    Sure.

11      A.    But if they knew my revenue amount of

12  what we did, then that would give them a more

13  competitive advantage on who to target if they were

14  going to go -- seriously go after my business.

15  Just like if a brand new start-up was to come up

16  and have my customer list with my revenues since

17  the start of the company, they're going to go, yep,

18  this is where we're going first.

19      Q.    You don't think Donald knew what

20  generally your revenues were from these customers?

21      A.    Generally -- generally, no.

22      Q.    Well, he just looked at the financials

23  in November.

24      A.    Right.

25      Q.    So you don't think he knew what the

1  revenues were already?                                01:24

2        MR. PATRÓN:

3            Object to the form.

4        THE WITNESS:

5            I don't know what Donald knows.

6  BY MR. ORMSBY:

7        Q.    Well, you know that his attorney sent a

8  letter to your -- to the company's attorneys --

9        A.    Correct.

10       Q.    -- asking for financial records that

11  were, in fact, reviewed by his attorney.

12       A.    Yeah, but it didn't include revenue by

13  client, I don't think, that I recall.

14       Q.    Okay.  So your position is that if a

15  competitor knows how much money you're making off

16  of a client, he's more apt to go after that client?

17       A.    Yes.

18       Q.    Isn't it true that all the other

19  staffing agencies and companies like yourself are

20  out there fighting for the same customers?

21       A.    Yes.

22       Q.    Right.

23            Isn't it a limited pool of customers?

24       A.    In certain businesses, there are, but

25  in the oil and gas, I think it's -- you could say

1  it's a certain pool, but it's a very large pool.  I  01:25

2  mean, we're not even close to being -- having the

3  number of customers that we could have.

4      Q.    So you believe that people only seek to

5  solicit customers if they know there's a lot of

6  revenue generated from that entity?  That's your

7  position?

8      A.    I believe it's an advantage, yes.

9      Q.    How is it an advantage to know what the

10  revenues are?

11      A.    Well, when you're starting off with

12  current knowledge of the company that you're an

13  owner of and with two employees or ex-employees

14  that know your operation with your client base and

15  the amount of revenue, it makes it easy to target.

16  That's a competitive advantage.

17      Q.    Well, he knows who your clients are

18  anyways, so why would he target them without

19  knowing what the revenues are?

20      A.    I don't know what he was thinking.

21      Q.    No.  I mean, that's what your basis of

22  your lawsuit is, is that that financial

23  information, that even though he's committed the

24  customers to his memory, the fact that he knew the

25  revenues somehow gives him a competitive advantage.

1          MR. PATRÓN:                                    01:26

2               Object to form.

3    BY MR. ORMSBY:

4          Q.    So how is that -- if he knows who the

5    customer is, why does the amount of revenue have

6    anything to do with whether or not that person

7    targets that customer?

8          MR. PATRÓN:

9               Same objection.

10              You can answer if you can.

11         MR. ORMSBY:

12              You can answer.

13         THE WITNESS:

14              Okay.  I just -- and because I can tell

15   you, if somebody -- if I had my clients' -- I mean,

16   my competitors' lists like that, I would know who I

17   wanted to go after.  If I was making a list of the

18   customers to go after, I'm going after the ones

19   with the big money.

20   BY MR. ORMSBY:

21         Q.    Okay.  Was one of the customers that

22   you were dealing with prior to Donald being

23   expelled Noble Drilling?

24         A.    Yes.

25         Q.    Okay.  Do you think you're the only

1  person that tried to solicit Noble Drilling to    01:26

2  work?

3       A.    No.

4       Q.    Okay.  Do you think there are other

5  staffing agencies out there trying to solicit Noble

6  Drilling to work who don't know what your revenues

7  are?

8       A.    Yes.

9       Q.    So how does that give them -- how would

10 that company who's soliciting Noble Drilling have a

11 competitive advantage knowing how much money you

12 made?

13      A.    Because two of the partners in the new

14 company know the contact and they know the revenue.

15 It gets them easier.  When they start working on a

16 client in the offshore market, if we're starting

17 from scratch, it will take us a year to a year and

18 a half to get in that door.

19      Q.    But they know the contract because it's

20 committed to their memory, not on a sheet of paper.

21      A.    Right.  Okay.

22      Q.    So what did Donald take that wasn't

23 committed to memory that would have given him a

24 competitive advantage?

25      A.    I don't know Donald's memory.

1      Q.    Look, your company, at your behest,      01:27

2   filed a lawsuit saying he took documents that are

3   trade secrets.

4      A.    Yes.

5      Q.    You've conceded that the clients, most

6   of the clients and customers of CLS, were committed

7   to Donald's memory.

8      A.    I haven't conceded that.  I just told

9   you I don't know what Donald's memory is.

10      Q.    So you think Donald needs your customer

11   list to know who your clients were?  That's your

12   position?

13      A.    To know all of them, yes.

14      Q.    Okay.  And why do you believe he would

15   not know who all of the clients are of the company

16   he's a 33 percent owner of?

17      A.    Because he wasn't involved in the

18   day-to-day operations every day.

19      Q.    Okay.  Was Shawana up until the time

20   she was terminated in March of 2018?

21      A.    Yes.  Yes.

22      Q.    Would she know who your clients were?

23      A.    Yes.

24      Q.    Okay.

25      A.    She wouldn't know the revenue, though.

1      Q.    Okay.  So the revenue is in the          01:28

2    financial documents, not on the customer list,

3    correct?

4      A.    Yes.

5      Q.    Okay.  So the customer list is solely a

6    list of the customers?

7      A.    Well, I mean, you can print a customer

8    list with the revenue out of the accounting

9    software, as well.

10     Q.    What did Donald do?

11     A.    He did it out of the accounting

12    software.

13     Q.    So he printed a customer list and had

14    the revenue right next to it?

15     A.    Yes.

16     Q.    Okay.  And you believe Donald took that

17    customer list and somehow started a competing

18    business?

19     A.    I was in the process of starting a

20    competing business.

21     Q.    And what leads you to believe that?

22     A.    I also discovered an NDA that he was

23    distributing to Ms. Elwell, Ms. Harris, Mr. Baker

24    and Mr. Kahn.

25     Q.    But you agree that Donald could

1           I'm sorry, 23 what?                    01:36

2      MR. ORMSBY:

3           234.

4      THE WITNESS:

5           Yes.

6  BY MR. ORMSBY:

7      Q.   You see that?

8      A.   Yes.

9      Q.   So you're providing revenue information

10 to people involved with Vistage of your customers?

11     A.   Generally, yes, we given them an

12 outline of what it is.  We don't apply it to all --

13     MR. PATRÓN:

14          I'm sorry, this page is designated as

15 attorney's eyes only.

16     MR. ORMSBY:

17          Okay.  All right.  Well, don't let them

18 see it.  They don't see it.

19          You want them out of the room?

20     MS. HARRIS:

21          I won't see it.

22     MR. PATRÓN:

23          Yeah, I mean, if -- I don't know how

24 detailed you're going to get into this.

25     MR. ORMSBY:

1            A lot.                                                 01:37

2       MR. PATRÓN:

3            Okay.  If we're going to have testimony

4   of attorney eyes only, let us have attorneys only.

5       MR. ORMSBY:

6            You want them out.

7       MR. PATRÓN:

8            Okay.

9   BY MR. ORMSBY:

10      Q.   So this document -- now, let me just --

11  your testimony was that the information, the

12  financial information that Donald took in March of

13  2018, the customer list, gave him a competitive

14  advantage because it had the revenue for customers.

15           I'm asking you right here, did you not

16  provide for one, two, three, four, five, six,

17  seven, eight, nine, ten clients revenue information

18  to Vistage, which is a gang of CEOs and other

19  people in your industry?

20      A.   They're not in my industry and we are

21  all bound to a confidentiality agreement inside of

22  Vistage.  So what we discuss in Vistage stays in

23  Vistage.

24      Q.   But you're producing -- okay.  So who

25  are members of Vistage?

1        A.     You got -- there's 16 guys in my group.     01:38

2        Q.     Is there anyone in the same industry as

3    you?

4        A.     No.

5        Q.     So why are you providing revenue

6    information to these people?

7        A.     We typically look at each other's.  We

8    do a presentation to each other and we ask

9    questions to make sure that we fully understand our

10   financials, as a CEO.  It's a group for growth.

11       Q.     Okay.

12       A.     Figure out which directions, you know,

13   we may think about moving, make suggestions,

14   et cetera.

15       Q.     Okay.  And your understanding is that

16   none of this information is shared with anyone

17   outside of Vistage?

18       A.     That's exactly my understanding.

19       Q.     Okay.  But Donald, as I showed you in

20   December, had a problem with you giving financials

21   to Vistage, didn't he?  Remember I showed you the

22   e-mail earlier?

23       A.     Yeah.

24       Q.     Okay.  Why is it important for them to

25   know what the specific revenues are for a

 1  particular entity?                                      01:39

 2        A.    It's not.

 3        Q.    Okay.  So you had no problem giving it

 4  to them, right?

 5        A.    I had -- yeah, because I know it's

 6  confidential.

 7        Q.    It's not confidential if you're giving

 8  it to someone else?  It may stay within that group

 9  but --

10        A.    In that group.

11        Q.    -- that person has that in their mind?

12        A.    Right.  In that group, it stayed

13  confidential.

14        Q.    And how do you make sure that that

15  person doesn't use what he knows to go target a

16  client?

17        A.    Because they're not in my industry.

18        Q.    None of them?

19        A.    None of them.

20        Q.    So tell me who the 16 people are who

21  are in there.

22        A.    There's obviously myself.  There's a

23  guy that owns a chemical plant, chemical processing

24  plant, guy that owns a generator company, guy that

25  owns an oilfield rental company, guy that owns a

1  food wholesale distributor, construction company, a        01:40

2  solar panel company, a salad restaurant.

3      Q.    Okay.  So what's a salad restaurant guy

4  going to know about ballasts and engineers?

5      A.    He doesn't.

6      Q.    Okay.

7      A.    We're giving a presentation of our

8  company and what we do, kind of that --

9      Q.    Right.

10          You give a presentation where you're

11  giving revenues of particular clients, which you

12  told me is your trade secret.

13      A.    And I only do it because I have a

14  confidentiality agreement with --

15      Q.    Did Donald know you were giving this

16  information out?

17      A.    No.

18      Q.    Okay.

19      MR. MORICE:

20          What exhibit is that?

21      MR. ORMSBY:

22          It's 19.

23      (Exhibit No. 19 was marked for

24      identification.)

25      MS. MINCE:

1                 If you want, perhaps it would be          01:41

2   simpler to just identify it by Bates range so we

3   don't have to deal with --

4        MR. ORMSBY:

5                 Yeah.  CLS000220 through CLS000240.

6   BY MR. ORMSBY:

7        Q.   All right.  And then I'm going to show

8   you this one is attorney eyes only, as well.

9        (Exhibit No. 20 was marked for

10       identification.)

11  BY MR. ORMSBY:

12       Q.   This is CLS000211 to CLS000212.

13       A.   Uh-huh.

14       Q.   Vistage group 4080, do you know what

15  that means?

16       A.   Yes.

17       Q.   This is information you submitted to

18  Vistage, right?

19       A.   I didn't submit it.  I showed it on a

20  slide, yes.

21       Q.   So you showed, on a slide to these

22  CEOs, your quarterly sales, your gross profit, your

23  EBITDA and your yearly to date sales.  I mean, you

24  showed them all the financial information of the

25  company.

1          MR. PATRÓN:                                    01:43

2                  Object to form.

3    BY MR. ORMSBY:

4          Q.    Well, did you?

5          A.    It's not all the financial.  I mean,

6    it's general.

7          Q.    General.

8                  They know your revenue, right?

9          A.    Yeah.

10         Q.    Okay.  Which you're concerned about

11   other people getting from the customer list?

12         A.    No, I'm -- yeah, revenue and customer

13   list together, combined.

14         Q.    Okay.  You're not worried about people

15   knowing your revenue?

16         A.    No.

17         Q.    So you're not worried about people

18   getting the information about specific revenue as I

19   showed you in Exhibit 19?

20         A.    Show me what page on Exhibit 19 you're

21   talking about.

22         Q.    Sure.  That's the one where it says

23   Noble Drilling is generating close to a million

24   dollars in revenue.

25         A.    This is not something I'm going to post

1    on my website.  Again, this was a slideshow that I          01:43

2    shared with members of the group.

3         Q.    To 16 people?

4         A.    Right.  Outside of my industry.

5         Q.    But you believe that Donald having that

6    revenue information would make him target those

7    people, right?

8         A.    Yes.

9         Q.    So if Donald didn't have the revenue

10   information, you don't think he would target those

11   people?

12        MR. PATRÓN:

13             Object to form.

14        THE WITNESS:

15             I mean, I don't know what Donald

16   thinks.

17   BY MR. ORMSBY:

18        Q.    Do you only target people you know

19   that -- let me ask you, when you target people, do

20   you know what the revenue they're going to generate

21   is?

22        A.    No.

23        Q.    Right.

24             You go at them because they're a

25   potential customer?

1        A.     Yeah.                                          01:44

2        Q.     Right.

3        A.     But if I know a client that I have a

4   really good idea that their revenue is going to be

5   higher, I'm going to target that customer a little

6   bit harder than I'm going to target a mom and pop

7   in the bayou, as well.

8        Q.     That's soliciting business, man.

9   That's what you do.  You go after people.  You

10  don't need to know what revenues they may generate,

11  do you?

12       MR. PATRÓN:

13            Object to form.

14  BY MR. ORMSBY:

15       Q.     Do you go when you have a potential

16  client and say --

17       A.     I go --

18       Q.     -- oh, I can make 7 million off --

19       A.     No, I don't know exactly.

20       Q.     Right.

21            Who is Kelly Brouillette?

22       A.     Kelly Brouillette is our partner in

23  Trash Doctors.

24       Q.     Okay.  Is there a particular reason why

25  you and Angela Verdin would be providing Kelly

1  Brouillette financial information to CLS?                    01:45

2        A.    I would have to see what you're talking

3  about.

4        Q.    Well, I mean, it's a pretty general

5  question.  Why would she need to see financial

6  information of your company?

7        A.    Again, I would have to see the reason

8  that you're asking.

9        Q.    I'm not asking for a reason.  I'm

10  asking you what would be the reason.

11        A.    And I would have to see what you're

12  talking about.

13        Q.    Okay.  You don't remember providing her

14  information about your company?

15        A.    (Views document.)

16        Q.    This will be the next exhibit, attorney

17  eyes only.

18        MR. PATRÓN:

19              21?

20        MR. ORMSBY:

21              Yep.

22        (Exhibit No. 21 was marked for

23        identification.)

24        THE WITNESS:

25              I don't remember the exact context of

 1  why I sent that to her.                                    01:46

 2  BY MR. ORMSBY:

 3      Q.   So here you're providing her with

 4  information of sales, gross margin and net profit,

 5  right?

 6      A.   Uh-huh.

 7      Q.   But that's not a trade secret?  This is

 8  not a trade secret, this type of information?

 9      A.   No, it's a general revenue.

10      Q.   Okay.  So I just want to make sure I'm

11  clear, then.  When you talk about customer list and

12  financial information in your complaint that you

13  verified --

14      A.   Uh-huh.

15      Q.   -- you are -- so far I understand is a

16  customer list that shows corresponding revenue to

17  that client.  That's what you're concerned about,

18  correct?

19      A.   Customer list, corresponding revenue

20  and revenue per -- I mean, and revenue since the

21  company started, yeah, I mean --

22      Q.   Revenue specific?

23      A.   Well, I mean, revenue per client.  I

24  mean, that's what -- that's the gist of it.

25      Q.   So you're not concerned about general

1  other.                                                01:58

2           Please read the question back.

3  BY MR. ORMSBY:

4      Q.    On March 8th, what protections did CLS

5  have in place to keep this information from being

6  accessed from people like my client?

7      A.    We had removed his password access to

8  our financial software.

9      Q.    Okay.  What else did you do besides

10 that?

11     A.    We removed his passwords from Dropbox.

12     Q.    Okay.

13     A.    Suspended his e-mail account.

14     Q.    Okay.  What about systemwide, was there

15 any encryption done on this information?

16     A.    No.

17     Q.    Okay.  So you basically just restricted

18 his access?

19     A.    Yes.

20     Q.    Did you have a restricted server or

21 anything?  Was it on a restricted server?

22     A.    Give me a definition of --

23     Q.    I mean, was the server restricted to

24 people in a management capacity?

25     A.    Only people with passwords to certain

1  things, yes.                                              01:59

2       Q.    Okay.  And how many people had the

3  password to this server that had the financial

4  information?

5       A.    Myself, Donald Rulh, Janet Pipitone,

6  Doris Ellis, Mitchell -- I forget Mitchell's last

7  name and Angela Verdin.

8       Q.    Okay.  Was there anyone else who worked

9  in the office, besides those people, who was

10 restricted from accessing that information?

11      A.    Yes.

12      Q.    Who?

13      A.    That worked in the office?

14      Q.    Yes.

15      A.    That didn't have information?

16      Q.    Who couldn't access that information?

17      A.    The remainder of the employees.

18      Q.    How many of those people?

19      A.    In that office -- it depended on the

20 time, because sometimes we had a couple more

21 people, but an average number of about four.

22      MS. MINCE:

23           How many?

24      THE WITNESS:

25           Four.

 1  BY MR. ORMSBY:                                           02:00

 2       Q.    Four more than those people?

 3       A.    That did not have access to the system,

 4  yes.  They were operations people.

 5       Q.    Oh, okay.

 6             And were those people that did have

 7  access, did they sign a confidentiality provision

 8  acknowledging the sensitivity of the information?

 9       A.    I'm very sure that they did.  We've

10  submitted those, so if you have copies of them, I

11  can verify it for you.

12       Q.    So it's your understanding that Janet

13  Pipitone, Doris Ellis and Mitchell would have

14  executed something that --

15       A.    And Angela, yes.

16       Q.    -- where they acknowledged the

17  confidentiality and sensitivity of the information?

18       A.    Yes.

19             Without having the documents in front

20  of me --

21       Q.    Right.  That's cool.

22             Did Janet Pipitone know that Donald

23  wasn't supposed to access this information?

24       A.    Yes.

25       Q.    How did she know that?

1       A.    She was told by Angela Verdin.                    02:01

2       Q.    When was she told, if you know?

3       A.    I don't remember the -- I don't know

4  the exact date.  I wasn't privy to the

5  conversation.

6       Q.    Was she told before she got that

7  information for Donald or after?

8       A.    Before.

9       Q.    And she still did it?

10      A.    (Shrugs.)

11      Q.    Was she reprimanded?

12      A.    She was terminated.

13      Q.    Because of that?

14      A.    That's part -- yes.

15      Q.    That's part of it or that was the

16  reason?

17      A.    That's it, yes.

18      Q.    Is there a personnel file on her that

19  has a separation report?

20      A.    Yes, there is.

21      Q.    Okay.

22      MR. ORMSBY:

23            Can we get that?

24      MR. PATRÓN:

25            Why don't we talk off-line on that.

```
 1              REPORTER'S CERTIFICATE

 2

 3       I, QUINCEE B. ROCCAFORTE, Certified Court
    Reporter in and for the State of Louisiana,
 4  Certificate No. 21016, as the officer before whom
    this testimony was taken, do hereby certify that
 5  SPENCER SENS, after having been duly sworn by me on
    January 10, 2019, upon authority of R.S. 37:2554,
 6  did testify as hereinbefore set forth in the
    foregoing 331 pages;
 7       That this testimony was reported by me in the
    stenotype reporting method, was prepared and
 8  transcribed by me or under my personal direction
    and supervision, and is a true and correct
 9  transcript to the best of my ability and
    understanding;
10       That the transcript has been prepared in
    compliance with transcript format guidelines
11  required by statute or by rules of the board, and
    that I am informed about the complete arrangement,
12  financial or otherwise, with the person or entity
    making arrangements for deposition services;
13       That I have acted in compliance with the
    prohibition on contractual relationships, as
14  defined by Louisiana Code of Civil Procedure
    Article 1434 and in rules and advisory opinions of
15  the board;
         That I have no actual knowledge of any
16  prohibited employment or contractual relationship,
    direct or indirect between a court reporting firm
17  and any party litigant in this matter or is that
    any such relationship between myself and a party
18  litigant in this matter.
         I am not related to counsel or to the parties
19  herein, nor am I otherwise interested in the
    outcome of this matter.
20

21       Dated this 23rd day of January, 2019.

22

23

24       _____
         QUINCEE B. ROCCAFORTE, CCR, RPR
25       Certificate No. 21016
```