rt050919sweetROUGHDRAFT.txt

                                              1
                ROUGH DRAFT (SEE NOTE PG 1)


    1


    2          UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
    3            CIVIL ACTION NO. 18-3799


    4


    5


    6


    7
       COMPLETE LOGISTICAL       *
    8  SERVICES LLC              *
                                 *
    9  VERSUS                    *
                                 *
   10  DONALD RULH JR.,          *
       ARNOLD BAKER, MORRIS      *
   11  KAHN, MICHELE ELWELL,     *
       SHAWANA HARRIS            *
   12  *   *   *   *   *   *   *   *   *


   13
       Deposition of ATHEN M. SWEET, 6406 MUIR
   14  STREET, BATON ROUGE, LOUISIANA 70817, taken in
       the offices of Smith & Fawer, 201 St. Charles
   15  Avenue, Suite 3702, New Orleans, Louisiana
       70170, commencing at 9:37 a.m., on the 9th day
   16  of May, 2019.

   17            REPORTER'S NOTE AND WARNING

   18

   19            This transcript is unedited work

   20  product and must be regarded as such until

   21  corrected, certified, and signed by the Court

   22  Reporter.  The Reporter reserves all rights to



rt050919sweetROUGHDRAFT.txt

23  make whatever editing she deems necessary in

24  order to produce an accurate, verbatim record.

25

                    CURREN COURT REPORTERS
                         (504)833-3330

                                              2
              ROUGH DRAFT (SEE NOTE PG 1)


 1  APPEARANCES:

 2

 3

         PHELPS DUNBAR LLP
 4       Attorneys at Law
         (By:   David Patrón, Esquire)
 5       365 Canal Street, Suite 2000
         New Orleans, Louisiana 70130-6534
 6

 7

 8

         SMITH & FAWER LLC
 9       Attorneys at Law
         (By:  J. Geoffrey Ormsby, Esquire)
10       201 St. Charles Avenue, Suite 3702
         New Orleans, Louisiana 70170
11

12

13

    ALSO PRESENT:
14
    Donald Rulh
15

16

    REPORTED BY:
17

```
                    rt050919sweetROUGHDRAFT.txt
18       KELLY MANUEL
         Certified Court Reporter
19       Registered Professional Reporter
         CURREN COURT REPORTERS
20       749 Aurora Avenue, Suite 4
         Metairie, Louisiana  70005
21       504.833.3330   504.833.3355 Fax

22

23

24

25


              CURREN COURT REPORTERS
                 (504)833-3330

                                    3
            ROUGH DRAFT (SEE NOTE PG 1)


 1                 I N D E X

 2    EXAMINATION BY MR. PATRÓN:           5

 3    EXAMINATION BY MR. ORMSBY:         235

 4    EXAMINATION BY MR. PATRÓN:         251

 5

 6

 7              INDEX OF EXHIBITS

 8

 9    EXHIBIT 1                          10

10

11

12

13
```

rt050919sweetROUGHDRAFT.txt

14

15

16

17

18

19

20

21

22

23

24

25

CURREN COURT REPORTERS
(504)833-3330

4
ROUGH DRAFT (SEE NOTE PG 1)

1           S T I P U L A T I O N

2

3          It is stipulated and agreed by and

4    between counsel for the parties hereto that

5    the deposition of the aforementioned witness

6    is hereby being taken under the Federal Rules

7    of Civil Procedure, for all purposes, in

8    accordance with law;

rt050919sweetROUGHDRAFT.txt

9       That the formalities of reading and

10  signing are specifically not waived;

11      That the formalities of filing, sealing

12  and certification are specifically waived;

13      That all objections, save those as to

14  the form of the question and the

15  responsiveness of the answer, are hereby

16  reserved until such time as this deposition,

17  or any part thereof, may be used or sought to

18  be used in evidence.

19          *   *   *   *

20      KELLY MANUEL, Certified Court Reporter,

21  Registered Professional Reporter, in and for

22  the State of Louisiana, officiated in

23  administering the oath to the

24  witness/witnesses.

25

                CURREN COURT REPORTERS
                   (504)833-3330

                                        5

                ROUGH DRAFT (SEE NOTE PG 1)


1        ATHEN M. SWEET,

2  after having been first duly sworn by the

3  above-mentioned Certified Court Reporter, did

4  testify as follows:
                    Page 5

rt050919sweetROUGHDRAFT.txt

5  these size characteristics equally?

6       A.   Yes.

7       Q.   Is that what Duff & Phelps says to

8  do?

9            Is this all part of the

10  Duff & Phelps program?

11      A.   This is all -- the source data is

12  based on the Duff & Phelps source data below

13  the line where, I have average and median

14  calculations.  I calculate the average and the

15  median for each the three sets of data.

16      Q.   Right.

17      A.   Those that were determined based

18  solely on the guideline method.  Those that

19  were determined by on a regression analysis.

20  And then the combined dataset to get a

21  holistic view of the company.

22      Q.   Okay.  Why did you do that?

23           And my question is:  You weighted

24  these equally to come up with an average

25  and median; on what base did you do that?

                CURREN COURT REPORTERS
                     (504)833-3330


                                        150
                ROUGH DRAFT (SEE NOTE PG 1)
                       Page 177

rt050919sweetROUGHDRAFT.txt

1       A.   That's -- it's standard to consider

2   each one of the sizes and not weight any more

3   heavily than others.   It's common practice.

4   And --

5       Q.   Is that something that's recommended

6   by Duff & Phelps in its Cost of Capital

7   Navigator?

8       A.   No.  I don't think they recommend

9   anything specific --

10      Q.   Okay.

11      A.   -- with regard to how to handle.

12           It does recommend that you

13   present cost of equity separately for

14   consideration, if you're using a

15   combination of regression and the guideline

16   method, which I've done.

17      Q.   Okay.  So just getting back to how

18   we got through all of this, you were talking

19   about the use of a company-specific risk

20   premium to make adjustments when you are

21   dealing with a privately-held company.

22           And your source data is all based

23   on publicly-held companies?

rt050919sweetROUGHDRAFT.txt

24      A.   Uh-huh (indicating affirmatively).

25      Q.   And then I asked you:  Is there any

                CURREN COURT REPORTERS
                   (504)833-3330

                                        151
             ROUGH DRAFT (SEE NOTE PG 1)


 1  value in trying to ascertain any difference in

 2  value based upon the fact that the company

 3  you're valuating is privately held and the

 4  data you have is publicly held.

 5            Do you remember that?

 6      A.   I do.

 7      Q.   Then you said it's already factored

 8  in because we're looking at size; right?

 9      A.   Uh-huh (indicating affirmatively).

10      Q.   And that's the whole discussion we

11  just had on size characteristics; right?

12      A.   Right.

13      Q.   So I get that.

14      A.   And to drive the point home, in four

15  of the seven cases, the subject company, CLS,

16  was actually larger than one of the

17  publicly-traded companies, one or more of the

18  publicly-traded companies in that 25th

19  portfolio.

rt050919sweetROUGHDRAFT.txt

21  head.

22      Q.   Okay.

23      A.   But they break it up into 25

24  portfolios because there's such a wide range.

25  And the companies that are worth billions and

CURREN COURT REPORTERS
(504)833-3330

                                        157
ROUGH DRAFT (SEE NOTE PG 1)

 1  billions of dollars are at the very top, in

 2  the first portfolio.

 3      Q.   That means they're all

 4  publicly-traded companies?

 5      A.   Correct.

 6      Q.   It's, basically, in terms of company

 7  size, breaking them up into 25 categories?

 8      A.   Duff & Phelps is.  I am not.

 9      Q.   Right.  Duff & Phelps is.  Right.

10          Okay.  So is it your opinion that

11  based upon your analysis, when comparing

12  CLS to that 25th percentile in

13  Duff & Phelps, that CLS has the same risk

14  as the publicly-traded companies within

15  that percentile?

16      A.   I would say it has very comparable

Page 186

rt050919sweetROUGHDRAFT.txt

17  risk.

18      Q.   Okay.

19      A.   I don't believe any two companies

20  have the same risk profile.

21      Q.   But your conclusion is that you're

22  using that 25 as the most comparable

23  measure --

24      A.   Correct.

25      Q.   -- for CLS's risk?  And that's what

                 CURREN COURT REPORTERS
                     (504)833-3330

                                        158
                 ROUGH DRAFT (SEE NOTE PG 1)

 1  you are using, in fact; right?

 2      A.   Correct.

 3      Q.   Okay.  And there are -- so there was

 4  no analysis that would include privately-held

 5  companies within that analysis; correct?

 6  Because Duff & Phelps didn't include any?

 7      A.   Correct.

 8      Q.   Okay.  And just to be clear, the

 9  Duff & Phelps companies are all the

10  publicly-traded company.  It's not limited to

11  those SIC codes that we were talking about

                     Page 187

rt050919sweetROUGHDRAFT.txt

12  before.  This is a wide spectrum, across many

13  industries?

14      A.   No.  When you're going through

15  the -- when you're going through the

16  Duff & Phelps process, you are indicating

17  what -- in what industry each -- in what

18  industry your subject company is in, which

19  identifies a SIC code.  That may just be for

20  the -- I think that's just for the industry.

21      Q.   Well, when you get put in a

22  percentile, like the 25th percentile, that's

23  not based upon any SIC code.

24          It's just where you fall in terms

25  of how big your company is; right?

                CURREN COURT REPORTERS
                   (504)833-3330

                                        159
                ROUGH DRAFT (SEE NOTE PG 1)


1      A.   Yes.  That's correct.

2      Q.   And this captures all of the

3  publicly-traded companies?

4      A.   I don't know.  I don't believe it

5  captures all of them.

6          I think it captures a

7  representative sample of each size.

                    Page 188

rt050919sweetROUGHDRAFT.txt

5   unsystematic risk of a single company.

6       Q.   Can you give me an example or

7   description of how you can, if a company does

8   have unsystematic risk, how that can be, as

9   you put it, diversified away by buying another

10  company?

11      A.   So one somebody considering an

12  investment in -- somebody considering an

13  investment in an oil and gas company that, of

14  course, there's market risk there, which is

15  systematic.  And you can't diversify it away.

16          There's also unsystematic risking

17  there in the form of, you know, joint

18  failed wells and so on, and so forth.

19          So you could diversify that away

20  by investing in one or two other oil and

21  gas companies to reduce the -- or mitigate

22  the risk of failure, or get into solar or

23  wind energy that doesn't have that same

24  type of unsystematic risk.

25      Q.   Okay.  The "A" point says that the

                CURREN COURT REPORTERS
                    (504)833-3330

                                    182
            ROUGH DRAFT (SEE NOTE PG 1)
                    Page 215

rt050919sweetROUGHDRAFT.txt

1  company-specific risk premium purports to

2  address, one of the things is, risk that

3  should have been -- should have already been

4  considered and addressed through the company's

5  forecast. (As read.)

6          Do you see that?

7      A.   I do.

8      Q.   And we touched on this on some

9  questions earlier.  I just want to clarify --

10     A.   Sure.

11     Q.   -- that.

12         So here, in this case of CLS, is

13  that -- you're relying on the company's

14  pre-incident forecast; right?

15     A.   Correct.

16     Q.   And what you're saying here is that

17  the company-specific risk premium is

18  purporting to address a risk that should have

19  already been considered in those forecasts; is

20  that right?

21     A.   That's correct.

22     Q.   Okay.  And so by not using the

23  company-specific risk premium, implicit in

rt050919sweetROUGHDRAFT.txt

24  that is your belief that the forecasts that

25  you are relying on do consider the risk that

CURREN COURT REPORTERS
(504)833-3330

183

ROUGH DRAFT (SEE NOTE PG 1)

1  the company-specific risk premium would

2  address; is that correct?

3       A.   Let me restate it, just to make sure

4  that we're on the same page.

5       Q.   Okay.

6       A.   The forecast upon which I and

7  Mr. MacMorran relied included growth rates

8  that were less than half of those that CLS had

9  achieved over the last three to four years.

10  Reducing expected growth to that extent,

11  whether willingly or by accident, is

12  incorporating a degree of execution risk, and

13  seemingly significantly.

14            So yes, that is one of the

15  reasons, you know, as I stated that --

16       Q.   So the forecast which scaled back

17  future growth compared to historical growth,

18  in a significant way, is your basis or

19  understanding for believing that those

Page 217

rt050919sweetROUGHDRAFT.txt

20  forecasts already considered and addressed the

21  risk that a company-specific risk premium

22  would otherwise address.

23          Is that fair?  Is that accurate?

24      A.   Yes.

25      Q.   All right.  Let's talk about the

                    CURREN COURT REPORTERS
                        (504)833-3330

                                        184
                ROUGH DRAFT (SEE NOTE PG 1)

 1  Risk Management Association.  What is that?

 2      A.   An organization that compiles and

 3  provides primarily ratio data for companies in

 4  various industries.

 5      Q.   Okay.  Your report relied on

 6  industry ratio data from what I'll call RMA;

 7  right?

 8      A.   Yes.

 9      Q.   And you used that industry ratio

10  data to estimate a sales working capital

11  ratio; right?

12      A.   I did.

13      Q.   Okay.  And that sales to working

14  capital ratio was used to project a change in

                    Page 218

rt050919sweetROUGHDRAFT.txt

15  working capital in the company's cash flow

16  forecast?

17       A.   Correct.

18       Q.   And so this is a way that you

19  deviated from what was in the P&N report;

20  right?

21       A.   I did.

22       Q.   And was the discounted cash flow

23  analysis in your report done on a debt-free

24  basis?

25       A.   Yes.

                 CURREN COURT REPORTERS
                    (504)833-3330

                                        185
                 ROUGH DRAFT (SEE NOTE PG 1)

1        Q.   Okay.  And was that the same for the

2  P&N report?

3        A.   I believe so.  Yes.

4        Q.   Okay.  Now, when you do a discounted

5  cash flow analysis on a debt-free basis, that

6  means cash flows have to be debt-free in order

7  to do that analysis?

8        A.   You -- your resulting -- the

9  resulting cash flow number that you discount

10  is cash flow to invested capital, as opposed

                    Page 219

rt050919sweetROUGHDRAFT.txt

11  to cash flow to debt.  So yes.

12      Q.   So you don't count cash that goes to

13  debt; is that right?

14      A.   You exclude debt from working

15  capital.

16      Q.   Okay.  So the working capital, there

17  needs to be adjustments that make the working

18  capital debt-free?

19      A.   Correct.

20      Q.   Okay.  Now, when you used the RMA

21  sales working capital ratio for a debt-free

22  discounted cash flow valuation, was it

23  necessary for you to make adjustments to the

24  RMA data?

25      A.   It was.

                CURREN COURT REPORTERS
                    (504)833-3330

                                        186
                ROUGH DRAFT (SEE NOTE PG 1)

1       Q.   Okay.  And that was to make it a

2   debt-free context?

3       A.   Convert the ratios to a debt-free

4   context.  Yes.

5       Q.   Did you do that?

                    Page 220

rt050919sweetROUGHDRAFT.txt

 6      A.   I did not.

 7      Q.   Why didn't you do it?

 8      A.   It was an oversight.

 9      Q.   Okay.

10      A.   After correcting that, and running

11   it through the model to see what the impact

12   was, it was somewhere in the $630,000

13   neighborhood for the discounted cash flow

14   value, which when weighted through the

15   40/40/20 was something in the $230,000

16   neighborhood reduction in overall value.

17      Q.   Okay.  So again, that brought the

18   discounted cash flow analysis down?

19      A.   Roughly, 630.

20      Q.   And that was only weighted

21   40 percent?

22      A.   Correct.

23      Q.   Therefore, it filtered through?

24      A.   Yes.

25      Q.   All right.  Let's talk about your

                CURREN COURT REPORTERS
                   (504)833-3330

                                      187
                ROUGH DRAFT (SEE NOTE PG 1)


 1   guideline transactions method before Geoff
                     Page 221

rt050919sweetROUGHDRAFT.txt

9    you do need to do some diligence on the

10    underlying data.

11        Q.   Let me ask you, when you did the

12    DoneDeals database, did you search the company

13    distributions that were generated from there

14    to limit them to descriptions that had the

15    word "staffing"?

16        A.    No.  When I searched the ones in

17    DoneDeals, I didn't have to limit it, because

18    the company descriptions of the 11 that came

19    up were all very much in line with -- it was a

20    staffing focus.  They weren't -- you see it

21    more with public companies, that they are

22    diversified into so many different buckets of

23    activity, that they may be tucked under a SIC

24    code, but they really do 15 other things.

25        Q.    Okay.  So you're in the Key Value

                    CURREN COURT REPORTERS
                       (504)833-3330

                                           213
                  ROUGH DRAFT (SEE NOTE PG 1)


1    Database.  You plug in that you want to focus

2    on those two SIC codes that we discussed 7361

3    and 7363; right?

4        A.   Yes.

                    Page 252

rt050919sweetROUGHDRAFT.txt

5      Q.   Then you put in the valuation date,

6   which is February 28, 2018; right?

7      A.   Yes.

8      Q.   Do you know how many companies came

9   up, at that point, in the database?

10      A.   I think -- are you saying with the

11   "staffing" modifier.

12      Q.   No.  Before the staffing modifier.

13      A.   No.  Maybe 10 in one SIC code, and

14   13 or so in the other, something like that.

15      Q.   When you saw that, you didn't search

16   for "staffing" within the company descriptions

17   in the field that was provided for those

18   companies?

19      A.   I first manually reviewed, without

20   entering a filter, manually reviewed several

21   of the descriptions and saw widely disparate,

22   and decided to refine my search then with the

23   "staffing" filter.

24      Q.   Okay.  And the staffing filter was

25   typing in the word "staffing" and hitting

CURREN COURT REPORTERS
(504)833-3330

214
ROUGH DRAFT (SEE NOTE PG 1)
Page 253

rt050919sweetROUGHDRAFT.txt

1   "search" and you got four hits.

2         A.   I got five.

3         Q.   Okay.  You got five hits?

4         A.   Yes.

5         Q.   You looked at that fifth one and it

6   still didn't apply?

7         A.   It had negative income and negative

8   EBITDA, and no useful -- no useful metrics.

9         Q.   So that is similar to what you did

10  with DoneDeals.  You eliminated deals that had

11  negative EBITDA; right?

12        A.   Yes.

13        Q.   You sort of manually looked at this

14  for the key value data to eliminate those?

15        A.   Since it was only one in the public

16  company, it was there, it was glaring.

17        Q.   Okay.

18        A.   So I just excluded it.

19        Q.   So that left the four; right?

20        A.   Yes.

21        Q.   That's how you got to the four?

22        A.   That's correct.

23        Q.   Okay.  So why don't you explain what

rt050919sweetROUGHDRAFT.txt

24  you did once you got the four in AMS 6.

25       A.   Once I got the four, I analyzed --

                CURREN COURT REPORTERS
                    (504)833-3330

                                          215
                ROUGH DRAFT (SEE NOTE PG 1)


 1  analyzed the data.

 2            I noticed that two FRSI and CRRSQ

 3  had older data.  So BBSI and TBI, the first

 4  two listed, had data as of 12/31/2017,

 5  which is perfect, considering the valuation

 6  date in February.

 7            FRSI was 12/13/15, so dated.

 8            And then CRRSQ, 1/3/2014, even

 9  more dated.

10       Q.   Were you concerned at all that the

11  data for FRSI and CRRSQ was multiple years

12  earlier from the valuation date at issue?

13       A.   So two to three years, respectively.

14  And yes.

15       Q.   Two or three years?

16            I mean, one is 2015, and one is

17  2014; right?  Am I reading that wrong?

18       A.   Yeah.  Two years removed from 2017

19  to 2015 is two years.

                    Page 255

rt050919sweetROUGHDRAFT.txt

20     Q.   I thought the valuation date was

21  2018.

22     A.   February 2 -- February 28th, 2018.

23     Q.   Oh, these are year-end?

24     A.   Yes.

25     Q.   All right.  But one says January 3,

                CURREN COURT REPORTERS
                   (504)833-3330

                                        216
              ROUGH DRAFT (SEE NOTE PG 1)


 1  2014.  That's more than two to three years,

 2  that's more than four years.  Right?

 3     A.   Yes.  So January would include all

 4  2014, so four years.

 5     Q.   So that one was four years, more

 6  than four years away from your valuation date.

 7          Then the other one would have

 8  been more than two years?

 9     A.   It is two years from a ideal date

10  of --

11     Q.   Right.  Okay.

12          Did that concern you at all?

13     A.   It certainly made me dig into the

14  underlying fundamentals of both and try to,

                Page 256

rt050919sweetROUGHDRAFT.txt

15  you know, assess the validity of the aged data

16  and see if it was still useful.

17      Q.   Did you have any concerns with the

18  sample size they were using, only four

19  companies?

20      A.   I would have liked a larger sample

21  size.  That is one of the reasons that led me

22  to a 20 percent weight on this.

23      Q.   Did you ever consider, in light of

24  the sample size and the age of the data, not

25  to even use the guideline public company

                CURREN COURT REPORTERS
                    (504)833-3330

                                        217
                ROUGH DRAFT (SEE NOTE PG 1)

 1  analysis in your valuation methodology?

 2      A.   I considered it.  But there was some

 3  compelling information presented in my -- you

 4  know, that I found in my analysis of the

 5  underlying companies.  And I ultimately

 6  decided to include it, but at a lesser weight.

 7      Q.   What was the compelling information?

 8      A.   So particularly with FRSI, even

 9  though it has data two years removed from the

10  ideal date of 12/31/17, its performance in the

                    Page 257

rt050919sweetROUGHDRAFT.txt

11  three years leading up to 2015 were very, very

12  similar in size and growth to what CLS

13  experienced in the three years leading up to

14  2017.

15          They had -- they started at a

16  revenue at $9 million, and grew to 18, and

17  then 32, which is a similar trajectory to

18  what I saw with CLS.

19      Q.   Let me see if I understand what you

20  said.

21          You thought FRSI was compelling

22  because when you looked at the data from

23  the December 2015, and then going back how

24  many years?

25      A.   2012.

                CURREN COURT REPORTERS
                    (504)833-3330

                                        218
                ROUGH DRAFT (SEE NOTE PG 1)

1       Q.   To 2012, going back three years?

2       A.   Yes.

3       Q.   That data, in your view, lined up

4   well with the CLS data?

5       A.   Yes.

rt050919sweetROUGHDRAFT.txt

 6      Q.   Okay.

 7      A.   So comparing these three-year

 8  trends, even though they were two years

 9  removed, comparing three-year trends leading

10  up to the value of FRSI at 2015 versus the

11  value of CLS at 2017, both ending a very

12  similar three-year run is compelling.

13      Q.   Are there any other examples of what

14  you thought was compelling in the data?

15      A.   The companies struck me as similar.

16  And, you know, even though, again, the data

17  from CRRSQ is even more data than FRSI, it was

18  declining, represented an increase in the risk

19  profile of the overall dataset, and

20  conservatively included.  So . . .

21      Q.   So I think you just said that you

22  thought it was compelling because you looked

23  at the companies and you thought they were

24  similar.

25          Is that fair?  Is that what you

                CURREN COURT REPORTERS
                    (504)833-3330

                                    219
                ROUGH DRAFT (SEE NOTE PG 1)


 1  just said?

rt050919sweetROUGHDRAFT.txt

 2          MR. ORMSBY:

 3              Object to the form.

 4      Q.   I just want to follow up on what you

 5  just said.  Did you just say that?

 6      A.   No.  I said FRSI, the performance

 7  was similar.

 8      Q.   I wasn't talking about performance.

 9          I thought you -- when I asked you

10  what else was compelling, you said you

11  looked at the companies and you thought

12  that they were similar?

13      A.   In industry focus.

14      Q.   In industry focus?

15      A.   Right.  So similar in industry

16  focus.  FRSI had a three-year run that, while

17  a couple of years removed from CLS's

18  three-year run, it was very, very similar.

19          Finding a public company with

20  revenue totals close to a private company,

21  which theirs started lower than CLS's and

22  ended higher is rare.  It's rare to find

23  that level of comparability when you are

24  look at publicly-traded companies.

25      Q.   Do you know why there was only

                    Page 260

rt050919sweetROUGHDRAFT.txt

CURREN COURT REPORTERS
(504)833-3330

220
ROUGH DRAFT (SEE NOTE PG 1)

1   information for FRSI that dated back to the

2   end of 2015?

3       A.   I reviewed as many news clippings or

4   articles as I could find from that time.  It

5   ultimately -- so it was traded in over the

6   counter prior to -- or up to 12/31/2015.  It

7   looks like they released quarterly financials

8   for three quarters after that and were

9   subsequently delisted.  I couldn't find

10  anything related to the delisting.  I don't

11  know if it was based on price alone.

12           But the company is still

13  operating, I'm assuming privately, and

14  still posting job things online as of, you

15  know, February of this year.

16      Q.   What does it indicate to you that

17  the company was delisted in the year after you

18  had this data?

19      A.   They could have been -- they could

20  have been taken private.  Could have elected

Page 261

rt050919sweetROUGHDRAFT.txt

21  to go private.

22          They could have been delisted for

23  something else.

24          But they continued to operate,

25  one.

                CURREN COURT REPORTERS
                    (504)833-3330

                                    221
            ROUGH DRAFT (SEE NOTE PG 1)


 1          And, two, I couldn't find any

 2  definitive information on the delisting

 3  action.

 4      Q.   Did you look at any of the SEC

 5  filings to determine whether the company was

 6  under financial stress that would have

 7  affected their need to delist --

 8      A.   That -- that --

 9      Q.   -- from the stock market?

10      A.   Sorry.  I'll let you finish.

11          Yeah.  I reviewed SEC filings up

12  through 2015, and then the quarterlies.

13  There was no mention of potential

14  delisting.  They were actually be

15  acquisitive and looking at acquiring other

16  companies.

                    Page 262

rt050919sweetROUGHDRAFT.txt

17          So there was nothing, at least

18  from any of the SEC filings that I saw,

19  that indicated financial distress or

20  anything detrimental.

21      Q.   When you picked these companies, you

22  knew they had been delisted when you produced

23  this report?

24          The two companies being FRSI and

25  CRRSQ.

                CURREN COURT REPORTERS
                    (504)833-3330

                                        222
                ROUGH DRAFT (SEE NOTE PG 1)

 1      A.   I didn't know, initially.  All I

 2  knew when I first entered the data was that

 3  they had aged data, which led me to look into

 4  why they had aged data, which is the point at

 5  which I discovered everything we just

 6  discussed.

 7      Q.   And you knew that when you issued

 8  this report?

 9      A.   Yes.

10      Q.   Okay.  And you're aware that

11  sometimes companies are forced to delist

                    Page 263

rt050919sweetROUGHDRAFT.txt

12  because they cannot meet the requirements of

13  financial performance that are required by the

14  agencies, like NASDAQ or New York Stock

15  Exchange?

16      A.   Yes.  Yes.

17           They are also -- sometimes they

18  delist by taking themselves or a private

19  equity company taking them private because

20  they are attractive.

21      Q.   So there was nothing in the

22  Securities and Exchange reports that you saw

23  that gave you concern those two companies,

24  FRSI and CRRSQ, that their delisting was

25  associated with declining performance,

                CURREN COURT REPORTERS
                    (504)833-3330

                                    223
            ROUGH DRAFT (SEE NOTE PG 1)

 1  economic or financial performance?

 2      A.   Well, for FRSI, specifically.

 3      Q.   Did you look at CRRSQ?

 4      A.   I did.  And CRRSQ was experiencing

 5  financial distress.  And as I mentioned, adds

 6  to the risk profile of the overall group of

 7  four.  Bringing down the multiple, adding

                    Page 264

rt050919sweetROUGHDRAFT.txt

 8  additional risk, which is, you know, a

 9  mitigating factor when comparing

10  publicly-traded companies to privately-traded

11  companies.

12      Q.   For the two companies that weren't

13  listed that you had relied on BBSI and TBI, do

14  you know how those companies compared to CLS

15  in terms of their capital structure or

16  capitalization?

17      A.   Capitalization, no.  I looked at

18  their debt ratio but didn't present them.  And

19  I don't recall what they were.

20      Q.   Do you know what the market capital

21  of those companies were?

22      A.   Not the market cap.

23           I know the market value and

24  invested capital, which excludes debt,

25  $505 million for BBSI, and $1.2 billion for

                CURREN COURT REPORTERS
                    (504)833-3330

                                          224
                ROUGH DRAFT (SEE NOTE PG 1)


 1  TBI.

 2      Q.   Do you consider those to be good

                        Page 265