## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **COMPLETE LOGISTICAL SERVICES, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-3799** |
| **DONALD RULH, JR. ET AL** | **SECTION "L" (5)** |

## ORDER & REASONS

Before the Court are several motions: (1) Defendant Donald Rulh's Motion for Partial Summary Judgment, in which Mr. Rulh also moves the Court to strike Plaintiff's expert, Mr. Jason MacMorran, R. Doc. 209; (2) a Motion for Partial Summary Judgment filed by Plaintiff Complete Logistical Services, LLC ("CLS"), R. Doc. 229; (3) CLS' motion to Exclude the Testimony of Mr. Athen M. Sweet, R. Doc. 231; and (4) Defendant Donald Rulh's Motion for Summary Judgment, R. Doc. 239. Each motion is opposed, R. Docs. 248, 245, 255, 252, and the parties have offered replies, R. Docs. 271, 275, 278, 273. The Court heard oral argument on the motions on June 4, 2019. R. Doc. 300. Because the motions are interrelated, the Court rules on them collectively.

### I.    BACKGROUND

CLS provides contract labor to various marine industries. It alleges its former member, Defendant Rulh, breached his fiduciary duties to CLS, misappropriated CLS' assets, damaged CLS' image, and took confidential and proprietary information after he was removed from the LLC by its remaining members. R. Doc. 98 at 1–3.[1]

In its verified complaint, CLS alleges that, as a result of Mr. Rulh's allegedly egregious

---

[1] The Court notes CLS filed its second amended complaint on November 14, 2018. R. Doc. 138. This amended complaint served as an amendment to the first amended complaint, replacing paragraph 100 of the first amended complaint only, R. Doc. 98; accordingly, the Court refers to R. Doc. 98 with respect to all allegations apart from paragraph 100.

conduct—specifically, his failing to collect payments from clients; refusing to reimburse the LLC for money he borrowed to refinance his private home; arriving intoxicated to company events; and changing the locks on the CLS office without first discussing the matter with the other LLC members—the other three members of CLS voted to treat Mr. Rulh as an assignee of the Company, thereby revoking his authority to manage the business or act unilaterally on its behalf. *Id.* at 4–6. CLS alleges that after Mr. Rulh was stripped of this authority, he stole from CLS confidential information including financial statements, customer lists, and sales records while the other members were at a company crawfish boil. *Id.* at 8. According to CLS, these documents were printed, scanned, and then emailed to Mr. Rulh's personal email account. *Id.* at 8. CLS further alleges Mr. Rulh took this information intending to start a competing business with his co-Defendants.[2] Finally, Plaintiff alleges Mr. Rulh took $222,000.00 from the LLC's bank account without authorization. *Id.* at 2. According to CLS, this resulted in the company's inability to pay holiday bonuses to its employees, including Mr. Scott Coker, head of CLS' diving division. *Id.* CLS submits Mr. Coker left CLS because he did not receive a bonus. *Id.*

After voting to make Mr. Rulh an assignee of the company, on July 23, 2018, the remaining CLS members "availed themselves of their rights in the CLS Operating Agreement to expel Mr. Rulh from CLS membership" and obtained a financial report that valued Mr. Rulh's expulsion price at negative $172,664.00. *Id.* at 14. Ultimately, the remaining members of CLS agreed to offer Mr. Rulh an expulsion price of $3,333.00 for his 33% membership interest in CLS. *Id.* at 4.

Based on this factual background, CLS brings claims against Mr. Rulh for violations of the Defend Trade Secrets Act ("DTSA"); Louisiana Uniform Trade Secrets Act ("LUTSA"); Computer Fraud and Abuse Act ("CFA"); Louisiana Unfair Trade Practices Act ("LUTPA"); and for unjust

---

[2] On April 1, 2019, as a result of ongoing negotiations among the Court and the parties, a settlement agreement was reached between Plaintiff and Defendants Arnold Baker, Morris Kahn, and Michele Elwell. R. Doc. 197.

enrichment; breach of fiduciary duties, duty of loyalty, and duty of due care; conversion; conspiracy; and fraud. *Id.* at 3. Finally, CLS seeks a declaration "that the expulsion proceedings were proper in all respects and confirming that Mr. Rulh is no longer a member of CLS." *Id.* at 4.[3]

On May 7, 2018, Mr. Rulh answered the complaint and filed counterclaims against CLS and a third-party complaint against CLS members Spencer Sens and Natchez Morice, III. R. Doc. 30. On August 21, 2018, the Court granted Mr. Sens and Dr. Morice's motion to strike Defendants' third party claims against them. R. Doc. 94. On May 2, 2019, Mr. Rulh filed an amended counterclaim, asserting a breach of contract claim as well as seeking a declaratory judgment that the expulsion price offered by CLS did not comply with the terms of the Operating Agreement. R. Doc. 237.

## II.    PRESENT MOTIONS

The motions presently before the Court mostly overlap. The parties both move to strike the other's expert, R. Docs. 209, 231, and both seek summary judgment on the issue of whether the expulsion price offered to Mr. Rulh complied with the terms of the CLS Operating Agreement, R. Docs. 209, 229, 239. Finally, Mr. Rulh seeks summary judgment on Plaintiff's remaining claims, namely its DTSA, CFAA, LUTSA, and LUTPA claims.

## III.    DISCUSSION

The facts relevant to the instant motions are largely undisputed. By April 23, 2014, CLS consisted of four members: Mr. Rulh, Mr. Spencer Sens, Dr. Natchez "Trey" Morice III, and Dr.

---

[3] CLS also initially sought injunctive relief, which the Court granted. On April 12, 2018, pursuant to CLS' request for a temporary restraining order ("TRO"), the Court held a telephone hearing with CLS and granted the request. Pursuant to the TRO, the Court directed Defendants to return materials taken from CLS, including a computer allegedly purchased with CLS funds. R. Doc. 8. On April 13, 2018, Defendant moved for an extension of the deadline to comply with the Court's order, R. Doc. 10, which the Court granted in part, R. Doc. 11.

On April 16, 2018, Defendants moved to dissolve the temporary restraining order. R. Doc. 13. The Court held oral argument on Defendants' motion that same day. The Court determined the TRO should remain in effect as to the prohibitory elements and ordered the parties to discuss a plan to determine which information, if any, may be privileged and which should be returned to Plaintiff. On Wednesday, April 18, 2018, the Court approved the parties proposed order for mirroring the files on the computer and other devices held by counsel. R. Doc. 17.

Brett Casey.[4] On January 12, 2018, pursuant to section 10.3 of the CLS Operating Agreement, Mr. Sens, Dr. Morice, and Dr. Casey voted to initiate expulsion proceedings against Mr. Rulh. These proceedings took the form of three meetings. The first meeting, held January 22, 2018, proceeded in two parts. First, Mr. Sens, Dr. Morice, and Dr. Casey "agree[d] by vote that [Mr. Rulh] ha[d] caused direct harm to [CLS]" and thereafter voted to immediately treat Mr. Rulh "as an assignee of [CLS] for all purposes." *See* CLS Operating Agreement, § 10.3. The members then scheduled the second meeting for February 26, 2018. Having set the second meeting, the CLS Operating Agreement allowed Mr. Rulh to "make a specific request to [CLS] to receive computer generated financial reports so that he may have an independent evaluation at his own cost if he so chooses." *Id.* Mr. Rulh did not request financial documents from the company.

At the second meeting, held February 26, 2018, Mr. Sens, Dr. Morice, and Dr. Casey "agree[d] by vote to have a financial evaluation of [Mr. Rulh's] interest," authorizing *Postlewaithe & Netterville* to provide CLS with a financial valuation of Mr. Rulh's interest in CLS. *Id.*; R. Doc. 98 ¶¶ 65, 67. Pursuant to this authorization, Mr. Jason MacMorran of *Postlewaithe & Netterville* completed a valuation of Mr. Rulh's membership interest, ultimately concluding that the appropriate expulsion price for Mr. Rulh was negative $172,664.00. *Id.* at 68. This valuation was "sent out with the certified notice of the [third] meeting," which the parties set for July 23, 2018.

In the event Mr. Rulh intended to introduce his own membership valuation at the July 23, 2018 meeting, the CLS Operating Agreement required Mr. Rulh to first request that the members consider his independent evaluation. *See* CLS Operating Agreement, § 10.3 ("If the offending member wishes to introduce his own evaluation price at the meeting, then he must request that his

---

[4] Their ownership interests were: Spencer Sens, 33.33%; Donald Rulh, Jr., 33.33%; Natchez Morice, III, 30.00%; Brett Casey, 3.33%. Although not explicitly stated, during oral argument, there appeared to be some dispute as to whether Mr. Casey is, in fact, a member of CLS. The Court notes, however, that this fact is immaterial to the issues at bar.

independent evaluation should be considered."). On July 6, 2018, Mr. Rulh's counsel sent a letter to the remaining members of CLS indicating that Mr. Rulh intended to introduce his own evaluation prepared by Mr. Athen Sweet. R. Doc. 209-10 at 1; *see also* R. Doc. 231-10 at 7. In his letter, Mr. Rulh contended the "fair and proper evaluation for his interest in CLS" was $7,448,891.00. R. Doc. 209-10 at 1.

During the July 23, 2018 meeting, however, Mr. Rulh stated his $7,448,891.00 price was "not an official valuation," and that he "need[ed] more information." R. Doc. 229-5 at 6. To clarify, Mr. Rulh's attorney explained Mr. Rulh had obtained "discounted cash flow analysis information" and "based upon that analysis [made a good faith] estimate that [Mr. Rulh's] share was in excess of $7.4 million."[5] *Id.* at 6. Nevertheless, thereafter, Mr. Rulh's attorney stated Mr. Rulh was "standing down" on "the $7.4 million that was in [his] July 6 letter" and confirmed that Mr. Rulh was not offering a specific valuation; rather, Mr. Rulh's attorney explained the $7,448,891.00 was "just [a] proposal."[6] *Id.* at 9. Mr. Rulh and his counsel then left the meeting. *Id.* at 11.

Following Mr. Rulh's departure, the members of CLS passed the following resolution pursuant to section 10.3 of the CLS Operating Agreement:

---

[5] At the third meeting, in explaining what additional information he needed in order to offer an official valuation, Mr. Rulh stated, "The only numbers I have are from November 30[,] Mark[,] so if we['re] using February 28 or whatever the end of February I will need to get those numbers so that I can do it, and have it audited." R. Doc. 229-5 at 8–9.

[6] Mr. Rulh takes issue with whether he did, in fact, offer an official valuation at the meeting. R. Doc. 245 at 8 n.3. Specifically, Mr. Rulh takes the position that he did not "withdraw" the $7.4 million valuation noted in his July 6 letter, as CLS contends; rather, Mr. Rulh submits the quoted conversation, "In no way . . . indicate[s] that [he was] withdrawing the valuation, only that he [wa]s willing to negotiate off that number in an effort at amicable resolution of what is now acrimonious litigation." *Id.* During the meeting, the following exchange took place:

> **Counsel for CLS**: Okay, so should we just note for the record you are not going to introduce the valuation and that your view is that you need more information.
>
> **Counsel for Mr. Rulh**: We obviously would like more information. Having said that we stand down on the $7.4 million that was in my July 6 letter. However, however, having looked at the P&N rebuttal report which does mention in excess of $2.1 million we would consider that if that is part of the expulsion and that is in fact put on the table is a discussion that we would have, that's all we can say right now.
>
> **Counsel for CLS**: Okay, so there's no specific valuation, it's just that's the proposal.
>
> **Counsel for Mr. Rulh**: Yes sir.

R. Doc. 229-5 at 9.

**WHEREAS**, the Members have determined Mr. Rulh has caused direct harm to the Company and his conduct is egregious enough to warrant a full expulsion by the Company;

**NOW, THEREFORE, BE IT RESOLVED**, that Mr. Rulh is hereby expelled from the Company effective July 23, 2018 in accordance with Section 10.3 of the Operating Agreement of the Company. . . .

**WHEREAS**, the Members have determined to pay Mr. Rulh $3,333.00 for his 33.3% equity interest in the Company notwithstanding the Members' determination that the Postlethwaite & Netterville valuation of Mr. Rulh's 33.3% equity interest in the Company at a negative $172,664.00 is a correct valuation for such interest;

**NOW, THEREFORE, BE IT RESOLVED**, that the Company purchase Mr. Rulh's 33.3% equity interest in the Company [for] $3,333.00 . . . .

*Id.* at 11–12.

After Mr. Rulh was formally expelled from CLS, Mr. Athen Sweet, whom Mr. Rulh now offers as an expert, prepared a valuation report wherein he concludes Mr. Rulh's membership interest in CLS is $6,419,000.00. R. Doc. 231-10 at 16. Although Mr. Rulh no longer contests the fact of his expulsion, R. Doc. 248-3 at 11–14, he maintains his allegation that CLS failed to comply with the terms of the CLS Operating Agreement with respect to setting his expulsion price.[7]

Chief among the disputes in this matter is the proper calculation of Mr. Rulh's ownership interest and corresponding expulsion price. CLS' expert, Mr. MacMannon, takes the position that he appropriately calculated Mr. Rulh's expulsion price as negative $172,664.00, R. Doc. 229-8 at 24; Mr. Rulh's expert, Mr. Sweet, takes a different position, setting Mr. Rulh's proper expulsion price at $6,419,000.00, R. Doc. 231-10 at 16.

In coming to his calculation, CLS expert Mr. MacMorran "perform[ed] a business valuation of Mr. Rulh's 33.33 percent ownership interest," by calculating the value of the company

---

[7] Although Mr. Rulh does not dispute the *fact* of his expulsion, he does maintain that his conduct was neither "egregious," nor did it cause "direct harm" to CLS. R. Doc. 245 at 1–2 ("Mr. Rulh stipulated that he is not seeking to overturn his expulsion. . . . However, Mr. Ruhl's stipulation can in no way be construed as conceding that: (1) he engaged in any wrongdoing; (2) CLS complied with its obligations under the Operating Agreement; or (3) CLS properly set the expulsion price.").

as a whole using the asset, income, and market approaches. R. Doc. 229-8 at 13. Under these approaches, Mr. MacMorran underwent his analysis comparing CLS' "post-incident" and "pre-incident" metrics and values. *Id.* "The primary difference between the Pre-Incident and Post-Incident forecasts [of CLS] was the treatment of revenues from the diving division as a result of the departure of Mr. [Scott] Coker attributable to [Mr. Rulh's having taken $222,000.00 out of the CLS bank account without authorization]." *Id.* at 14.[8] Using these valuation methods, Mr. MacMorran came to his valuation "of a 100 percent ownership interest in the Company on a Pre-Incident and Post-Incident basis." *Id.* at 18. Next, Mr. MacMorran applied reductions for marketability and control to the post-incident value of the company. *Id.* at 19–21. After calculating the 100% "Post-Incident non-marketable, non-controlling interest value" of CLS, Mr. MacMorran extrapolated Mr. Rulh's 33.33% interest in the company and reduced Mr. Rulh's ownership interest value for diminution of value losses and out of pocket costs, arriving at Mr. Rulh's expulsion price of negative $172,664.00. *Id.* at 24.

Mr. Sweet, Mr. Rulh's expert, took a different approach. In coming to his valuation, Mr. Sweet underwent an analysis using three methods to calculate the 100% ownership value of CLS: (1) a discounted cash flow analysis, (2) a guideline transaction indication of value, and (3) the guideline public company indication of value. R. Doc. 231-10 at 16. He then extrapolated Mr. Rulh's 33.33% interest. *Id.* Notably, Mr. Sweet did not make any adjustments for lack of control or marketability. *Id.* Additionally, Mr. Sweet did not make any reduction for any losses to the company's value allegedly caused by Mr. Rulh, as he submits nothing in his analysis "indicat[ed] [Mr. Rulh had caused CLS] any losses, whether actual or speculative." *Id.* at 17. Based on his

---

[8] According to Mr. MacMorran, "[a]lthough Article 10.3 of the Company's Operating Agreement indicates that the expulsion price is to consider all losses 'whether actual or speculative,'" there are "clear links between Mr. Rulh's acts and the losses calculated herein, including but not limited to the allegedly unauthorized withdrawal of $222,000.00 and the Company's inability to keep certain compensation commitments to its Diving Division manager, [Mr. Scott Coker,] resulting in [Mr. Coker's] resignation." *Id.* at 5.

analysis, Mr. Sweet concluded the proper expulsion price for Mr. Rulh is $6,419,000.00. *Id.*

The relevant facts being largely undisputed, the case is ripe for summary judgment. The Court first considers the parties' motions to exclude their respective experts, R. Docs. 209, 231, before determining whether CLS complied with the terms of the CLS Operating Agreement in coming to Mr. Rulh's expulsion price, R. Docs. 209, 229, 239. Finally, the Court analyzes whether CLS' remaining claims survive summary judgment, R. Doc. 239.

### A. Whether the Court Should Exclude Either Expert

In his motion, Mr. Rulh argues the Court should exclude the testimony of Plaintiff's expert, Jason MacMorran, as Mr. Rulh contends Mr. MacMorran's use of a fair market valuation, wherein Mr. MacMorran applied discounts for marketability and control, is contrary to the CLS Operating Agreement and Louisiana law. R. Doc. 209-1 at 18. Further, Mr. Rulh submits Mr. MacMorran also applied the improper section of the CLS Operating Agreement—specifically, Section 11.3—in coming to his assessment. *Id.* Finally, Mr. Rulh contends that, because Mr. MacMorran's "valuation of Mr. Rulh's interest is premised on inapplicable valuation methodology," and "intentionally depress[es] the value of Mr. Rulh's interest," Mr. MacMorran "has clearly shown an inherent bias and lack of partiality" and his testimony should therefore be stricken. *Id.* at 18–19.

In opposition, CLS argues "Mr. Rulh does not point to any 'deliberate, manifest, pervasive, and systematic bias [by Mr. MacMorran] in selecting his data points, in adjusting the data points, and in assigning weights to the data points' that would render Mr. MacMorran's testimony fundamentally unreliable." R. Doc. 248 at 17. Thus, CLS submits, because Mr. Rulh "merely challenges Mr. MacMorran's legal authority to apply discounts," he has not established that Mr. MacMorran's testimony is fundamentally unreliable. R. Doc. 248 at 17. Accordingly, CLS argues Mr. MacMorran's testimony should be permitted at trial. *Id.*

In its motion, CLS moves the Court to exclude Mr. Sweet as an expert. R. Doc. 231-1. CLS takes issue with the methodology employed by Mr. Sweet in coming to his valuation. *Id.* at 2. According to CLS, although Mr. Sweet purports to have applied standard industry calculations in valuing CLS, "Mr. Sweet misapplies valuation techniques, deviates from accepted valuation principles and professional standards, applies data sources erroneously and inconsistently, and selects biased data that inflates the value of Mr. Rulh's interest." *Id.* at 3. Moreover, CLS contends Mr. Sweet's opinion exceeds his expertise and contains impermissible conclusions of law. *Id.*

Mr. Rulh opposes the motion, arguing the "legal conclusions" offered by Mr. Sweet in his report are statements "commonly made by experts, who are permitted to determine the appropriate valuation methodology based on the facts and circumstances of the case." R. Doc. 255 at 17. Next, Mr. Rulh argues Mr. Sweet's opinions and valuation are consistent with industry practice, pointing to paragraphs 38–42 of Mr. Sweet's report, in which he "discusses the merits of the various valuation methods with consideration for the specific facts and circumstances of this case." *Id.* at 21.[9] Finally, Mr. Rulh argues Mr. Sweet is qualified to render these opinions, as "Rule 702 does not require valuation credentials, an active CPA license, or membership to any specific organizations." *Id.* at 20. Rather, because Mr. Sweet's expertise will assist the trier of fact in making its determination, Mr. Sweet's experience in the field of business valuations passes muster. *Id.*

### i. The *Daubert* Standard

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides that,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an

---

[9] Mr. Rulh admits Mr. Sweet "did indeed" make an error in his working capital adjustment analysis. R. Doc. 255 at 28. He contends, however, that "processing the correction only results in a DCF equity value of $16,896,781.00, a reduction of $638,885.00, not 'approximately $700,000,' as indicated by CLS/MacMorran. Carrying the correction one step further to the Summary of Value Indications yields an equity value of $19,002,736.00, a mere reduction of $255,554.00." *Id.*

expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule codifies the Supreme Court's decisions in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

The threshold question in determining whether an individual may offer expert testimony under Rule 702 is whether the individual has the qualifications to do so. Fed. R. Evid. 702. "Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert." *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) (quoting *Ellis v. K–Lan Co.*, 695 F.2d 157, 162 (5th Cir. 1983)). Under Rule 702, "the expert is viewed, not in a narrow sense, but as a person qualified by 'knowledge, skill, experience, training or education.'" Fed. R. Evid. 702 advisory committee's note.

Apart from determining the qualifications of the expert, the Court must act as a "gate-keeper" to ensure that the proffered expert testimony is "both reliable and relevant." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (quoting *Daubert*, 509 U.S. at 592–93). With respect to reliability, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

When the admissibility of expert testimony is challenged under *Daubert*, the proponent of the evidence bears the burden of proving that the testimony is reliable and relevant. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). To meet this burden, a party cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology. *Id.* Rather, some objective, independent validation of the expert's methodology is

required. *Id.* In this regard, however, it is not necessary for the proponent of the evidence to prove that "the testimony is factually correct." *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 388 (5th Cir. 2009).

Ultimately, a court's role as a gatekeeper does not replace the adversary system. *Daubert*, 509 U.S. at 596. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* Proper deference is to be accorded to the jury's role "as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *Id.* (quoting *Viterbo*, 826 F.2d at 422).

### ii. Analysis

Both parties challenge the credentials of the other's expert, their methodology, and perceived bias. Moreover, CLS challenges the propriety of allowing Mr. Rulh's expert, Mr. Sweet, to offer his legal interpretations of the CLS Operating Agreement. The Court addresses each challenge in turn.

### 1. Credentials

In reviewing Mr. Sweet's and Mr. MacMorran's credentials, the Court concludes both are qualified to render the opinions they offer. For example, Mr. Sweet is the founder and CEO of a company that "offer[s] Business Valuations services." R. Doc. 231-10 at 18. Moreover, from 2008–2012, Mr. Sweet worked for *Faulk & Winkler, LLC*, "leading acquisition deal teams, valuations, [and] leading recapitalization efforts." *Id.* Similarly, Mr. MacMorran, whose work with *Postlethwaite & Netterville* "focuses on business valuation, transaction advisory services, and

economic damages" is likewise qualified. R. Doc. 209-12 at 5. Both proffered experts have sufficient training and experience in the field of business valuations to render an expert opinion on the overall value of CLS as well as the proper membership and expulsion price for Mr. Rulh. Thus, the Court concludes both proffered experts have "specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

## 2. Methodology

Next, both parties complain the opposing party's expert employed unreliable methodology in coming to their respective valuations. Generally, "questions relating to the bases and sources of an expert's opinion affect the weight of the evidence rather than its admissibility and should be left for the finder of fact." *14.38 Acres of Land*, 80 F.3d at 1077. "Unless wholly unreliable, the data on which the expert relies goes to the weight and not the admissibility of the expert opinion." *Rosiere v. Wood Towing, LLC*, No. 07-1265, 2009 WL 982659, at *1 (E.D. La. Apr. 8, 2009) (citing *14.38 Acres of Land*, 80 F.3d at 1077).

In this case, neither expert's assessment is "wholly unreliable."[10] Thus, the Court will not exclude either expert on that basis. *See 14.38 Acres of Land*, 80 F.3d at 1077 (stating that expert opinions attacked based on the sources or methodology should nevertheless be admitted to allow the jury to fulfill its role as the proper arbiter of disputes between conflicting opinions). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 596) (internal quotation marks omitted).

---

[10] Notably, in its motion, CLS states, "*Although this approach is generally accepted in valuing a business like CLS*, Mr. Sweet misapplies valuation techniques, deviates from accepted valuation principles and professional standards, applies data sources erroneously and inconsistently, and selects biased data that inflates the value of Mr. Rulh's interest." R. Doc. 231-1 at 3 (emphasis added).

### 3. Legal Opinions

Finally, CLS criticizes the many instances in which Mr. Sweet's expert report offers an opinion interpreting the CLS Operating Agreement. For example, Mr. Sweet explains that, in his opinion, any valuation of Mr. Rulh's expulsion price may not consider section 11.3 of the CLS Operating Agreement. R. Doc. 231-10 at 7–8 ("Articles 10.3 and 11.3 are clearly intended to govern different transactions. 11.3 (redemption) clearly defines the standard of value and the premise of value while 10.3 (expulsion) does not."). Expert testimony that offers a legal opinion is inadmissible. *Estate of Sowell v. United States*, 198 F.3d 169, 171 (5th Cir. 1999); *Askanase v. Fatjo*, 130 F.3d 657, 669 (5th Cir. 1997). As a result, Mr. Sweet will not be permitted to offer such opinions on contract interpretation at trial.

Based on the foregoing, the Court will deny both motions to exclude the parties' respective experts. At trial, both parties will be free to vigorously cross-examine the other's expert witness, leaving for the finder of fact the ultimate decision of how much weight, if any, should be given to either expert's opinion. Neither expert will be permitted to give their legal opinion or interpretation of the CLS Operating Agreement.

### B. Whether Either Party's Claims Survive Summary Judgment

Having concluded both experts will be permitted to testify at trial, the Court turns to an evaluation of the parties' cross-motions for summary judgment. CLS takes the position that it is entitled to a declaratory judgment that the expulsion price offered by CLS comports with the CLS Operating Agreement. Mr. Rulh takes the opposite position, arguing he is entitled to a judgment that CLS failed to comply with the terms of the Operating Agreement with respect to the expulsion price. Mr. Rulh further argues he is entitled to summary judgment on CLS' remaining claims against him; namely, that CLS has failed to offer proof of elements essential to their DTSA, CFAA, LUTSA, and LUTPA claims. The Court evaluates each argument in turn.

### i. Motion for Summary Judgment Standard

Summary judgment is appropriate when the record before a court supports the conclusion that there is no "genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *See id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994); *see also Anderson*, 477 U.S. at 249–50. In ruling on a summary judgment motion, however, a court may not resolve credibility issues or weigh evidence. *See Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). Furthermore, a court must assess the evidence and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001).

### ii. Analysis

The bulk of the summary judgment dispute centers on the expulsion price offered to Mr Rulh and the proper valuation of CLS. Thus, the Court's analysis begins there before turning to the remainder of Mr. Rulh's motion.

### 1. Whether the Expulsion Price Complies with the Terms of the CLS Operating Agreement

It is undisputed that section 10.3 of the CLS Operating Agreement governs this issue. Section 10.3 requires that the members wishing to fully expel another member of CLS must decide, by majority vote, that the offending member engaged in "egregious" conduct that "caus[ed] . . . direct harm to the company." CLS Operating Agreement, § 10.3. "The process of full expulsion takes three meetings and the timelines are to be strictly construed." *Id.* After voting to initiate expulsion proceedings at the first meeting, a majority of members "must agree by a vote to have a financial evaluation of the offending member's interest in order to progression [*sic*] the expulsion of the offending member" at the second meeting. *Id.* There is little guidance offered by the CLS Operating Agreement with respect to the method by which an offending member's expulsion price must be calculated. The agreement dictates simply that, at the third expulsion meeting, a majority of members "must agree by a vote to expel the offending member and agree on a price to pay the expelled member for his interest" and that "[t]his price shall take into account all losses caused by the offending member whether actual or speculative." *Id.*

The parties dispute whether this language allows the expulsion price offered to an offending member to include certain discounts. In its motion, CLS argues that, given the above quoted language, "there is no legal or contractual prohibition on the application of the discounts [Mr. MacMorran applied] and they are entirely appropriate under generally accepted accounting and evaluation standards." R. Doc. 229-1 at 11. Mr. Rulh disagrees. He argues his expulsion price should have been calculated under the Fair Value standard, instead of the Fair *Market* Value standard employed by Mr. MacMorran, and that applying any discounts to his membership value is contrary to both the terms of the CLS Operating Agreement as well as Louisiana law. R. Doc. 245 at 12–14; R. Doc. 209-1 at 1.

### a. Whether Louisiana Law Prohibits the Use of Discounts

In support of his argument that Louisiana law prohibits the use of control and marketability discounts, Mr. Rulh points to the Louisiana Supreme Court's holding in *Cannon v. Bertrand*, 2008-1073 (La. 1/21/09), 2 So. 3d 393. Mr. Rulh argues *Cannon* stands for the proposition that "minority or lack of marketability discounts should be used sparingly in the valuation of a departing member's interest, and only when the facts support their use," and that, under the facts of this case, "the use of a discount is unwarranted." R. Doc. 209-1 at 11. In opposition, CLS points out that "*Cannon* does not concern the application of discounts in the context of a limited liability company like CLS"; rather, Cannon applies to limited liability *partnerships*, which, in the absence of an agreement on how to value a departing member's interest, Civil Code articles 2823-2825 apply. R. Doc. 229-1 at 18. Moreover, CLS submits *Cannon* "is specifically limited to the interests of individuals who voluntarily withdraw from a partnership," but that in this case, Mr. Rulh, the departing member, was expelled. *Id.* at 19.

The Court agrees with CLS and concludes *Cannon* does not control the case at bar. Although "*Cannon* did involve the buyout of a minority owner's interest by the remaining members of the entity, that entity was a limited liability partnership rather than a limited liability company," which are governed by two different legal provisions. *Wall v. Bryan*, 251 So. 3d 650, 659 (La. App. 2 Cir. 6/27/18) (explaining that LLPs are governed by La. C.C. art. 2823 while LLCs are governed by La. R.S. 12:1325(c)).

In addition to *Cannon*, both CLS and Mr. Rulh point to *Wall v. Bryan*. Unlike *Cannon*, the Louisiana's Second Circuit Court of Appeal addressed valuations of withdrawing members of an LLC. *Id.* As the *Wall* court explained, LLC withdrawals are governed by La. R.S. 12:1325(c), which provides that "a withdrawing . . . member is entitled to receive such distribution, if any, to which the member is entitled under a written operating agreement and, if not otherwise provided

in a written operating agreement . . . the fair market value of the member's interest . . . ." *Id.* In *Wall*, the court, applying La. R.S. 12:1325(c), found the application of minority and marketability discounts was proper. 251 So. 3d at 660 ("[B]oth the first and the fifth circuits have distinguished Cannon and affirmed the application of post-Cannon discounts in valuations of limited liability companies." (citing *Vedros v. Vedros*, 2016-735 (La. App. 5 Cir. 10/25/17), 229 So. 3d 677; *Trahan v. Trahan*, 2010-0109 (La. App. 1 Cir. 6/11/10), 43 So. 3d 218).

Although the *Wall* case evaluated the use of these discounts in the context of a noncontrolling interest in an ambulatory surgery center, the holding in *Wall* makes plain that the application of marketability and minority discounts in valuating a withdrawing LLC member's interest is not contrary to law. As a result, the Court will not grant Mr. Rulh's motion on that basis.

### b. Whether the Terms of the CLS Operating Agreement Prohibits the Use of Discounts

It is undisputed that, as a binding contract, the CLS Operating Agreement constitutes the law between the parties. *See, e.g.*, *Texaco Expl. & Prod., Inc. v. Smackco, Ltd.*, No. 98-2293, 1999 WL 539548, at *2 (E.D. La. July 26, 1999). As such, the agreement must be interpreted pursuant to Louisiana contract law. *Ark–La–Tex Safety Showers, LLC v. Jorio*, 48,478 (La. App. 2 Cir. 12/18/13), 132 So. 3d 986, 993 (citing *Risk Mgmt. Servs., L.L.C. v. Moss*, 2009–632 (La. App. 5 Cir. 4/13/10), 40 So. 3d 176).

"Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent, and courts must enforce the contract as written." *Succession of Shaw v. Alexandria Inv. Grp., LLC*, 2017-582 (La. App. 3 Cir. 7/26/17), 248 So. 3d 332. When the contract lacks a provision bearing on the issue before the court, the contract is ambiguous as to that issue. *Campbell v. Melton*, 2001-2578 (La.

5/14/02), 817 So. 2d 69; *LFI Fort Pierce, Inc. v. Acme Steel Bldgs., Inc.*, 2016-71, p. 7 (La. App. 3 Cir. 8/17/16), 200 So. 3d 939, 946, *writ denied*, 2016-1684 (La. 11/29/16), 210 So. 3d 804.

In this case, the CLS Operating Agreement provides little guidance on the issue of how to undergo a valuation of an expelled member's expulsion price. The only guidance offered by the CLS Operating Agreement is that a majority of members must "agree on a price to pay the expelled member for his interest," and that "[t]his price shall take into account all losses caused by the offending member whether actual or speculative." CLS Operating Agreement, § 10.3. It is silent as to *how* the expulsion price must be calculated. CLS takes the position that, given the CLS Operating Agreement's silence on how to calculate Mr. Rulh's expulsion price, the remaining members of CLS were free to set the expulsion price at any given amount, so long as the members agreed to it. Such an interpretation would lead to an absurd result and would permit the remaining members to arbitrarily set the expulsion price to their benefit, allowing the remaining members to realize a windfall profit at the expelled member's expense. Thus, the Court finds the contract is ambiguous as to that issue.

Having concluded the issue of how Mr. Rulh's expulsion price must be calculated is ambiguous, the Court must fill in the gap. The closest provision available to fill in this gap is Louisiana Revised Statutes section 1325(C), which provides, "if not otherwise provided in a written operating agreement, within a reasonable time after withdrawal or resignation, [a withdrawing or resigning member is entitled to receive] the fair market value of the member's interest as of the date of the member's withdrawal or resignation." Notably, this provision addresses distributions upon resignation or withdrawal from an LLC, not an expulsion.[11] There is

---

[11] During Oral argument, both parties made much of the Louisiana Third Circuit Court of Appeal's holding in *Mixon v. Iberia Surgical, LLC*, 2006-878, p. 10–12 (La. App. 3 Cir. 4/18/07), 956 So. 2d 76, in which the court upheld the expulsion of an LLC member as well as his expulsion price, which was calculated using a Fair Market Value valuation methodology. In that case, however, the court upheld the expulsion and the price, as the court concluded it "the terms of the Operating Agreement clear and controlling in determining the amount owed to a member." *Id.* at p.

no civil code article or revised statute that specifically addresses this situation. *See* Susan Kalinka, *Dissociation of a Member from a Louisiana Limited Liability Company: The Need for Reform*, 66 LA. L. REV. 365, 405–09 (2006).

Although it would not do violence to the statute to interpret it as including *involuntary* withdrawals, the Court could find no Louisiana case law applying Louisiana Revised Statutes section 1325(C) to an expulsion. *See id.* at 406 ("[T]here is no statute in the Louisiana LLC Law defining the term 'withdrawal.' If an expulsion is treated as an involuntary withdrawal within the meaning of section 12:1325, an expelled member should be entitled to a distribution."). As a federal court sitting in diversity the Court may not "expand state law beyond its presently existing boundaries." *Kimble v. Cargo Carriers, Inc.*, 45 F. App'x 318 at *3 (5th Cir. 2002) (quoting *Barfield v. Madison Cty.*, 212 F.3d 269, 272 (5th Cir. 2000)) (internal citations and quotation marks omitted). As a result, the Court concludes there exists a genuine issue of material fact as to how to calculate the value of Mr. Rulh's 33.33% interest in CLS, less a deduction for "all losses caused by the offending member whether actual or speculative," *see* CLS Operating Agreement, § 10.3, in order to come to the proper expulsion price for Mr. Rulh. This issue will be left for the jury.

### c. Whether Mr. Rulh has Waived His Ability to Challenge his Expulsion Price

In opposition to Mr. Rulh's motion for summary judgment on the issue of whether CLS complied with the terms of the CLS Operating Agreement with respect to setting his expulsion price, CLS argues Mr. Rulh's "refus[al] to meaningfully participate in the expulsion process" waived his ability "to challenge his expulsion price *ex post facto*." R. Doc. 252 at 26. Mr. Rulh

---

11. In this case, however, the CLS Operating Agreement is ambiguous as to how an expelled member's expulsion price should be calculated.

responds by pointing to language in the CLS Operating Agreement he contends precludes CLS' waiver argument. R. Doc. 239-1 at 37.

Section 10.3 of the CLS Operating Agreement states "the offending member *may* make a specific request to [CLS] to receive computer generated financial reports so that he may have an independent evaluation at his own cost *if he so chooses*" and that "[i]f the offending member *wishes to introduce his own valuation price* at the meeting, then he must request that his independent evaluation should be considered." Based on this plain language, the Court concludes Mr. Rulh's participation in his expulsion was permissive, but not required. Thus, the Court finds Mr. Rulh's failure to request financial records in advance of the second meeting and "stand[ing] down" on the valuation he offered at the third meeting did not waive his right to subsequently challenge his expulsion price.

However, to the extent CLS seeks an order finding that "in the event Mr. Rulh is . . . entitled to any increase in his expulsion price, any increased expulsion price must be paid in monthly installments, over a term not to exceed 120 months, and evidenced by a promissory note, as required by the plain terms of the [CLS] Operating Agreement," R. Doc. 229-1 at 11, 20–21, the Court will grant the motion. Mr. Rulh has neither opposed this request, nor has he offered any evidence that the unambiguous terms of the CLS Operating Agreement requires any different.

### 2. Defend Trade Secrets Act

Next, Mr. Rulh moves for summary judgment on CLS' DTSA claim. To prevail under the DTSA, a plaintiff must prove (1) the existence of a trade secret, (2) misappropriation of the trade secret by another, and (3) the trade secret's relation to a good or service used or intended for use in interstate or foreign commerce. 18 U.S.C. § 1836(b)(1); *see also Source Prod. & Equip. Co., Inc. v. Schehr*, No. 16-17528, 2017 WL 3721543, at *2 (E.D. La. Aug. 29, 2017) (Vance, J.). Mr. Rulh challenges the first two elements of CLS' DTSA claim, contending: (1) "CLS has failed to establish how the purported 'Confidential Information' derives independent economic value from

not being generally unknown or readily ascertainable through proper means," (2) "CLS cannot establish that the 'Confidential Information' affords a 'demonstrable competitive advantage to actual or potential customers,'" and (3) "CLS [cannot] establish that the alleged Confidential Information was 'misappropriated.'" R. Doc. 239-1 at 12.

### a. The existence of a trade secret

A "trade secret" under the DTSA includes scientific and technical information that "the owner thereof has taken reasonable measures to keep . . . secret" and "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

Plaintiff alleges Mr. Rulh took profit and loss statements, customer lists, and sales analyses without authorization and offers competent summary judgment evidence substantiating this allegation, including Mr. Rulh's own statements. *See* R. Doc. 239-2 at ¶ 19–23 (admitting he took the documents); R. Doc. 252-11 (stating he "had Ms. Janet [Pipitone] pull recent numbers for TD and CLS *as I don't have access anymore*." (emphasis added)).

As he did in his motion to dismiss, Mr. Rulh argues these documents may not be considered trade secrets. As the Court previously held, these documents, including the CLS customer list, can be considered trade secrets.[12] For example, in *Alfasigma USA, Inc. v. EBM Med., LLC*, the plaintiff alleged the defendants violated the DTSA when they "used [the plaintiff's] confidential customer lists in order to market [their products] to [the plaintiff's] customers." No. 17-7753, 2018 WL

---

[12] Moreover, "existing state law on trade secrets informs the Court's application of the DTSA." *Source Prod. & Equip. Co. v. Schehr*, No. 16-17528, 2017 WL 3721543, at *2 (E.D. La. Aug. 29, 2017) (Comparing 18 U.S.C. §§ 1836, 1839, with LUTSA § 1); *see also JJ Plank Company, LLC v. Bowman*, No. 18-0798, 2018 WL 3579475, at *3–4 (W.D. La. July 25, 2018). Louisiana courts have routinely held customer lists may constitute a trade secret. *See Pontchartrain Med. Labs., Inc. v. Roche Biomedical Labs, Inc.*, 677 So. 2d 1086, 1090 (La. App. 1 Cir. 1996); *Wyatt v. P02, Inc.*, 651 So. 2d 359 (La. App. 2d Cir. 1995).

1604961, at *1 (E.D. La. Apr. 3, 2018). In analyzing the defendants' motion to dismiss, the district court concluded that the plaintiff had sufficiently pleaded the existence of a trade secret, as the plaintiff's complaint "set[] forth allegations regarding the formulation of its [products], as well as customer lists and other information used to market [its products]." *Id.* at *3.

The district court also noted that the definition of a trade secret under the DTSA is broad and includes "information that derives independent economic value from not being generally known to or ascertainable by other persons, that is the subject of reasonable efforts to maintain the information's secrecy." *Id.*[13] Notably, even if a compilation of information consists of "readily available" information, "it may be protected as a trade secret given the difficulty and expense of compiling the information." *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. 14-00847, 2016 WL 900577, at *4 (W.D. Tex. Mar. 2, 2016) (citing *Zoecon Indus. v. Am. Stockman Tag Co.*, 713 F.2d 1174, 1179 (5th Cir. 1983)).

In this case, CLS alleges Mr. Rulh "accessed CLS' proprietary and confidential electronic data" including Plaintiff's financial statements, customer lists, and sales records, which are kept on Plaintiff's "secure and protected computer system." R. Doc. 98 at ¶ 98. Moreover, Plaintiff alleges it "maintains its Confidential Information as confidential within CLS and does not share this information outside of CLS," R. Doc. 98 at ¶ 38, which Plaintiff alleges makes the information "highly valuable." *Id.* at ¶ 39. Finally, Plaintiff alleges it "derives a competitive advantage and independent economic value, both actual and potential, from the Confidential Information, because the Confidential Information is not generally known to the public or to others who can obtain economic value from its

---

[13] *See also SPBS, Inc. v. Mobley*, No. 18-391, 2018 WL 4185522, at *4 (E.D. Tex. Aug. 31, 2018) (finding pricing, contracts, customer lists, and client contacts were trade secrets); *BRG Insurance Solutions, LLC v. O'Connell*, No. 16-2448, 2017 WL 7513649, at *8 (N.D. Tex. July 18, 2017) (finding plaintiffs had stated a claim under the DTSA based on the allegation defendant had stolen their client list); *Mission Measurement Corp. v. Blackbaud, Inc.*, 216 F. Supp. 3d 915, 920–21 (N.D. Ill. 2016) (holding that a complaint was well-pleaded when it identified the purported trade secrets as including "business models, . . . business plans, and product development plans").

disclosure or use." *Id.* at ¶ 39. CLS has substantiated each of these allegations.

With respect to Mr. Rulh's assertion that CLS has no evidence that its customer and revenue lists held independent economic value, CLS offers the deposition testimony of its corporate officer, Mr. Sens. Mr. Sens testified that the CLS customer list, which includes corresponding revenues for each customer, held an independent economic value, explaining that if CLS' competitors were to obtain the CLS customer list,

> then that would give them a more competitive advantage on who to target if they were going to go—seriously go after my business. Just like if a brand new start-up was to come up and have my customer list with my revenues since the start of the company, they're going to go, yep, this is where we're going first.

R. Doc. 252-4 at 11. Although Mr. Rulh states in his affidavit that CLS' revenues are generally known, Mr. Sens testified they are not. Thus, there exists a genuine issue of material fact as to whether the CLS customer and revenue lists have independent economic value.

Finally, Mr. Rulh contends CLS has no evidence it made reasonable efforts to protect its trade secrets. In opposition, CLS again points to the deposition testimony of its corporate officer, Mr. Sens. *Id.* In his deposition, Mr. Sens testified that: (1) CLS' financial records were stored in an electronic system, (2) the system is password-protected, (3) the employees with access executed confidentiality agreements, in which the employees acknowledged that the information was protected, and (4) that CLS specifically instructed Ms. Janet Pipitone, who Mr. Rulh admits provided him with CLS' alleged trade secrets, that she was not permitted to provide any financial information to Mr. Rulh. *Id.* at 29–32.

This testimony, which contradicts Mr. Rulh's assertion to the contrary, is sufficient to create a genuine issue of material fact as to whether CLS took sufficient steps to keep its confidential information a secret. *CheckPoint Fluidic Sys. Int'l v. Guccione*, No. 10-4505, 2012 WL 3579838, at *17–18 (E.D. La. Aug. 17, 2012) (holding that "requiring employees to sign a confidentiality

agreement as a condition of employment, by password protecting certain confidential and proprietary information and limiting access to those passwords, and by requiring confidentiality agreements before disclosing" trade secrets constituted reasonable efforts to protect trade secrets).

It is undisputed that Mr. Rulh took CLS' customer list. Whether CLS' customer list constitutes a trade secret and the extent to which CLS kept its customer list a secret is a question of fact inappropriate for a determination on summary judgment. *See Ruby Slipper Café v. Belou*, No. 18-1548, 2019 WL 1254897, at *6 (E.D. La. Mar. 19, 2019) (quoting *CheckPoint Fluidic Sys. Int'l, Ltd. v. Guccione*, 888 F. Supp. 2d 780, 796 (E.D. La. 2012)); *Oneida Grp., Inc. v. Steelite Int'l U.S.A., Inc.*, No. 17-957, 2017 WL 6459464 at *6–7 (E.D.N.Y. Dec. 15, 2017) (collecting cases). Moreover, there exists a genuine issue of material fact as to whether CLS' customer and revenue lists derived independent economic value and the extent to which CLS took steps to keep these lists secret. Thus, Mr. Rulh is not entitled to summary judgment on this basis.

### b. Misappropriation of the Trade Secret

Mr. Rulh next argues CLS has no evidence he misappropriated the alleged trade secrets. The DTSA defines "misappropriation" as:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
> > (i) used improper means to acquire knowledge of the trade secret;
> > (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
> > > (I) derived from or through a person who had used improper means to acquire the trade secret;
> > > (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> > > (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
> > (iii) before a material change of the position of the person, knew or had reason to know that—
> > > (I) the trade secret was a trade secret; and
> > > (II) knowledge of the trade secret had been acquired by accident or mistake . . . .

24

18 U.S.C. § 1839(5). The statute further defines improper means as including "breach or inducement of a breach of a duty to maintain secrecy." *Id.* § 1839(6)(A).

In his motion for summary judgment, as in his motion to dismiss, Mr. Rulh argues CLS has no evidence he took trade secrets by improper means, as he was "arguably . . . still a member of CLS." R. Doc. 239-1 at 23; R. Doc. 103-2 at 15. In opposition, Plaintiff submits that, at the time Mr. Rulh took the documents, he had no authority to do so. R. Doc. 252 at 16. The Court previously held this allegation was sufficient to overcome Mr. Rulh's motion to dismiss. R. Doc. 126 at 9. At the summary judgment stage, CLS has substantiated that allegation with competent evidence, pointing to, among other pieces of evidence, an email Mr. Rulh sent to Mr. Morris Kahn, in which Mr. Rulh states he "had Ms. Janet [Pipitone] pull recent numbers for TD and CLS *as I don't have access anymore.*" R. Doc. 252-11 (emphasis added). Thus, there is a genuine issue of material fact as to whether Mr. Rulh "ha[d] reason to know that the trade secret was acquired by improper means" or that it was "derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(A), (B)(ii)(III). As a result, the Court finds a genuine issue of material fact as to whether Mr. Rulh misappropriated CLS' trade secrets as defined by the DTSA.

Because there exists a genuine issue of material fact as to whether CLS can prove the DTSA's essential elements, the Court will deny Mr. Rulh's motion for summary judgment with respect to this claim.

### 3. Louisiana Uniform Trade Secrets Act

Mr. Rulh next contends CLS has no evidence upon which a jury could base a finding that Mr. Rulh violated the LUTSA. R. Doc. 239-1 at 26. However, Mr. Rulh states the bases for this argument is the same as his argument that CLS has no evidence upon which a jury could base a

finding that he violated the DTSA. *Id.* at 26–27. As a result, the Court will deny Mr. Rulh's motion for summary judgment with respect to CLS' LUTSA claim.

### 4. Computer Fraud and Abuse Act

Mr. Rulh next moves for summary judgment on CLS' CFAA claim. He argues the allegations CLS brings in its second amended complaint are "conclusory" and that the record shows "CLS clearly cannot support a cognizable loss under the CFAA." R. Doc. 239-1. Much like his argument for why he is entitled to summary judgment on CLS' DTSA claim, Mr. Rulh again largely recasts the arguments this Court already rejected in his motion to dismiss.

As the Court previously explained, the CFAA prohibits unauthorized access to a "protected computer," as defined by 18 U.S.C.A. § 1030(e)(2), for the purposes of obtaining information, causing damage, or perpetrating fraud, 18 U.S.C. § 1030(a)(2). The CFAA defines "protected computer" as "a computer . . . which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C.A. § 1030(e)(2)(B). "Pleading specific facts that the defendant accessed a computer connected to the internet is sufficient to establish that the accessed computer was 'protected.'" *Merritt Hawkins & Associates v. Gresham*, 948 F. Supp. 2d 671, 674 (N.D. Tex. 2013) (citing *United States v. Trotter*, 478 F.3d 918, 921 (8th Cir. 2007) (holding that the accessed computer was "protected" because defendant "admitted the computers were connected to the Internet"); *Becker v. Toca*, No. 07-7202, 2008 WL 4443050, at *5 (E.D. La. Sept. 26, 2008) (finding the plaintiff sufficiently pleaded the computer was "protected" because he claimed "computers were connected to the internet")).

To prevail on a civil CFAA claim, a plaintiff must prove that one of the first five factors listed in 18 U.S.C. § 1030(c)(4)(A)(i) is present. *See* 18 U.S.C. § 1030(g). In this case, CLS alleges the first factor, a "loss" during a one-year period of at least $5,000 in value. *See* § 1030(c)(4)(A)(i)(I). "Loss" is defined under the CFAA as:

any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.

18 U.S.C. § 1030(e)(11).

In this case, as he did in his motion to dismiss, Mr. Rulh argues CLS' CFAA claim fails, as CLS has no evidence it suffered an interruption in service as a result of Mr. Rulh's theft. Moreover, Mr. Rulh contends that, "although CLS spent money on a company to forensically look at all previous and current defendants' computers, CLS did not hire a company to look at CLS' own computer to determine if there was any damage." R. Doc. 239-1 at 29. In opposition, CLS argues the Court has already rejected Mr. Rulh's interruption of service argument and that CLS has evidence demonstrating that it sustained a loss in excess of $5,000 in investigating and responding to Mr. Rulh's unauthorized access. R. Doc. 252 at 19.

As the Court explained in its order denying Mr. Rulh's motion to dismiss, several of our sister circuits have held that the plain language of the statutory definition includes two separate types of loss: (1) reasonable costs incurred in connection with such activities as responding to a violation, assessing the damage done, and restoring the affected data, program system, or information to its condition prior to the violation, as Plaintiff alleges here; and (2) any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. *See Brown Jordan International, Inc. v. Carmicle*, 846 F.3d 1167, 1173–74 (11th Cir. 2017); *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1073–74 (6th Cir. 2014); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009); *see also* 18 U.S.C. § 1030(e)(11). Because the statute is written in the disjunctive, it is only the second type of loss that requires a plaintiff to prove its losses resulted from an interruption in service. On the other hand, the first type of loss may be proven independent of an interruption of service. In sum, "'Loss' includes the direct costs of

responding to the violation in the first portion of the definition, and consequential damages resulting from interruption of service in the second." *Brown*, 846 F.3d at 1174.

In its opposition to Mr. Rulh's motion to dismiss, CLS made plain that it alleges a loss of the first type. Now on summary judgment, CLS provides evidence to substantiate its allegation. For example, CLS offers the declaration of Mr. Sens, who states, "To date, CLS has incurred substantial expense, exceeding $20,000.00 in obtaining . . . forensic examinations" of:

> (1) the CLS owned desktop computer used by Janet Pipitone prior to her termination, (2) the CLS owned desktop computer used by Shawana Harris prior to her termination, (3) the CLS owned laptop used by Ms. Harris prior to her termination; and (4) the CLS owned laptop used by Mr. Rulh prior to his expulsion from CLS.

R. Doc. 252-8 at 3. Thus, the Court finds there is a genuine issue of material fact as to whether the forensic examinations of these computers were conducted in "respon[se] to the violation" and whether CLS actually incurred these costs. As a result, the Court concludes Mr. Rulh is not entitled to summary judgment on CLS' CFAA claim.

### 5. Louisiana Unfair Trade Practices Act and CLS' Claims for Conversion, Fraud, and Breach of Fiduciary Duty

Finally, Mr. Rulh argues CLS has no evidence it has suffered any damages as a result of his alleged conversion, fraud, breach of fiduciary duties, or alleged violations of the LUTPA. R. Doc 239-1 at 30–31; R. Doc. 273 at 6–7. He submits, "CLS has stipulated that it has suffered no recoverable damages arising from these alleged acts, and, consequently, these claims are not justiciable and must also suffer dismissal." R. Doc. 239-1 at 1. As Mr. Rulh submits CLS "has not suffered any damages in the form of lost revenues, lost profits, or otherwise," he has borne his burden on summary judgment with respect to these claims, thereby shifting the burden to CLS. *Id.* at 30–31. CLS offers no opposition to this contention. As a result, the Court will grant Mr. Rulh summary judgment with respect to these claims.

## IV. CONCLUSION

For the foregoing reasons;

**IT IS ORDERED** that Defendant Donald Rulh's Motion for Partial Summary Judgment, R. Doc. 209, be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that the Motion for Partial Summary Judgment filed by Plaintiff Complete Logistical Services, LLC, R. Doc. 229, be **GRANTED** in part and **DENIED** in part. With respect to CLS' request that the Court hold that, "in the event Mr. Rulh is . . . entitled to any increase in his expulsion price, any increased expulsion price must be paid in monthly installment, over a term not to exceed 120 months, and evidenced by a promissory note, as required by the plain terms of the [CLS] Operating Agreement" the motion is **GRANTED**. The motion is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that CLS' motion to Exclude the Testimony of Mr. Athen M. Sweet, R. Doc. 231, be **GRANTED** in part and **DENIED** in part. With respect to any legal opinions interpreting the CLS Operating Agreement offered by Mr. Sweet, the motion is **GRANTED**. The motion is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that Mr. Rulh's Motion for Summary Judgment, R. Doc. 239, be **GRANTED** in part and **DENIED** in part. With respect to CLS' claims for conversion, fraud, breach of fiduciary duty, and violations of the LUTPA, the motion is **GRANTED**. With respect to all other claims, however, the motion is **DENIED**.

New Orleans, Louisiana on this 6th day of June, 2019.

_____
Eldon E. Fallon
U.S. District Court Judge